WR-80,923-02
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 6/1/2015 2:03:46 PM
Accepted 6/1/2015 2:28:04 PM
ABEL ACOSTA
CLERK

## No. WR-80,923-02

## In the Court of Criminal Appeals of Texas

RECEIVED
COURT OF CRIMINAL APPEALS
6/1/2015
ABEL ACOSTA, CLERK

## In re RODERICK HARRIS,
### Relator

## No. W09-00409-Y(A)
## Criminal District Court No. 7
## of Dallas County, Texas

---

## STATE'S RESPONSE

## To Relator Roderick Harris's Motion for Leave to File Application for Writ of Prohibition, Application for Writ of Prohibition, and Request for Injunction

Susan Hawk
Criminal District Attorney
Dallas County, Texas

Shelly O'Brien Yeatts
Assistant District Attorney
State Bar No. 24033487
133 N. Riverfront Blvd., LB-19
Dallas, TX 75207-4399
(214) 653-3625
(214) 653-3643 *fax*
syeatts@dallascounty.org

REAL PARTY IN INTEREST

## IDENTITY OF PARTIES AND COUNSEL

1.  Relator is Roderick Harris, who is represented by the Office of Capital Writs. Counsel of record is Brad Levenson, Robert Romig, and Jeremy Schepers.

2.  Respondent is the Honorable Elizabeth Frizell, Presiding Judge of the Criminal District Court No. 7 of Dallas County, Texas.

3.  The Real Party in Interest is Susan Hawk, Criminal District Attorney of Dallas County, Texas. Counsel of record is Shelly O'Brien Yeatts.

## TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ............................................................... ii

TABLE OF AUTHORITIES ..................................................................................... iv

STATE'S RESPONSE ................................................................................................ 1

ISSUE PRESENTED .................................................................................................. 1

STATEMENT OF THE CASE AND STATEMENT OF FACTS ......................... 1

ARGUMENT .............................................................................................................. 4

PRAYER ................................................................................................................... 11

VERIFICATION ...................................................................................................... 11

CERTIFICATE OF SERVICE ............................................................................... 12

EXHIBITS .................................................................................................................

Exhibit A:  Initial Application for Writ of Habeas Corpus (without exhibits)

Exhibit B:  Order Designating Issues for an 11.071 Hearing

Exhibit C:  Trial Court's Amended Order on State's Motion for Disclosure of Roderick Harris's Trial Files, issued April 24, 2015

# TABLE OF AUTHORITIES

**Cases**

*Burnett v. State,*
642 S.W.2d 765 (Tex. Crim. App. 1982) ...................................................................9

*Cameron v. State,*
241 S.W.3d 15 (Tex. Crim. App. 2007) ...................................................................6

*Carmona v. State,*
941 S.W.2d 949 (Tex. Crim. App. 1997). ...................................................................6

*Harris v. State,* No. AP-76,810, 2014 Tex. Crim. App. Unpub. LEXIS 517
(Tex. Crim. App. May 21, 2014) (not designated for publication) ...................................1

*In re McCann,*
422 S.W.3d 701 (Tex. Crim. App. 2013) ...................................................................passim

*Pope v. State,*
207 S.W.3d 352 (Tex. Crim. App. 2006) ...................................................................6

*Simon v. Levario,*
306 S.W.3d 318 (Tex. Crim. App. 2009) ...................................................................5

*State ex rel. Lykos v. Fine,*
330 S.W.3d 904 (Tex. Crim. App. 2011) ...................................................................4

*State ex rel. Wade v. Mays,*
689 S.W.2d 893 (Tex. Crim. App. 1985) ...................................................................5

*State v. Thomas,*
428 S.W.3d 99 (Tex. Crim. App. 2014) ...................................................................7

*Strickland v. Washington,*
466 U.S. 668 (1984) ...................................................................3

*Woodruff v. State,*
330 S.W.3d 709 (Tex. App.—Texarkana 2010, pet. ref'd) ...................................................................7

**Statutes**

Tex. Code Crim. Proc. Ann. art. 11.071, §§ 8(a), 9(a) (West Supp. 2014)......................7, 8

**Rules**

Tex. R. Evid. 104(a)..........................................................................................................6

Tex. R. Evid. 503(a), (b)...................................................................................................6

Tex. R. Evid. 503(b)(2)......................................................................................................6

Tex. R. Evid. 503(c)..........................................................................................................9

Tex. R. Evid. 503(d)(3)......................................................................................................7

## STATE'S RESPONSE

The Real Party in Interest, Susan Hawk, the Criminal District Attorney of Dallas County, Texas, hereinafter referred to as "the State," submits this response to Relator Roderick Harris's Motion for Leave to File Application for Writ of Prohibition, Application for Writ of Prohibition, and Request for Injunction.

## ISSUE PRESENTED

Whether the trial court, pursuant to its authority to direct the gathering of evidence for the resolution of habeas claims under Article 11.071 of the Code of Criminal Procedure, may exercise discretion to order Relator Roderick Harris to produce to the State the portions of his trial files relevant to his habeas claims of ineffective assistance of prior counsel.

## STATEMENT OF THE CASE AND STATEMENT OF FACTS

Relator Roderick Harris was convicted and sentenced to death in May 2012 for the capital murder of Alfredo Gallardo in the course of a robbery. This Court affirmed his conviction and sentence on direct appeal. *Harris v. State*, No. AP-76,810, 2014 Tex. Crim. App. Unpub. LEXIS 517 (Tex. Crim. App. May 21, 2014) (not designated for publication). Attorneys Brad Lollar, Doug Parks, Mike Howard, and Calvin Johnson represented Harris at trial. After trial, the court appointed the Office of Capital Writs (OCW) to represent Harris in his Article

1

11.071 application for writ of habeas corpus. With Harris's authorization, trial counsel tendered Harris's original trial files to OCW. *See generally In re McCann*, 422 S.W.3d 701, 704-705 (Tex. Crim. App. 2013) (explaining that the contents of the trial file belongs to the defendant).

Following an investigation, OCW filed a post-conviction application for writ of habeas corpus on Harris's behalf, challenging his conviction and death sentence. (Exhibit A). The application is pending in the trial court. Five out of six of Harris's claims for relief in the application (not counting subparts) allege ineffective assistance of counsel. These claims encompass counsel's performance during the pre-trial investigation, the guilt-innocence phase, and the punishment phase and include allegations that trial counsel was ineffective for:

- failing to sufficiently investigate and present punishment phase evidence that Harris suffers from fetal alcohol spectrum disorder and was exposed to toxic levels of lead as a child (Application at 16-41);

- failing to present sufficient expert testimony in the punishment phase to explain the mitigating impact of Harris's life history (Application at 41-70);

- failing to offer punishment phase evidence in the form of Harris's own gang expert testimony to rebut the State's evidence of his involvement in a West Dallas street gang (Application at 70-75);

- failing to object to evidence in the punishment phase that Harris wore a restraint device while being transported in a courthouse elevator during jury selection (Application at 75-83);

2

- failing to object during the guilt-innocence phase to the admission of autopsy photos of the second decedent at the scene, Carlos Gallardo, and to the medical examiner's corresponding testimony (Application at 84-95);

- failing to raise guilt-innocence phase objections to the admission of (a) crime scene photographs and police officer testimony regarding attempts to save the complainant's life at the scene, (b) references in police officers' testimony that Harris shot at the officers when he exited the Gallardo family's trailer, (c) evidence regarding a gun, ammunition, and gloves seized from Harris's vehicle, which authorities found parked in the driveway next door, and (d) a jail book-in sheet which identified Harris's vehicle (Application at 96-104).

(Exhibit A). Harris's across-the-board challenges to trial counsel's investigation, treatment of certain guilt-innocence evidence, and failure to present sufficient or particular mitigation evidence in this case place trial counsel's entire performance at issue. In light of these claims, the trial court must make findings of fact and conclusions of law regarding whether Harris's attorneys performed deficiently and, if so, whether that performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

The trial court's "Order Designating Issues" in the habeas proceeding designated all of Harris's ineffective assistance claims for further fact gathering and scheduled an evidentiary hearing. (Exhibit B). On the State's motion and in preparation for the evidentiary hearing, the trial court ordered OCW to provide the State with access to the portions of Harris's trial files relevant to his claims of ineffective assistance. (Exhibit C).

3

OCW filed an application for writ of prohibition and request for injunction with this Court, seeking extraordinary relief from the trial court's order.[1] Before making a decision on Harris's motion for leave to file, this Court has provided the State and the trial court an opportunity to respond.

## ARGUMENT

Harris fails to demonstrate he is entitled to the extraordinary relief he requests, namely, to be free from the trial court's order to provide the State with access to the portions of his trial files relevant to his ineffective assistance of counsel claims.

Relief on a petition for writ of prohibition is available only if a relator shows that he has (1) a clear and indisputable right to the relief sought and (2) no other adequate legal remedy available. *McCann*, 422 S.W.3d at 704; *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 907 (Tex. Crim. App. 2011). The State agrees that Harris has no other vehicle for obtaining relief from the trial court's order to provide the State access to his trial files; however, he cannot show a clear right to relief.

---

[1] In other Dallas County death penalty writs in which OCW has been appointed to represent an applicant, OCW has acknowledged the waiver of privileges in relation to ineffective assistance of counsel claims and agreed to release the files. In *Ex parte Medina*, No. W07-32923-S(A), OCW turned over all the trial files. In *Ex parte Garry Green*, No. W09-59380-S(A), OCW turned over portions of the files and provided a privilege log of excepted items. In *Ex parte Juan Lizcano*, No. W05-59563-S(A), OCW agreed to release the files but the trial court substituted other counsel before the release actually occurred. Despite its position on release of trial files in the past, OCW has in this instance declined to release the trial files.

4

To demonstrate a clear right to relief, Harris must show the act he seeks to prohibit is ministerial and does not involve a discretionary or judicial decision. An applicant satisfies this requirement if the facts and circumstances dictate but one rational decision under unequivocal, well-settled, and clearly controlling legal principles. *See Simon v. Levario*, 306 S.W.3d 318, 320 (Tex. Crim. App. 2009) (citing *State ex rel. Young v. Sixth Judicial District Court of Appeals*, 236 S.W.3d 207, 210 (Tex. Crim. App. 2007)); *State ex rel. Wade v. Mays*, 689 S.W.2d 893, 897 (Tex. Crim. App. 1985). The relator on a writ of prohibition "must make a clear showing that under certain facts, the law is subject to but one interpretation; he then must show that undisputed facts exist which entitle him unequivocally to a right flowing from that single interpretation." *Wade,* 689 S.W.2d. at 898 n.11. Even if the issue is one of first impression, a relator may establish a clear right to relief where well-settled law governs the issue. *McCann*, 422 S.W.3d at 704.

Evidence which may later reflect and be relevant to a defense team's effective or ineffective representation of a client takes many forms, including communications between the attorneys and the client, communications among the attorneys and their experts or consultants, materials generated and collected by the attorneys and their agents, evaluations performed at the attorneys' request, the attorneys' mental impressions and analysis, and the tangible records and files maintained by the attorneys. Harris's assertions of post-conviction ineffective

5

assistance of counsel claims constitute a waiver of the attendant attorney-client and work-product privileges and allow the State access to communications and materials which would usually be protected from disclosure, including the contents of his trial files.

The attorney-client privilege is an evidentiary privilege which protects against the compelled disclosure of confidential communications. *Pope v. State*, 207 S.W.3d 352, 357 (Tex. Crim. App. 2006); *see* Tex. R. Evid. 503(a), (b). The attorney-client privilege belongs to and protects the client. *Pope*, 207 S.W.3d at 357; *Carmona v. State*, 941 S.W.2d 949, 953 (Tex. Crim. App. 1997). Preliminary questions concerning the existence of a privilege shall be determined by the trial court. Tex. R. Evid. 104(a). In determining whether the attorney-client privilege has been waived, a court examines the totality of the circumstances and reasonable inferences therefrom. *Carmona*, 941 S.W.2d 954.

The attorney work-product doctrine or privilege functions as a qualified privilege to prevent an attorney from being compelled to disclose his work product to an adversary. *Pope*, 207 S.W.3d at 357-358. The purpose of the doctrine is to stimulate the production of information for trials. *Id.* Although not expressly provided for, the attorney work-product privilege falls within Texas Rule of Evidence 503(b)(2). *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007); *see* Tex. R. Evid. 503(b)(2) (indicating that a criminal client has a privilege

6

to prevent his attorney or the attorney's representative from disclosing facts which developed as a result of the attorney-client relationship).

Harris's assertions of post-conviction ineffective assistance of counsel claims have resulted in a waiver of the attorney-client and work-product privileges. *See State v. Thomas*, 428 S.W.3d 99, 106 (Tex. Crim. App. 2014) ("When counsel faces an ineffective-assistance claim, the attorney-client privilege is waived, and trial counsel has the opportunity to explain his actions"); Tex. R. Evid. 503(d)(3) (establishing that the attorney-client privilege does not extend to communications "relevant to an issue of breach of duty by the lawyer to the client or by the client to the lawyer"); *Woodruff v. State*, 330 S.W.3d 709, 728 (Tex. App.—Texarkana 2010, pet. ref'd) (holding that the exceptions of Texas Rule of Evidence 503(d) also apply to the work-product privilege in the proper circumstances).

The parties agree that Harris's assertions of ineffective assistance of counsel constitute a waiver of his attorney-client privileges. The parties disagree whether the trial court may, based on Harris's waiver, order his habeas counsel to disclose to the State the contents of the trial files relevant to his claims.

Article 11.071 of the Code of Criminal Procedure, which governs habeas proceedings in death penalty cases, requires the trial court to determine what, if any, fact issues require resolution and the manner in which those issues should be resolved. *See* Tex. Code Crim. Proc. Ann. art. 11.071, §§ 8(a), 9(a) (West Supp.

7

2014). The statute gives the trial court discretion to use various avenues for resolving issues, including requiring affidavits, depositions, interrogatories, and evidentiary hearings and using personal recollection. *Id.* § 9(a). Through these avenues, including an evidentiary hearing, the trial court receives evidence relevant to the contested fact issues. In conjunction with its authority to hold an evidentiary hearing in this habeas proceeding and receive evidence, the trial court ordered OCW to provide the State access to the portions of Harris's trial files that are relevant to his ineffective assistance of trial counsel claims prior to the hearing. Nothing in Article 11.071 prohibits a trial judge from ordering such discovery during the evidence gathering process.

Moreover, there is no other legal bar to ordering this discovery. Harris does not claim the files are not discoverable. Indeed, he concedes that his ineffective assistance of counsel complaints act as a waiver of his privilege. He argues, however, that the court must order his trial lawyers—not his writ lawyers—to turn the files over. Harris does not explain why the court must go elsewhere for the files, and no legal reason is otherwise apparent. The trial files belong to Harris. *See McCann*, 422 S.W.3d at 704-705 (reaffirming that a client owns the contents of his or her file). And his current counsel has possession of originals and/or copies.

8

Harris seeks to place the burden on the individual trial attorneys to determine the application and scope of Harris's attorney-client waiver, i.e. to identify which documents in the files are relevant to his ineffective assistance of counsel claims. However, the right to claim or waive the attorney-client privilege belongs to Harris, not his trial attorneys. *See Burnett v. State*, 642 S.W.2d 765, 770 (Tex. Crim. App. 1982) ("The law is 'perfectly plain that the waiver [of the client-attorney privilege], like the privilege, belongs solely to the client, and not to the attorney.'"); Tex. R. Evid. 503(c) (indicating that the lawyer may claim the privilege "only on behalf of the client").

The State agrees with OCW that it does not "represent" trial counsel for purposes of this writ proceeding; however, the State is in the position of defending against Harris's habeas claims, which he has elected to formulate and file. Harris contends that "[h]ow trial counsel chooses to defend themselves from these claims, and to what extent the limited waiver of privileged information will be effectuated, is a decision for trial counsel, not the State to make." (Application at 8). This inference that trial counsel is responsible for release of documents from the files ignores this Court's holdings that a criminal defendant's file is the defendant's property. *See McCann*, 422 S.W.3d at 704-705; *Burnett*, 642 S.W.2d at 769 (holding a tape recording of the defendant's pre-hypnotic interview was the defendant's property and subject to the attorney-client privilege). Moreover, that

9

the trial files might be available through an alternative source does not mean the trial court did not have discretion to order Harris to release them.

The trial court determines the extent of the waiver of privileged information based on the relevancy of the information to the asserted claims. These determinations properly lie solely within the trial court's discretion. Contrary to Harris's contentions, the State is not seeking to determine the extent of the waiver. Furthermore, Harris acknowledges that documents from his trial files relevant to his ineffective assistance of counsel claims may be disclosed and admitted into evidence at a hearing. Nothing deprives the trial court of the discretion to regulate the timing of the disclosure of the files and to order it to occur earlier.

By accusing his counsel of ineffectiveness, Harris has waived any privileges attendant to his trial files, which in effect record much of the representation. The trial court's order for Harris to produce the files to the State prior to an evidentiary hearing was discretionary; Harris presents this Court with no authority that deprives the trial court of its discretion to order production of the files. The trial court here exercised a manifestly judicial—not a ministerial—function. Accordingly, this Court should deny Harris's request for the extraordinary remedy of prohibition.

## PRAYER

The State prays that this Court deny Harris's motion for leave to file his application for a writ of prohibition and the application itself. Moreover, the State asks this Court to lift its order staying the discovery order and any hearings on the habeas application.

Respectfully submitted,

_[signature]_

Shelly O'Brien Yeatts
Assistant District Attorney
State Bar No. 24033487
133 N. Riverfront Blvd., LB-19
Dallas, TX 75207-4399
(214) 653-3625
(214) 653-3643 *fax*
syeatts@dallascounty.org

Susan Hawk
Criminal District Attorney
Dallas County, Texas

## VERIFICATION

STATE OF TEXAS §
§
COUNTY OF DALLAS §

I, Shelly O'Brien Yeatts, attest and affirm that I have reviewed the response, that I have personal knowledge of the factual statements it contains, and that those factual statements are true and correct and supported by competent evidence included in the appendix or record.

_[signature]_

Shelly O'Brien Yeatts

11

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing response has been served on the following on June 1, 2015:

Hon. Elizabeth Frizell
Criminal District Court No. 7
133 N. Riverfront Blvd.
Dallas, Texas 75207

Brad D. Levenson
Robert Romig
Office of Capital Writs
1700 N. Congress Ave., Suite 460
Austin, Texas 78711
Brad.Levenson@owc.texas.gov
Robert.Romig@ocw.texas.gov
ATTORNEYS FOR RELATOR

_____
Shelly O'Brien Yeatts

# EXHIBIT A

**Roderick Harris's Initial Application for Writ of
Habeas Corpus (without exhibits)**

FILED
2014 JUN 11 PM 3:27

GA~ . ~IMONS
    [~· .· SLERK
DA:~ ~ .IEXAS
~~~~ ~~PUTY

WW09-00409-Y (A)

# IN CRIMINAL DISTRICT COURT NO. 7
# DALLAS COUNTY, TEXAS

|  |  |
|---|---|
| EX PARTE ) | **Trial Cause No.** |
| RODERICK HARRIS, ) | **F09-00409** |
| APPLICANT ) | |
| ) | |
| ) | |
| ) | |
| ) | |

## INITIAL APPLICATION FOR WRIT OF HABEAS CORPUS (FILED PURSUANT TO TEX. CODE CRIM. PROC. ART. 11.071)

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-mail: Robert.Romig@ocw.texas.gov)
SAM FARINA-HENRY (No. 24082979)
(E-mail: Sam.Farina-Henry@ocw.texas.gov)
RYAN CARLYLE KENT (No. 24090205)
(E-mail: Ryan.Kent@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 North Congress Avenue, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

# TABLE OF CONTENTS

APPLICATION FOR A WRIT OF HABEAS CORPUS.............................................. 1

PROCEDURAL HISTORY................................................................................... 4

    A. Trial Court Proceedings............................................................................ 4

    B. State Appellate Proceedings ..................................................................... 6

    C. State Habeas Proceedings ......................................................................... 6

STATEMENT OF FACTS ................................................................................... 6

    A. Guilt/Innocence Phase Presentation ........................................................ 6

    B. Punishment Phase Presentation ............................................................... 7

STANDARD OF CARE ....................................................................................... 9

    A. Ineffective Assistance of Trial Counsel................................................... 9

    B. Ineffective Assistance of Appellate Counsel........................................ 13

    C. Scope of the Waiver of Attorney-Client Privilege ................................ 13

ARGUMENT ..................................................................................................... 16

CLAIM ONE: TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE
BY FAILING TO SUFFICIENTLY INVESTIGATE AND PRESENT CERTAIN
MITIGATING EVIDENCE DURING HARRIS'S TRIAL .................................. 16

    A. Trial Counsel Was Ineffective for Failing to Investigate and Present
       Available Evidence that Harris Suffers from Fetal Alcohol Spectrum
       Disorder.................................................................................................. 20

    B. Trial Counsel Failed to Uncover and Present Information That Harris Was
       Exposed to Toxic Levels of Lead as a Child.......................................... 34

    C. Trial Counsel Failed to Retain and Present Testimony from Expert
       Witnesses to Explain the Mitigating Impact of Harris's Life History ......... 41

    D. Trial Counsel's Failure to Present This Mitigating Information Was
       Deficient and Prejudiced Harris's Trial................................................. 69

CLAIM TWO: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT A GANG EXPERT TO OFFER AN EXPERT OPINION TO REBUT THE PROSECUTION'S EVIDENCE OF HARRIS'S GANG INVOLVEMENT 70

    A. Relevant Facts ........................................................................ 70

    B. Trial Counsel Was Ineffective for Failing to Rebut the Prosecution's Evidence of Harris's Gang Affiliation by Presenting Testimony from a Gang Expert ............................................................. 72

    C. Harris was Prejudiced by Trial Counsel's Failure to Present Testimony from a Gang Expert ................................................... 75

CLAIM THREE: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO INHERENTLY PREJUDICIAL TESTIMONY INFORMING THE JURY THAT HARRIS WAS RESTRAINED ...................................... 75

    A. Restraint Evidence Presented to Jury at Harris's Trial ............... 76

    B. Restraint Evidence Was Objectionable ..................................... 78

    C. Trial Counsel Was Ineffective for Failing to Object to Restraint Evidence 80

    D. Harris Was Prejudiced by Trial Counsel's Failure to Object ...... 82

CLAIM FOUR: HARRIS WAS DENIED DUE PROCESS BY TRIAL COUNSEL'S FAILURE TO OBJECT OT THE ADMISSION OF FORENSIC EVIDENCE CONCERNING CARLOS GALLARDO ............................. 84

    A. Relevant Facts ........................................................................ 84

    B. Legal Standards ...................................................................... 86

    C. Trial Counsel Performed Ineffectively by Failing to Object to Testimony and Exhibits Concerning the Death of Carlos Gallardo ................. 89

    D. Conclusion ............................................................................. 95

CLAIM FIVE: HARRIS WAS DENIED DUE PROCESS BY TRIAL COUNSEL'S FAILURES TO OBJECT TO PREJUDICIAL, CUMULATIVE, AND INADMISSIBLE EVIDENCE .............................................. 95

    A. Relevant Facts ........................................................................ 96

B. Legal Standards ............................................................................. 96

C. Trial Counsel Performed Ineffectively by Failing to Object to Prejudicial and Cumulative Testimony Concerning the Crime Scene and Harris's Shooting at Police Officers, as well as to Prejudicial and Inadmissible Evidence Seized from the Ford Crown Victoria .......................... 97

D. Conclusion ................................................................................ 103

CLAIM SIX: HARRIS'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE TRIAL COURT REFUSED TO INSTRUCT THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE ............ 104

A. As Applied to Harris's Jury, the "10-12 Rule" Unconstitutionally Impaired a Juror's Ability to Answer Special Issue Three ............................ 106

B. The Supreme Court Has Invalidated Jury Instructions That Place an Added Burden on the Sentencer Before Finding Mitigating Circumstances ......... 109

C. Conclusion ................................................................................ 111

PRAYER FOR RELIEF ................................................................... 112

# TABLE OF AUTHORITIES

**Cases**

*Allen v. United States*, 164 U.S. 492 (1896).........................................................108

*Arizona v. Washington*, 434 U.S. 497 (1978).....................................................108

*Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003)..........................................14

*Bobby v. Van Hook*, 558 U.S. 4 (2009)................................................................10

*Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388 (2011)................................10

*Downum v. United States*, 372 U.S. 734 (1963)...............................................108

*Evitts v. Lucey*, 469 U.S. 387 (1985)..................................................................13

*Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770 (2011).........................10, 12

*In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 120 F.R.D. 687 (C.D. Cal. 1988).......................................................................................15

*Johnson v. Alabama*, 256 F.3d 1156 (11th Cir. 2001)........................................15

*Laughner v. United States*, 373 F.2d 326 (5th Cir. 1967)..................................14

*Levin v. Ripple Twist Mills, Inc.*, 416 F. Supp. 876 (E.D. Pa. 1976).................15

*McKoy v. North Carolina*, 494 U.S. 433 (1990)...............................................111

*Miller v. Dretke*, 420 F.3d 356 (5th Cir. 2005)..................................................11

*Mills v. Maryland*, 486 U.S. 367 (1988)..........................................109, 110, 111

*Padilla v. Kentucky*, 559 U.S. 356 (2010)..........................................................10

*Porter v. McCollum*, 558 U.S. 30 (2009)..................................................9, 12, 93

*Ries v. Quarterman*, 522 F.3d 517 (5th Cir. 2008).............................................13

*Rompilla v. Beard*, 545 U.S. 374 (2005)..................................................9, 10, 11

*Smith v. Robbins*, 528 U.S. 259 (2000).......................................................passim

*Strickland v. Washington*, 466 U.S. 668 (1984)..........................................passim

*United States v. Basham*, Cr. No. 4:02-992-JFA, 2012 WL 1130657 (D.S.C. Apr. 4, 2012)...............................................................................................................15

*United States v. Pinson*, 584 F.3d 972 (10th Cir. 2009)....................................14

*Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006).....................................................9

*Wiggins v. Smith*, 539 U.S. 510 (2003)........................................................passim

*Williams v. Taylor*, 529 U.S. 362 (2000)............................................................12

*Woodson v. North Carolina*, 428 U.S. 280 (1976)................................................1

**Statutes**

*Alabama v. Lewis*, 36 So. 3d 72 (Ala. Crim. App. 2008).....................................15

*Beall v. Ditmore*, 867 S.W.2d 791 (Tex. App.—El Paso 1993).........................80

*Boone v. State*, 230 S.W.3d 907 (Tex. App.—Houston 2007)............................79

*Cedillos v. State*, 250 S.W.3d 145 (Tex. App.—Eastland 2008)........................79

*Draughon v. State*, 831 S.W.2d 331 (Tex. Crim. App. 1992).....................106, 111

*Ex parte Chandler*, 182 S.W.3d 350 (Tex. Crim. App. 2005)............................70

*Ex parte Ellis*, 233 S.W.3d 324 (Tex. Crim. App. 2007)...................................... 70

*Ex parte Flores*, 387 S.W.3d 626 (Tex. Crim. App. 2012)...................................... 9

*Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006).............. 11, 12, 13, 41

*Ex parte Jimenez*, 364 S.W.3d 866 (Tex. Crim. App. 2012) ...................................... 9

*Ex parte Martinez*, 195 S.W.3d 713 (Tex. Crim. App. 2006)................................... 12

*Ex parte Santana*, 227 S.W.3d 700 (Tex. Crim. App. 2007)............................ 13, 88

*Frazier v. State*, 600 S.W.2d 271 (Tex. Crim. App. 1979)..................................... 102

*In re Dean*, 711 A.2d 257 (N.H. 1998) ...................................................................... 15

*Joseph v. State*, 3 S.W.3d 627 (Tex. App.—Houston [14th Dist.] 1999).............. 14

*Long v. State*, 590 S.W.2d 138 (Tex. Crim. App. 1979)....................................... 102

*Maryland Am. Gen. Ins. v. Blackmon*, 639 S.W.2d 455 (Tex. 1982) ..................... 14

*Meza v .State*, 206 S.W.3d 684 (Tex. Crim. App. 2006) ........................................ 13

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990) ................. 87, 97, 99

*Moreno v. State*, 22 S.W.3d 482 (Tex. Crim. App. 1999) .......................... 87, 88, 97

*Rankin v. State*, 974 S.W.2d 707 (Tex. Crim. App. 1996)...................................... 92

*Robertson v. State*, 777 S.W.2d 427 (Tex. Crim. App. 1989) ................................ 91

*Rogers v. State*, 853 S.W.2d 29 (Tex. Crim. App. 1993)................................... 86, 87

*Saldano v. State*, 70 S.W.3d 873 (Tex. Crim. App. 2002)...................................... 80

*Shuffield v. State*, 189 S.W.3d 782 (Tex. Crim. App. 2005)...................... 87, 94, 97

*State v. Mechler*, 153 S.W.3d 435 (Tex. Crim. App. 2005)..................................... 88

*Stone v. State*, 17 S.W.3d 348 (Tex. Crim. App. 2000) .......................................... 91

*Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999) ...................................... 9

*Waldrip v. Head*, 532 S.E.2d 380 (Ga. 2000) ......................................................... 15

*West v. Solito*, 563 S.W.2d 240 (Tex. 1978)............................................................. 14

*Wiseman v. State*, 223 S.W.3d 45 (Tex. App.—Houston [1st Dist.] 2006)............ 79

*Wood v. State*, No. 09-10-00195-CR, 2012 WL 1448333 (Tex. App.—Beaumont
   Apr. 25, 2012)..................................................................................................... 103

**Other Authorities**

Tex. Code Crim. Proc. art. 37.071 ...................................................... 104, 105

Tex. R. Evid. 101 ..................................................................................... 86

Tex. R. Evid. 402 ..................................................................................... 91

Tex. R. Evid. 403 ............................................................................... passim

Tex. R. Evid. 404 .................................................................................. 86, 91

Tex. R. Evid. 503 ..................................................................................... 13

Tex. R. Evid. 802 ................................................................................... 103

Tex. R. Evid. 901 ................................................................................... 103

Tex. R. Evid. 902 ................................................................................... 103

**Rules**

ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Opinion 10-456 (2010)........................................................................................16

ABA, ABA STANDARDS FOR CRIMINAL JUSTICE (3d ed. 1993).........................10, 11

ABA, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913 (2003)...............................passim

State Bar of Tex., *Guidelines and Standards for Texas Capital Counsel*, 69 TEX. B.J. 966 (2006) ........................................................................10, 11, 16

## APPLICATION FOR A WRIT OF HABEAS CORPUS

### This is a Capital Case

In 1976, the Supreme Court banned the practice of sentencing that made the death penalty mandatory for all capital murders. *Woodson v. North Carolina*, 428 U.S. 280 (1976). Because of the "diverse frailties of mankind" the Court held that the Constitution required "particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." *Id.* at 303-04. This landmark decision recognized the importance of presenting mitigating evidence specifically tailored to an individual defendant.

There is a "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Wiggins v. Smith*, 539 U.S. 510, 535 (2003). The State attempted to portray Roderick Harris as a defendant with no mitigating factors in his life story, someone who had "a pretty decent childhood" who was "so fortunate to have family" testify on his behalf. (66 RR at 40-41, 74-75, 89.) However, this characterization of Harris is wholly inaccurate, for Harris was destined for disadvantage before he was born.

Harris was born to seventeen-year-old single mother Pamela Maddox. Ms. Maddox, born and raised in West Dallas, had spent at least a decade prior to Harris's birth living with her own mother at 3544 Nomas Street, less than half a mile downwind of a lead smelting facility that was later declared a Superfund hazardous waste site. As a child, Ms. Maddox was exposed to toxic levels of lead in the air and in the ground. Because lead accumulates in the bones, and can be transferred from mother to child during pregnancy, Harris likely was exposed to lead in utero.

1

Harris lived on Nomas Street, in the shadow of the lead smelter, for approximately six of the first eight years of his life. Children are particularly sensitive to lead exposure, which can damage the central nervous system, damage the brain, and result in cognitive and academic deficits.

Harmful as it is, lead was not the only toxin Harris was exposed to in utero. Harris's mother consumed alcohol during the first trimester, before she was aware of her pregnancy. As a result, Harris exhibits deficits in cognitive functioning, and has a history of neurodevelopmental disorders that are consistent with a diagnosis of Alcohol Related Neurodevelopmental Disorder, one of the specific diagnostic conditions of Fetal Alcohol Spectrum Disorder ("FASD"). Individuals with FASD suffer from deficits in an array of cognitive functions, including attention, learning, logical thinking, impulse inhibition, and self-regulation. Because of these deficits, these individuals also struggle socially and are linked to disproportionate rates of mental illness, drug abuse, and involvement in the criminal justice system.

As he grew up, Harris struggled at home and in school. For most of his childhood, the relationship between Harris's mother and stepfather was physically and verbally abusive. Harris and his half-brothers were often left alone, or taken to adult parties where there was open consumption of alcohol and marijuana. Mr. Maddox treated Harris more strictly than his two biological sons, and this, in turn, led Harris to run away from home as a juvenile.

At the age of seven, Harris was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and he was prescribed Ritalin. Despite the positive effect Ritalin had on Harris's behavior, his parents frequently took him off the medication, citing Harris's zombie-like affect when he took it. Harris cycled on and off the medication until he reached puberty, when the treatment was discontinued altogether.

Along with ADHD, Harris labored with learning disabilities throughout his time in school. He was continuously placed in special education classes, and he struggled behaviorally, as well, earning several suspensions and expulsions, which led to his involvement in the juvenile justice system.

It is not altogether surprising that amidst this chaotic background, Harris found some solace in a juvenile street gang. Harris joined the gang at the age of ten but left it before dropping out of high school. The gang he joined was not a violent, organized criminal enterprise but functioned more as a group of similarly-situated adolescents from the same neighborhood.

Harris's jury did not hear the full complement of information available to describe his childhood, adolescence, and early adulthood. Moreover, no evidence was presented about Harris's prenatal exposure to two poisonous substances—alcohol and lead—nor the effects of this exposure on his cognitive functioning. This evidence was available, could have been presented through the testimony of both lay and expert witnesses, and would have been incredibly relevant and persuasive to a juror during Harris's trial.

Because Harris's constitutional and statutory rights were violated by the omission of this evidence from his trial, Harris's verdict and death sentence should be reversed.

# I.

# PROCEDURAL HISTORY

Roderick Harris is confined under a sentence of death pursuant to the judgment of Criminal District Court No. 7, Dallas County, Texas, cause number F09-00409, which was rendered on May 21, 2012 (66 RR at 107)[1] and entered on the same day (2 CR at 709).

## A. Trial Court Proceedings

The Court appointed Brad Lollar, Doug Parks, and Mike Howard to represent Harris during his capital trial.

### 1. Indictment

On June 2, 2009, a grand jury indicted Harris with capital murder for intentionally causing the death of Alfredo Gallardo while in the course of committing and attempting the offense of robbery. (1 CR at 7.)

### 2. Recusal Proceedings

Harris's case was initially assigned to the 203rd District Court in Dallas County, Judge Teresa Hawthorne presiding. On December 19, 2011, Judge Hawthorne heard arguments pertaining to pretrial motions filed on behalf of Harris. (4 RR at 5, *et seq.*) During this proceeding, Judge Hawthorne granted several defense motions which declared the death penalty unconstitutional. (*Id.* at 19.) The State filed a motion to recuse Judge Hawthorne on December 21, 2011 (2 CR at 572), and a hearing was held on January 3, 2012, before Presiding Administrative Judge John Ovard. (6 RR at 6, *et seq.*) Judge Ovard granted the State's motion to recuse Judge Hawthorne, and the case was assigned to Criminal District Court No. 7, Judge Michael Snipes presiding. (2 CR at 581-82.) Judge

---

[1] "CR" refers to the Clerk's Record of Harris's capital trial. "RR" refers to the Reporter's Record of Harris's capital trial.

4

Snipes later reviewed de novo Judge Hawthorne's constitutional rulings, which he overturned. (8 RR at 14-34.)

### 3. Trial

Voir dire began on January 9, 2012, and concluded on March 26, 2012. (9 RR at 4; 52 RR at 75.) Harris was arraigned on May 8, 2012, and entered a plea of not guilty. (58 RR at 6-7.) Later that day, the State gave an opening statement and called the first witness. (*Id.* at 17, 27.) The State rested its case for guilt on May 10, 2012. (60 RR at 75.) Defense counsel did not give an opening statement, but did call one witness before resting its case. (*Id.* at 79, 81.) Both sides gave closing arguments, and the case was submitted to the jury for deliberation. (*Id.* at 92-125.) The jury returned with a verdict finding Harris guilty of capital murder. (*Id.* at 126.)

The punishment phase began on May 14, 2012, with the State giving an opening statement. (62 RR at 19.) The State then presented its case regarding punishment, and rested on May 16, 2012. (64 RR at 118.) Defense counsel proceeded to give an opening statement before presenting its case. (*Id.* at 140.) After calling a number of witnesses, defense counsel rested on May 17, 2012. (65 RR at 233.) The State then presented several witnesses in rebuttal, including five witnesses who provided victim impact testimony. (*Id.* at 234-95, 300-16.) The next day, May 18, 2012, both sides presented closing arguments before the case was given to the jury. (66 RR at 30, *et seq.*) The jury did not reach a verdict as to punishment during the first day of deliberations, so the Court excused the jury for the weekend. (*Id.* at 96.) On May 21, 2012, the jury reconvened to continue deliberations, and returned with a verdict later that day, answering "Yes" to Special Issue One and "No to Special Issue Two. (*Id.* at 103-04.) Harris was then formally sentenced to death by the Court. (*Id.* at 107.)

## B. State Appellate Proceedings

Harris was notified of his right to appeal on May 21, 2012. (2 CR at 712.) He was declared indigent and on May 23, 2012, John Tatum was appointed to represent Harris for the purpose of filing a direct appeal. (*Id.* at 713.) Appellate counsel filed a motion for a new trial on June 15, 2012, which was overruled. (*Id.* at 714.)

On September 3, 2013, appellate counsel filed an opening appellate brief in *Roderick Harris v. The State of Texas*, cause number AP-76,810. The State filed its brief in response on January 28, 2014. Both the State and post-conviction counsel filed motions requesting that the clerk and court reporter supplement the trial record. The clerk did so and ultimately provided four supplements to the clerk's record. (*See* CR Supps. 1-4.) Both the State and direct appeal counsel presented oral argument before the CCA on April 2, 2014. On May 21, 2014, the CCA denied Harris's direct appeal in full.

## C. State Habeas Proceedings

On May 22, 2012, the Office of Capital Writs ("OCW") was appointed to represent Harris for the purpose of investigating and filing a writ of habeas corpus pursuant to Article 11.071 of the Texas Code of Criminal Procedure. This Application follows.

## II.

## STATEMENT OF FACTS

## A. Guilt/Innocence Phase Presentation

During the guilt/innocence phase of Harris's trial, the prosecution presented evidence and testimony to show that on March 17, 2009, Harris shot and killed Alfredo Gallardo while in the course of robbing Alfredo and his family. Though Harris was only on trial for the death of Alfredo, the State presented evidence that Harris shot and killed Alfredo's brother, Carlos Gallardo. Specifically, the

6

prosecution presented testimony from three members of the Gallardo family who described how Harris entered their home, held them at gunpoint, and attempted to rob them before engaging in a struggle with Alfredo and Carlos, during which both were shot and killed. (58 RR at 37-151.) Alfredo's son, Omar Gallardo, fled the scene and notified a security guard, who then called the police. (*Id.* at 27-37.) As a result, a number of officers from the Dallas Police Department were present at the scene when Harris exited the Gallardo's trailer home. Several responding officers testified about the apprehension of Harris. (*Id.* at 151-241; 59 RR at 8-48, 146-59.) A number of police officers, crime scene technicians, and lab analysts were called to testify regarding the collection and analysis of evidence found at the scene. (59 RR at 49-103, 127-45, 159-261; 60 RR at 52-75.) Two Dallas County medical examiners testified about the wounds and causes of death for both Alfredo Gallardo and Carlos Gallardo. (59 RR at 261-302.)

Following the testimony of the medical examiners, it was brought to the court's attention that a juror had discussed reading newspaper articles about the trial with several other jurors. After questioning the offending juror, as well as the remaining jurors, he was dismissed and the first alternate juror seated. Defense counsel's motion for a mistrial was denied. (60 RR at 5-50.)

The defense presented one witness, recalling Alfredo's daughter Yahaira Gallardo to the stand. (*Id.* at 79-81.) Yahaira testified that her father was wearing a white T-shirt at the time he was shot. Following Yahaira's testimony, the defense rested its case. (*Id.* at 81.)

Closing arguments took place shortly thereafter, and, later that same day, the jury found Harris guilty of capital murder. (*Id.* at 126.)

**B. Punishment Phase Presentation**

The State's presentation at punishment initially focused on Harris's extraneous offenses in middle school and high school (62 RR at 27-38, 72-93), as a

7

juvenile living in Atlanta (*id.* at 94-118), and as a juvenile and young adult living in the Dallas area (*id.* at 119-225; 63 RR at 125-36). The jury also heard testimony that Harris was affiliated with a street gang. (62 RR at 43-70.) The State also implicated Harris in an unsolved armed robbery committed on February 15, 2009 (*id.* at 229-73; 63 RR at 11-125), and in an unsolved robbery-murder committed on March 3, 2009 (63 RR at 137-316; 64 RR at 24-118). After presenting this evidence, the State rested. (64 RR at 118.)

The defense's presentation at punishment consisted of three parts. First, trial counsel sought to undermine a witness's photographic identification of Harris as the shooter in the unsolved armed robbery committed on February 15, 2009. (64 RR at 155-215.) Second, trial counsel solicited testimony from Harris's mother Pamela Maddox, stepfather Ramon Maddox, Sr., half-brother Ramon Maddox, Jr., and maternal cousin Shamy Conley concerning Harris's upbringing, childhood, learning disability, and drug use. (*Id.* at 215-93; 65 RR at 29-63, 70-118.) Finally, four expert witnesses were presented, testifying about prison conditions (65 RR at 170-92), risk factors for delinquent behavior (*id.* at 152-70), Harris's drug addiction (*id.* at 119-46), and the Texas Department of Criminal Justice's inmate classification system (*id.* at 193-233).

The State presented rebuttal testimony regarding Harris's behavior while at the Dallas County Jail (65 at 261-84), and the impact of Alfredo's death on his family (*id.* at 285-95, 308-16). In addition, an investigator with the Dallas County District Attorney's Office testified about phone calls made by Harris while he was incarcerated at the Dallas County Jail. (*Id.* at 295-308; 66 RR at 10-23.)

8

# III.

## STANDARD OF CARE

### A. Ineffective Assistance of Trial Counsel

A criminal defendant is guaranteed the right to trial representation. This Sixth Amendment right to counsel "preserves the fairness, consistency, and reliability of criminal proceedings by ensuring that the process is an adversarial one." *Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012).

An ineffective assistance of counsel claim has two components: Harris must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Porter v. McCollum*, 558 U.S. 30, 38-39 (2009); *Wiggins*, 539 U.S. at 521; *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006); *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) ("[A]ppellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

To establish deficiency, Harris must show his counsel's representation fell below an objective standard of reasonableness. *Porter*, 558 U.S. at 38-39 (quoting *Strickland*, 466 U.S. at 688). A defendant need only prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson*, 9 S.W.3d at 813. This standard governs the claim as a whole, and does not replace the more lenient "reasonable probability" standard for the prejudice prong.

The Supreme Court has reiterated that it applies a "case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland*." *Rompilla v. Beard*, 545 U.S. 374, 393-94 (2005) (O'Connor, J., concurring) (citing *Strickland*, 466 U.S. 668).

Deficient performance is performance that is "inconsistent with the standard of professional competence in capital cases that prevailed [at the time of the trial]."

9

*Cullen v. Pinholster*, __U.S.__, 131 S. Ct. 1388, 1407 (2011). The Supreme Court has repeatedly assessed the reasonableness of counsel's performance by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *see also Padilla v. Kentucky*, 559 U.S. 356, 367 (2010) (noting that the *ABA Standards* "may be valuable measures of the prevailing professional norms of effective representation"); *Rompilla*, 545 U.S. at 387 ("'[W]e long have referred [to the ABA *Standards for Criminal Justice*] as "guides to determining what is reasonable."'" (quoting *Wiggins*, 539 U.S. at 524)). Because adequacy is based upon "counsel's perspective at the time," *Strickland*, 466 U.S. at 689, courts must look to the guidelines then in effect. *See Bobby v. Van Hook*, 558 U.S. 4 (2009).

At the time of Harris's trial, his attorneys' obligations were governed by the "prevailing professional norms," even if those norms did not align with a less rigorous defense based on "most common customs." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 788 (2011). The Supreme Court instructs courts to look at the "norms of practice as reflected in the American Bar Association and the like" and to consider "all the circumstances" of a case. *Strickland*, 466 U.S. at 688. These sources of norms include the ABA *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913 (2003) ("*ABA Guidelines*"), and the ABA *Standards for Criminal Justice* (3d ed. 1993) ("*ABA Standards*"). *See also* State Bar of Tex., *Guidelines and Standards for Texas Capital Counsel*, 69 TEX. B.J. 966 (2006) ("Texas Guidelines").

Defense counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690-91. "[The] Guidelines applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases and imposed . . . similarly forceful directive[s]." *Rompilla*, 545 U.S.

10

at 387 n.7. Pursuant to the *ABA Guidelines*, counsel was required to conduct "thorough and independent investigations relating to the issues of both guilt and penalty." *ABA Guidelines*, Guideline 10.7. A court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005); *Wiggins*, 539 U.S. at 521. When defense counsel is not aware of the relevant mitigating evidence, "the issue is not whether he was ineffective for failing to present [the] evidence . . . , but rather whether he failed to conduct a reasonable investigation to uncover mitigating evidence." *Ex parte Gonzales*, 204 S.W.3d 391, 396 (Tex. Crim. App. 2006).

Similarly, the *ABA Standards* state that counsel "should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty." *ABA Standards*, Standard 4-4.1; *Texas Guidelines*, Guideline 11.1. Most significantly, "[t]he duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty." *Id.* Similarly, the duty to investigate may exist despite the accused's failure to mention potentially mitigating evidence or the accused's affirmative denial that such evidence exists. *Rompilla*, 545 U.S. at 377; *Ex parte Gonzales*, 204 S.W.3d at 396.

Once capital trial counsel completes the necessary pretrial investigation, he must then formulate a defense theory "that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." *ABA Guidelines*, Guideline 10.10.1. The CCA holds capital counsel to an even higher standard: "It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and

11

forcefully inquire about each topic." *Ex parte Gonzales*, 204 S.W.3d at 400-01 (Cochran, J., concurring).

To establish prejudice, Harris "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in [the] outcome." *Porter*, 558 U.S. at 44 (quoting *Strickland*, 466 U.S. at 693-94). Harris need not show that counsel's deficient conduct "more likely than not altered the outcome" in his case, *Strickland*, 466 U.S. at 693, but he must demonstrate that "the likelihood of a different result [is] substantial, not just conceivable." *Richter*, 131 S. Ct. at 792. State courts "must decide whether the undiscovered and unoffered evidence would have created a reasonable probability that, had the jury heard it, the jury's verdict would have been different." *Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim. App. 2006).

State post-conviction courts must analyze a capital penalty phase ineffectiveness claim by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. It is not necessary for the petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances. *Williams v. Taylor*, 529 U.S. 362, 394-98 (2000). The Constitution requires that state post-conviction courts "engage with what [a defendant] actually went through," as expressed in mitigating evidence. *Porter*, 558 U.S. at 44. It is not only incorrect but "unreasonable to discount to irrelevance [mitigating] evidence . . . [or] to conclude that [certain mitigating evidence] would be reduced to inconsequential proportions simply because the jury would also have learned [of related aggravating evidence]." *Id.* The CCA has "adapted the Supreme Court's prejudice test to require that there is a reasonable probability that, absent the errors, the jury

12

would have answered the mitigation issue differently." *Ex parte Gonzales*, 204 S.W.3d at 394.

## B. Ineffective Assistance of Appellate Counsel

Ineffective assistance of appellate counsel claims are governed by *Strickland. Smith v. Robbins*, 528 U.S. 259, 285 (2000) ("the proper standard for evaluating [a petitioner's] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland v. Washington*"); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985) (the Fourteenth Amendment requires the assistance of counsel to appellants for their first appeal as of right); *accord Ries v. Quarterman*, 522 F.3d 517, 531-32 (5th Cir. 2008); *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

An appellate counsel has a duty to review the record and present any potentially meritorious claims. *Meza v. State*, 206 S.W.3d 684, 689 (Tex. Crim. App. 2006) (noting appellate counsel's "constitutional duty to review the record for any arguable error").

## C. Scope of the Waiver of Attorney-Client Privilege

Harris recognizes that raising specific issues of ineffective assistance of counsel as developed in this Application operates as a limited waiver of privileged information; however, he asserts his right to have all privileged information not directly relevant to his claims remain privileged.

Under the Texas Rules of Evidence, confidential communications between a client and his attorney are privileged. TEX. R. EVID. 503(b)(1)(A) ("A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client . . . between the client . . . and the client's lawyer."). The privileged nature of communications between client and attorney

13

remains intact, even upon the termination of the attorney-client relationship. *See Maryland Am. Gen. Ins. v. Blackmon*, 639 S.W.2d 455, 458 (Tex. 1982).

The privilege between attorney and client is not absolute. It is "well-established . . . that when an attorney's professional conduct is challenged by the client, the privilege is waived so far as necessary to defend the attorney's character." *West v. Solito*, 563 S.W.2d 240, 245 n.3 (Tex. 1978). In the context of criminal law, courts across the nation have consistently "held that a claim of ineffective assistance of counsel by a defendant against a former attorney waives the attorney-client privilege." *Joseph v. State*, 3 S.W.3d 627, 637 (Tex. App.—Houston [14th Dist.] 1999) (citing *Laughner v. United States*, 373 F.2d 326, 327 (5th Cir. 1967)); *see also United States v. Pinson*, 584 F.3d 972, 978 (10th Cir. 2009).

However, any waiver of the attorney-client privilege only applies to communications relevant to the claim of ineffective assistance of counsel. *Laughner*, 373 F.2d at 327 (where "the client alleges a breach of duty to him by the attorney, . . . he thereby waives the privilege as to all communications *relevant* to that issue" (emphasis added)). Courts have consistently limited the scope of these waivers, permitting disclosure of only those confidential communications that are "*necessary* to prove or disprove [the client's] claims." *Pinson*, 584 F.3d at 978 (emphasis added).[2]

---

[2] *See also Bittaker v. Woodford*, 331 F.3d 715, 720 (9th Cir. 2003) ("Because a waiver is required so as to be fair to the opposing side, the rationale only supports a waiver broad enough to serve that purpose. Courts, including ours, that have imposed waivers under the fairness principle have therefore closely tailored the scope of the waiver to the needs of the opposing party in litigating the claim in question."); *Johnson v. Alabama*, 256 F.3d 1156, 1179 (11th Cir. 2001) ("[A] habeas petitioner alleging that his counsel made unreasonable strategic decisions waives any claim of privilege over the contents of communications with counsel *relevant* to assessing the reasonableness of those decisions in the

14

Predecessor counsel's duty to limit disclosure to information relevant to the claim of ineffective assistance also flows from counsel's continuing duty to the former client. Both the *ABA Guidelines* and the *Texas Guidelines* stipulate that, "[i]n accordance with professional norms, all persons who are or have been

circumstances." (emphasis added)); *United States v. Basham*, Cr. No. 4:02-992-JFA, 2012 WL 1130657 at *6 (D.S.C. Apr. 4, 2012) (unpublished) ("the Government will not use and will not make copies of any material or information in trial counsel's files that is not *related or relevant* to a claim in Basham's § 2255 Motion" (emphasis added)); *In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 120 F.R.D. 687, 692 (C.D. Cal. 1988) (in which the court "reject[ed] the suggestion made by some parties that 'selective' disclosure should not be allowed, that if the exception is permitted to be invoked, *all* attorney-client communications should be disclosed" as "directly contrary to the reasonable necessity standard"); *Levin v. Ripple Twist Mills, Inc.*, 416 F. Supp. 876, 886-87 (E.D. Pa. 1976) ("In almost any case when an attorney and a former client are adversaries in the courtroom, there will be a credibility contest between them. This does not entitle the attorney to rummage through every file he has on that particular client (regardless of its relatedness to the subject matter of the present case) and to publicize any confidential communication he comes across which may tend to impeach his former client. At the very least, the word 'necessary' in the disciplinary rule requires that the probative value of the disclosed material be great enough to outweigh the potential damage the disclosure will cause to the client and the legal profession."); *Alabama v. Lewis*, 36 So. 3d 72, 77-78 (Ala. Crim. App. 2008) (noting that, by alleging "ineffective assistance of counsel during the trial and direct appeal of these cases, the defendant waived the benefits of both the attorney-client privilege and the work product privilege, but *only* with respect to matters *relevant* to his allegations of ineffective assistance of counsel" (second emphasis added)); *Waldrip v. Head*, 532 S.E.2d 380, 387 (Ga. 2000) ("[W]e hold that a habeas petitioner who asserts a claim of ineffective assistance of counsel makes a limited waiver of the attorney-client privilege and work product doctrine and the state is entitled only to counsel's documents and files *relevant* to the specific allegations of ineffectiveness." (emphasis added)); *In re Dean*, 711 A.2d 257, 258-59 (N.H. 1998) ("We hold that claims of ineffective assistance of counsel, whether brought in a motion for new trial or in a habeas corpus proceeding, constitute a waiver of the attorney-client privilege to the extent *relevant* to the ineffectiveness claim; the waiver is a limited one." (emphasis added)).

15

members of the defense team have a continuing duty to safeguard the interests of the client." *ABA Guidelines*, Guideline 10.13; *Texas Guidelines*, Guideline 11.8. ABA Formal Opinion 10-456 states that, in the context of an ineffective assistance of counsel claim, lawyers may disclose information "reasonably necessary" for resolution of the ineffectiveness claim. ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Opinion 10-456, at 5 (2010). However, the opinion further states that it is "highly unlikely that a disclosure in response to a prosecution request, prior to a court-supervised response by way of testimony or otherwise, will be justifiable." *Id.*

## IV.

## ARGUMENT

## CLAIM ONE

## TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO SUFFICIENTLY INVESTIGATE AND PRESENT CERTAIN MITIGATING EVIDENCE DURING HARRIS'S TRIAL

At the heart of the punishment phase of a capital trial is the presentation of mitigation evidence and the concept of moral culpability. Moral culpability acknowledges an elementary psychological reality—that people do not arrive at their choices from the same path. Thus, it follows that the degree of an individual's "blameworthiness" for capital murder may vary depending on what factors and experiences shape, influence, and/or compromise that choice. A jury's understanding of the evidence affecting the moral culpability of a defendant is critical to a jury's consideration of the appropriate punishment for a capital offense.

Mitigating evidence is not developed to provide a defense to the crime or to challenge evidence of guilt, nor is it an excuse or explanation for a crime. Instead, it provides a context for the crime by describing an individual's life experiences

16

that serve to inspire compassion, empathy, mercy, and/or understanding. Indeed, mitigating evidence is *any* evidence that "might serve 'as a basis for a sentence less than death.'" *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)) (emphasis added); *Coble v. State*, 330 S.W.3d 253, 296 (Tex. Crim. App. 2010) (acknowledging *Tennard*'s language that no nexus is required between mitigating evidence and the crime).

The standards for professional norms for capital representation require that trial counsel make a thorough investigation into the areas of mitigating evidence that might be presented on a defendant's behalf. *ABA Guidelines*, Guideline 10.7 (commentary) (noting that a "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history"); ABA, *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 HOFSTRA L. REV. 677, 688 (2008) ("*ABA Mitigation Guidelines*") ("It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client. It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy.").

But it is also not enough to simply gather the facts of a defendant's life story and then present it through lay witness testimony. An expert should also be retained to synthesize that information into a coherent psycho-social narrative for presentation to the jury. *See ABA Guidelines*, Guideline 10.11 (commentary) (noting the importance of presenting "the client's complete social history" at punishment); *see also ABA Mitigation Guidelines*, Guideline 10.11. Such an expert uses their particularized expertise relevant to the defendant to present his social history in a cohesive narrative for the jury. John Blume, *Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental*

17

*Health Examination*, 17 THE ADVOCATE 4, 10 (Aug. 1995) ("[P]ersuasive expert testimony must . . . enable the jury to see the world from your client's perspective, i.e., to appreciate his subjective experience.").

Like any subject matter which warrants an expert opinion, the forces that have helped to determine a defendant's life story must be explained to the jury in a way that illuminates why they are relevant to moral culpability. It is not sufficient to present a parade of witnesses discussing the defendant's history—an expert witness is needed to give that life history context. Put differently,

> you have to give the fact-finder a view of the crime from the defendant's perspective. If you don't, you run the risk of making your client seem "otherly," frightening and thus expendable. What you strive for is to enable the fact-finder to look through your client's eyes and to walk, at least for a few minutes, in his shoes.

Blume, *ante*, at 10.

During the defense's presentation on mitigation during the punishment phase of trial, counsel offered testimony from four family members—Harris's mother, brother, stepfather, and cousin—to discuss various details of Harris's life story. (64 RR at 215, 257; 65 RR at 29, 88.) Their testimony explained to the jury that Harris's family (including his mother) struggled with mental illness; that Harris was exposed to family violence, physical abuse, and drug abuse as a child; that Harris was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and put on Ritalin; and that Harris began running away from home, became involved in juvenile gang and street life, and ultimately dropped out of school. (64 RR at 215, 257; 65 RR at 29, 88.) Counsel understood the potential impact of these facts when woven together as a narrative, arguing to the jury in closing that the facts they had presented were meant to tell the jury "how a child, how a baby, came to where this man is today." (66 RR at 42.)

18

Counsel's investigation and presentation of Harris's mitigation case, however, failed to fulfill their purpose in two respects. First, counsel failed to investigate and develop evidence regarding two very serious and mitigating root causes of Harris's life impairments. Evidence was available that Harris suffered from prenatal exposure to alcohol, causing cognitive impairments consistent with Fetal Alcohol Spectrum Disorder ("FASD"). Further, Harris was exposed to toxic levels of lead from a smelter located in the heart of his childhood neighborhood.

Second, counsel failed to investigate and develop sufficient expert testimony to explain to the jury why the facts of Harris's life that were presented by family members should be considered mitigating. The only expert testimony the jury heard relating to mitigation came from an addictions expert discussing the impact of Harris's drug use and from a psychologist speaking academically about risk factors for childhood delinquency. (65 RR at 19, 64, 152.) Without further explanation from expert witnesses about the mitigating impact of Harris's life trajectory, the jury was left without a context to understand why Harris's behavioral issues as a child, his ADHD diagnosis, or his entry into gang life and drug use were mitigating. Instead, the jury heard the State explain that "from all accounts," Harris had "a pretty decent childhood, growing up together, playing, fun, you know, happy." (66 RR at 74.)

Yet, substantial expert testimony was available that would have explained why Harris's life trajectory was not of his own making but the product of many environmental, social, and institutional forces. Beginning with his prenatal exposure to both alcohol and lead, Harris entered the world disadvantaged and impaired. His family circumstances deprived him of secure attachments and healthy childhood development. And when Harris's cognitive and developmental impairments began to manifest, they were misinterpreted by both his parents and school officials and treated as mere behavioral problems. Harris entered what has

19

become known as the "school to prison pipeline," pointing his life trajectory toward street life, gangs, drug abuse, and, ultimately, incarceration through the juvenile and adult criminal justice systems.

Such testimony would have offered Harris's jury a starkly different understanding of why Harris's life story was mitigating and why Harris deserved a life sentence. Counsel's failure to investigate and present the above-mentioned information constituted deficient performance of capital counsel and prejudiced Harris's trial. Counsel's ineffective assistance violated Harris's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. For these reasons, his sentence should be reversed.

## A. Trial Counsel Was Ineffective for Failing to Investigate and Present Available Evidence that Harris Suffers from Fetal Alcohol Spectrum Disorder

Prior to Roderick Harris's capital murder trial, counsel was aware that Harris's mother, Pamela Maddox, drank alcohol while she was pregnant with Harris. However, counsel failed to thoroughly investigate the effect Ms. Maddox's prenatal drinking had on Harris. Had trial counsel done so, they would have discovered that Harris suffers from FASD, an umbrella term that encompasses a set of neurological conditions resulting from prenatal brain damage caused by maternal consumption of alcohol during pregnancy. This failure deprived the jury of significant mitigating evidence that reasonably could have influenced the verdict in Harris's punishment phase.

### 1. What Is Fetal Alcohol Spectrum Disorder?

FASD is an umbrella term for several medical diagnoses caused by maternal consumption of alcohol during pregnancy. (Ex. 1 at ¶11 [Aff. of Dr. Natalie

20

Brown].)[3] The mother's drinking leads to prenatal brain damage in the developing embryo or fetus. (*Id.*) There are three distinct yet closely-related specific diagnoses encompassed by FASD: Fetal Alcohol Syndrome ("FAS"), Partial Fetal Alcohol Syndrome ("Partial FAS"), and Alcohol Related Neurodevelopmental Disorder ("ARND"). (*Id.*) In general, the three conditions do not vary in the severity of the associated brain damage, but are distinguished by variations in the external, physical damage attributed to the disorder (e.g., facial abnormalities, growth deficits). (*Id.*) Similarly, damage to the central nervous system can be equally severe, regardless of the specific condition that is diagnosed. (*Id.*)

FASD has a worldwide diagnostic history that at the time of Harris's capital murder trial spanned nearly forty years. (Ex. 1 at ¶12 [Aff. of Dr. Natalie Brown].) FAS was first recognized in 1973 by researchers at the University of Washington. (*Id.*) Diagnostic criteria for FASD were published in 1996 by the Institute of Medicine, the health arm of the independent National Academy of Sciences. (*Id.*) In 2004, the Centers for Disease Control and Prevention expanded upon and quantified the diagnostic criteria, making them more explicit. (*Id.*)

Under the diagnostic criteria, a diagnosis of FAS requires three present factors: (1) presence of facial abnormalities (e.g., small palpebral fissures or eye slits, smooth philtrum or groove between the bottom of the nose and upper lip, and thin upper lip); (2) a growth deficit at any point in life; and (3) central nervous system abnormality. (Ex. 1 at ¶13 [Aff. of Dr. Natalie Brown].) A central nervous system abnormality can be measured structurally (e.g., neuroimaging), neurologically (e.g., seizures, gait problems), or functionally (e.g., neuropsychological testing). (*Id.*)

---

[3] Dr. Brown is a licensed psychologist who specializes in the evaluation of individuals with FASD. (Ex. 1 at ¶¶1-2, 4, 6-7 [Aff. of Dr. Natalie Brown].)

21

If there is confirmation of prenatal exposure to alcohol, a diagnosis of Partial FAS or ARND can be reached. (Ex. 1 at ¶13 [Aff. of Dr. Natalie Brown].) A Partial FAS diagnosis requires central nervous system abnormality along with one or more of the above-mentioned facial abnormalities. (*Id.*) A diagnosis of ARND requires only a central nervous system abnormality. (*Id.*)

Brain damage resulting from FASD can cause an array of functional deficits and impaired neurocognitive functioning. (Ex. 1 at ¶14 [Aff. of Dr. Natalie Brown].) Basic deficits attributed to FASD are referred to as "primary disabilities." (*Id.*) These disabilities include deficits in attention, learning, memory, language development, logical thinking, impulse inhibition and behavior control, among others. (*Id.*) Only about 10% of individuals with FASD have IQ scores at or below 70, and a score above 70 may mask other significant cognitive deficits that, when considered together, have a substantial negative impact on adaptive and/or social functioning. (*Id.*) This is due to the fact that individuals with FASD generally perform best in structured, familiar settings in which they can rely on external guidance as opposed to their own judgment. (*Id.* at ¶15.) Thus, IQ test scores reflect the performance of an individual with FASD in a situation which favors them, i.e., a controlled, structured setting. (*Id.*) In contrast, when an individual with FASD is left to their own devices with little or no direction, the individual's adaptive deficits are exposed. (*Id.*) This decline in adaptive performance is associated with executive dysfunction, which is controlled by the prefrontal cortex of the brain. (*Id.*) Neuroimaging studies have revealed that the prefrontal cortex is particularly sensitive to the teratogenic effects of maternal alcohol use during pregnancy. (*Id.*)

The deficits in cognitive functioning attributed to FASD often result in individuals suffering what are referred to as "secondary disabilities." (Ex. 1 at ¶16 [Aff. of Dr. Natalie Brown].) Secondary disabilities are the product of the

22

interaction between neurological executive dysfunction and traumatic environmental experiences in childhood. (*Id.*) Individuals with FASD have deficits in social skills and social judgment (an executive function). (*Id.*) When faced with a stressful situation, individuals with FASD frequently react with ineffective coping responses (e.g., internalizing or externalizing behaviors). (*Id.*) Thus, these secondary disabilities reflect maladaptive coping reactions to environmental stress and usually can result in mental health disorders, school disruption, substance abuse, criminal behavior, confinement, poor work history, and struggling to live independently as an adult. (*Id.*) In fact, nearly two-thirds of juveniles with FASD will go on to commit a crime at least once in their lives. (*Id.*) Epidemiological studies estimate that 5% of the United States population are afflicted with FASD, and that FASD afflicts between 16% and 23% of individuals caught up in the criminal justice system. (*Id.*)

The effects of these secondary disabilities can be mitigated with early intervention, such as the provision of developmental disabilities services, and nurturing, stable, and protective caregiving. (Ex. 1 at ¶17 [Aff. of Dr. Natalie Brown].) However, the risk of secondary disabilities associated with FASD increases in the absence of a diagnosis early in childhood. (*Id.*) Diagnosis of FASD is typically conducted in children prior to the onset of puberty, which can alter facial structures and obscure any abnormalities that previously existed. (*Id.*) However, most children afflicted with FASD (such as those with Partial FAS or ARND) do not display any external manifestation of their FASD condition, nor are they intellectually disabled, as discussed above. (*Id.*) As a result, many individuals "slip through the cracks" and are never diagnosed with FASD; consequently, they never receive professional intervention that could ameliorate their social and adaptive deficits. (*Id.*) As an undiagnosed youth with FASD grows older, adults are increasingly likely to attribute the youth's poor judgment,

23

impulse control, and decision-making to willful misconduct, rather than to the cognitive impairments of FASD. (*Id.*) Diagnosis of FASD in individuals over the age of eighteen becomes increasingly difficult, largely due to the absence or destruction of educational and medical records that chronicled childhood deficits. (*Id.*)

## 2. Fetal Alcohol Spectrum Disorder Was Widely Recognized by the Medical and Legal Communities at the Time of Harris's Trial

At the time of Harris's capital trial, psychologists and medical doctors were qualified to diagnose the central nervous system damage resulting from FASD as "consistent with FASD". (Ex. 1 at ¶18 [Aff. of Dr. Natalie Brown].) By the time of Harris's trial, FASD was well-recognized in the medical and psychological community. (*Id.* at ¶30.) A sampling of the research and available data includes that

- In 1973, FAS was first recognized in the United States by researchers at the University of Washington. Several articles about FAS were published in the prestigious medical journal *Lancet.*
- In 1977, the National Institute of Alcohol Abuse and Alcoholism ("NIAAA") issued an advisory that six or more drinks per day put a pregnant woman at risk of producing a child with birth defects. Later research would determine that much less exposure also could cause FASD conditions.
- In 1978, FAS was an integral part of a specially commissioned report to the U.S. Congress—the *Third Special Report to Congress on Alcohol and Health: Fetal Alcohol Syndrome*—which was published by the Department of Health and Human Services ("HHS") and the NIAAA. After more than 250 published case reports, it was clear by this time that FAS was one of several identifiable disorders associated with maternal alcohol abuse. The term "Fetal Alcohol Effects" (or "FAE") was coined to classify FASD conditions without the full array of facial abnormalities associated with FAS. (FAE now is an outdated term, having been replaced in 1996 with the term "Alcohol Related Neurodevelopmental Disorder" (or "ARND").)

24

- By 1979, over 600 cases of FAS had been reported worldwide. In the book *Fetal Alcohol Syndrome and Fetal Alcohol Effects*, Dr. Ernest Abel reported cases of FAS in articles from Australia, Belgium, Brazil, Canada, Chile, Czechoslovakia, France, Germany, Hungary, Ireland, Italy, South Africa, Spain, Sweden, Switzerland, and the United States.

- By 1980, the Research Society on Alcoholism issued the first diagnostic guidelines for FAS, which involved three diagnostic criteria in the context of prenatal alcohol exposure: "A pattern of characteristic facial features, pre-postnatal deficit in height and weight, and central nervous system damage."

- By 1981, HHS and NIAAA provided more information on FAS in the *Fourth Special Report to Congress on Alcohol and Health: Fetal Alcohol Syndrome*. In this same year, the U.S. Surgeon General issued a national health advisory recommending that pregnant women or women considering getting pregnant should abstain from using alcohol because of possible harm to the unborn child. The Surgeon General noted adverse effects "with only 1 ounce/day of absolute alcohol or 2 drinks and risk of FAS in children of heavy drinkers."

- In 1982, information on FAS appeared in the fourteenth edition of the *Merck Manual*. Therein, the *Merck Manual* noted that "the most serious consequence [of drinking alcohol during pregnancy] is mental retardation."

- In 1983, the *Fifth Special Report to Congress on Alcohol and Health: Fetal Alcohol Syndrome* was issued and contained more information about FAS.

- In 1984, an updated edition of Dr. Ernest Abel's treatise, *Fetal Alcohol Syndrome and Fetal Alcohol Effects*, became one of the first medical textbooks to summarize the mechanisms and laboratory research on the effects of alcohol in laboratory animals and selected cases.

- In 1985, the first non-medical book on FAS—*A Poison Stronger Than Love* by Anastasia Shkilnyk—further brought the condition to the attention of the lay public.

- In 1987, more information on FAS was published in the *Sixth Special Report to Congress on Alcohol and Health: Fetal Alcohol Syndrome*.

- In 1988, the Alcoholic Beverage Labeling Act, PL 100-690, was passed into law. The law mandated a warning label on every alcoholic beverage container sold in the United States, which stated: "According to the Surgeon General, women should not drink alcoholic beverages during

pregnancy because of the risk of birth defects." This law was widely publicized in the media around the time of its passage.

- In 1989, *The Broken Cord* by Michael Dorris was published. This was the first nationally distributed book on FAS and its impact on a family. Dr. Dorris cited 165 articles and books and three videos that addressed the dangers of drinking during pregnancy. The book became very popular and is still referred to today as a "classic" in FASD literature in terms of describing the long-term behavioral and developmental effects of prenatal alcohol exposure.

- In 1990, Congress received more information on FAS in the *Seventh Special Report to Congress on Alcohol and Health: Fetal Alcohol Syndrome.*

- In 1992, the sixteenth edition of the *Merck Manual* included FAS, noting that the condition was "the leading known cause of mental retardation." The *Merck Manual* also noted the "severe behavioral effects," "varying degrees of mental retardation," and "abnormal neurobehavioral development" associated with the condition.

- In 1993, HHS/NIAAA published the *Eighth Special Report to Congress on Alcohol and Health: Fetal Alcohol Syndrome.*

- In 1995, *Fetal Alcohol Syndrome: Diagnosis, Epidemiology, Prevention and Treatment*, edited by Kathleen Stratton and her colleagues, was published. This Institute of Medicine ("IOM") textbook consolidated the research and practical knowledge on FAS available in the United States at the time and provided a uniform basis for diagnosis.

- In 1995, the seventeenth edition of the *Merck Manual* was published. Among other things, the *Merck Manual* noted the behavioral effects of FAS (e.g., "varying degrees of mental retardation and abnormal neurobehavioral development").

- In 1996, *Alcohol, Pregnancy, and the Developing Child*, edited by Hans-Ludwig Spohr and Hans-Christoph Steinhausen, was published. This was the European counterpart to the Stratton publication from 1995.

- In 1996, there were two groundbreaking publications in the United States. The first of these, a publication by the IOM, formalized FASD diagnosis by publishing diagnostic criteria for five conditions under the FASD umbrella: FAS with confirmed prenatal exposure, FAS without confirmed prenatal exposure, Partial FAS, ARND, and Alcohol Related Birth Defects. (The lattermost condition focused solely on damage to physical structures outside the central nervous system, such as organs, limbs, and skeletal structure.) With this IOM publication, older

26

terminology (e.g., Fetal Alcohol Effects, encephalopathy) began to be replaced with newer terms, such as Partial FAS and ARND. Eventually, the umbrella term "Fetal Alcohol Spectrum Disorders" was promulgated as an inclusive term for all five IOM diagnostic categories.

- Also in 1996, the Centers for Disease Control and Prevention published the results of a large research study on secondary disabilities associated with FASD. The study, led by Dr. Ann Streissguth at the University of Washington, focused on the developmental trajectory of individuals with FASD. Adverse developmental outcomes (i.e., adaptive problems) were described as "secondary disabilities." Some of the most surprising findings were that individuals with FASD were at a high risk to commit crimes, engage in substance abuse, and have mental health histories that included inappropriate sexual behaviors. Adults with FASD were at an extremely high risk of having employment problems and difficulty living independently. The authors of the study concluded that secondary disabilities arose in the context of environmental adversity and lack of protective factors.

- In 1997, *Fetal Alcohol Syndrome: A Guide for Families and Communities* by Ann Streissguth was published by HHS and NIAAA. This book contained a developmental view of FASD and referenced the secondary disabilities study that had just been published. On page 241 of that work, Dr. Streissguth wrote that, "[a]s of 1997, several authors have described FAS/FAE from a criminal justice perspective (see Barnett, 1997; Dagher-Margosian, 1997; Fehr, 1995; LaDue & Dunne, 1997; and Novick, 1997)."

- In 1997, HHS/NIAAA published the *Ninth Special Report to Congress on Alcohol and Health: Fetal Alcohol Syndrome.*

- In 2000, HHS/NIAAA published the *Tenth Special Report to Congress on Alcohol and Health: Fetal Alcohol Syndrome.*

- In 2001, Craig Lesley's *Storm Riders* was published. This commercially successful book focuses on Lesley's adopted son who suffers from FAS and the condition's effects.

- In 2004, the Centers for Disease Control published a detailed diagnostic manual for FASD that quantified diagnosis and resolved some of the ambiguities from the 1996 IOM publication.

Furthermore, FASD was also widely used as mitigating evidence at the time of Harris's trial. Multiple authors had written about the application of FASD to the criminal justice system. (Ex. 1 at ¶30 [Aff. of Dr. Natalie Brown].) Numerous

27

cases across the country had already presented FASD as a relevant, mitigating factor at the punishment stage. (*Id.* at ¶31 (citing twenty-three cases that presented FASD as mitigating prior to Harris's trial).) Evidence that Harris suffers from FASD could and should have been presented to the jury.

### 3. Before Trial, Counsel Possessed Evidence that Harris Suffered from FASD

A significant body of evidence was available to trial counsel that indicated Harris was afflicted with FASD. Trial counsel overlooked these clear signs and failed to pursue the necessary medical investigation and consultation that would have revealed Harris suffers from FASD. *See Wiggins*, 539 U.S. at 522-23.

During the defense presentation at the punishment phase of Harris's trial, counsel elicited testimony from Harris's mother, Pamela Maddox, that she drank alcohol, smoked cigarettes, and smoked marijuana during the first six weeks of her pregnancy with Harris. (64 RR at 222-24.) Trial counsel was in possession of this information prior to Harris's trial. Defense mitigation investigator Brendan Ross conducted an interview with Ms. Maddox in November 2011 during which Ms. Maddox admitted to consuming alcohol during the period immediately prior to her discovery that she was pregnant with Harris.

Post-conviction investigation has revealed that, at minimum, Ms. Maddox drank several glasses of wine on the weekends during the first six weeks of her pregnancy with Harris. (Ex. 11 at ¶7 [Aff. of Pamela Maddox].) Ms. Maddox also confirmed that she smoked marijuana and cigarettes during this time period. (*Id.*) Ms. Maddox was unaware that she was pregnant until she went to the hospital with pneumonia-like symptoms, where she discovered that she was with child. (*Id.* at ¶6.) As she testified at trial, she stated that she stopped drinking once she learned that she was pregnant. (*Id.* at ¶7.)

While pretrial confirmation of prenatal exposure to alcohol alone should have triggered further investigation into FASD, trial counsel was in possession of additional information relevant to the cognitive deficits and secondary disabilities consistent with FASD that further indicated the need to consult an expert in the field of FASD.

While Harris was born at full-term and was a normal birth weight, he was "severely depressed" immediately after he was delivered by cesarean section. (Ex. 1 at ¶21 [Aff. of Dr. Natalie Brown].) Harris's Apgar score was initially three and only increased to eight after five minutes of treatment.[4] (*Id.*) Pregnancy-induced hypertension was diagnosed as the etiology behind Harris's neonate distress. Such hypertension can be caused by prenatal alcohol exposure. (*Id.*)

Additionally, Harris's family members and school records chronicled his childhood struggles with two neurodevelopmental disorders, social skill deficits, and behavioral problems, all of which stemmed from executive functioning problems. (Ex. 1 at ¶¶22-23 [Aff. of Dr. Natalie Brown].) Harris was diagnosed around the age of seven with ADHD, and a 1991 psychological evaluation resulted in a diagnosis of dysthymia. (*Id.* at ¶¶23, 27.) School records also indicated that Harris struggled with learning disabilities. (*Id.* at ¶¶22-23.) A 1994 evaluation resulted in diagnoses of dysthymia, ADHD, and "developmental problems in Arithmetic, Expressive Writing, and Reading." (*Id.* at ¶23.) Testing in 2000 indicated concrete thinking, inadequate coping defenses, anxiety, and interpersonal

---

[4] Apgar is a scoring method that assesses the health of newborns immediately after birth. The score is compiled from adding individual scores for the infant's respiratory effort, heart rate, skin color, response to a catheter in the nostril, and muscle tone. Scores for these factors range from zero to two points, and the scores are summed. Thus, the highest possible Apgar score is ten. A newborn with a score between zero and three needs immediate resuscitation. (Ex. 1 at ¶21, n.2 [Aff. of Dr. Natalie Brown].)

skill deficits. (*Id.* at ¶22.) A 2003 psychological evaluation documented diagnoses of depression, anxiety, and ADHD, as well as a behavioral history of numerous runaway episodes. (*Id.* at ¶23.) Harris's documented struggles in school constitute examples of deficits in executive function, mood regulation, social skills, and adaptive coping. (*Id.* at ¶¶22-23.)

Trial counsel elicited testimony from Harris's mother, stepfather, and younger brother. Each witness described Harris's diagnosis with ADHD, and his intermittent treatment with Ritalin. Moreover, each of the three witnesses described Harris's learning disabilities, his depression, and his pattern of running away from home.

## 4. This Evidence Establishes That Harris Meets Diagnostic Criteria for Fetal Alcohol Spectrum Disorder

A diagnosis of FASD requires abnormalities to the central nervous system in the context of confirmed prenatal alcohol exposure. (Ex. 1 at ¶40 [Aff. of Dr. Natalie Brown].) The more specific diagnosis of ARND does not require the observation of facial abnormalities. (*Id.*) Harris possesses qualifying central nervous system abnormalities which, coupled with his confirmed prenatal exposure to alcohol, means that he meets diagnostic criteria for ARND, one of the conditions under the FASD umbrella. (*Id.* at ¶29.)

Trial counsel retained Dr. Antoinette McGarrahan to conduct neuropsychological testing on Harris. (Ex. 1 at ¶25 [Aff. of Dr. Natalie Brown].)[5] A review of this testing, which occurred in November 2011, indicates that Harris has significant deficits in four major cognitive domains: (1) academic

---

[5] At the request of post-conviction counsel, Dr. James Underhill, a licensed neuropsychologist, reviewed Dr. McGarrahan's raw testing data. (Ex. 6 at ¶10 [Aff. of Dr. James Underhill].) Dr. Underhill compiled a list of Harris's scores on the tests, as well as scores for any subscales within the testing measures. (*Id.* at ¶12.) This list of scores was provided to Dr. Brown for review.

achievement; (2) executive functioning; (3) visual spatial integration; and (4) auditory and visual memory. (*Id.*) Harris's testing revealed a WAIS-IV IQ score of 84, placing him in the low average range. (*Id.*) Although this score does not fall into the intellectually deficient range, there were significant discrepancies among the four WAIS-IV indices, suggesting the possibility of brain damage consistent with FASD. (*Id.*) Harris displayed deficient ability in all academic areas, and, despite completing the tenth grade, his academic skills ranged from fifth to seventh grade. (*Id.*) Harris's results on a visual-spatial integration test (Hooper Visual Orientation Test) fell more than 1 standard deviation below the mean. (*Id.*) Scores on tests of auditory and visual memory and learning (Wechsler Memory Scale-4, California Verbal Learning Test, Rey Complex Figure Test) fell 1 to 2.5 standard deviations below the mean. (*Id.*) Several of Harris's scores on tests of executive function (Wisconsin Card Sorting Test, Boston Naming Test) fell 1 to 3 standard deviations below the mean. (*Id.*) Overall, these deficits provide convergent evidence that is highly suggestive of frontal lobe brain damage, with some damage in the temporal and parietal lobes. (*Id.*) These neuropsychological deficits mirror deficits observed in individuals with FASD, and qualify as a central nervous system abnormality required for a diagnosis of FASD. (*Id.* at ¶40.)

Harris was also diagnosed with two neurodevelopmental disorders that are correlated with individuals afflicted with FASD, a learning disorder (especially in mathematics) and ADHD. (Ex. 1 at ¶35 [Aff. of Dr. Natalie Brown].) Neurodevelopmental disorders typically stem from brain damage. (*Id.*) Harris's birth records provide additional support that he was likely born with brain damage, as they indicate Harris was in "severe" distress at birth, a complication that, like developmental disabilities and learning disorders, is associated with FASD. (*Id.*)

Screening questionnaires (Fetal Alcohol Behavior Scale) were administered to three of Harris's family members during post-conviction investigation. (Ex. 1 at

31

¶37 [Aff. of Dr. Natalie Brown].) Each response contained scores that placed Harris's behavior in the FASD range. (*Id.*)

Finally, Harris's mother Pamela Maddox confirmed in pretrial and post-conviction investigation that she consumed alcohol during at least the first six weeks of her pregnancy with Harris. (*See* 64 RR at 222-24; Ex. 11 at ¶7 [Aff. of Pamela Maddox].) Given Harris's confirmed prenatal exposure to alcohol, his deficits in four discrete cognitive domains revealed by neuropsychological testing, and his lifelong neurodevelopmental disorders (ADHD and learning disorder), it is clear that Harris meets the diagnostic criteria for ARND, a condition on the spectrum of FASD.[6]

## 5. Trial Counsel's Failure to Develop and Present Evidence Harris Suffered from FASD Constitutes Deficient Performance That Prejudiced Harris

As discussed above, prior to Harris's capital trial defense counsel was in possession of numerous pieces of evidence that should have led to an investigation into whether Harris was afflicted with FASD. First and foremost, counsel knew that Harris's mother consumed alcohol during the first six weeks of her pregnancy because Ms. Maddox admitted as much to Brendan Ross, defense counsel's mitigation investigator. Moreover, trial counsel affirmatively elicited testimony to this effect from Ms. Maddox during the punishment phase of Harris's trial, indicating that they were both aware of this information and knew it to be relevant.

---

[6] Examination of a childhood photograph of Roderick Harris indicates possible facial dysmorphology consistent with FASD. Consultation with a medical doctor with expertise in FASD could likely result in a diagnosis of FAS or Partial FAS. Regardless of the specific condition (FAS, Partial FAS, or ARND), all FASD conditions involve similar degrees of brain damage and functional impairment. Thus, the specific diagnostic condition is forensically irrelevant. (Ex. 1 at ¶40 [Aff. of Dr. Natalie Brown].) Regardless, Harris intends to undergo further medical testing and will supplement this application with any updated FASD information.

32

(64 RR at 222-24.) The fact that trial counsel had maternal confirmation that Harris was exposed to alcohol in utero should have prompted a consultation with a psychologist or medical doctor with expertise in FASD.[7]

In addition to Harris's confirmed prenatal exposure to alcohol, trial counsel overlooked several clear and consistent "red flags" that Harris suffered from serious, chronic cognitive difficulties and associated adaptive dysfunction. From birth, Harris's records indicate a likelihood that he suffered from brain damage. (Ex. 1 at ¶35 [Aff. of Dr. Natalie Brown].) Moreover, Harris's school records indicate a long history with learning disorders, ADHD, depressed mood, dysthymia, and suicidal ideations. (*Id.* at ¶¶22-23.) Trial counsel elicited testimony about these factors from Harris's mother, stepfather, and younger brother during the punishment phase as well. (64 RR at 215-293; 65 RR at 29-62, 70-87.) This information should have operated as a clear warning sign to trial counsel that Harris had considerable problems with cognitive functioning, which should have prompted further investigation into the etiology of these complications.

In light of trial counsel's confirmation of Harris's prenatal exposure to alcohol, trial counsel's failure to consult a psychologist or medical doctor with expertise in FASD is a glaring omission. Had trial counsel sought to explain the underlying cause of the troubling aspects of Harris's cognitive and behavioral impairments, such an investigation would have led to consultation with an expert in the area of FASD who could have testified that Harris meets the diagnostic criteria for ARND, one of the specific conditions of FASD. (Ex. 1 at ¶39 [Aff. of Dr. Natalie Brown].)

---

[7] According to Dr. Brown, it is common practice for trial counsel to hire an FASD specialist whenever prenatal alcohol exposure is merely suspected. (Ex. 1 at ¶38 [Aff. of Dr. Natalie Brown].)

A diagnosis of ARND would have proven to be powerful mitigating evidence for a jury to hear. Individuals with ARND are, through no fault of their own, born with serious cognitive impairments. These impairments include deficits in a broad array of neurocognitive functions, such as attention, learning, logical thinking, impulse inhibition, and self-regulation, which are certainly relevant to the mitigating circumstances special issue posed to capital juries in Texas. (*See* Ex. 1at ¶14 [Aff. of Dr. Natalie Brown].) Moreover, individuals with FASD suffer "secondary disabilities" that inhibit their ability to have successful social interactions and integration, leading to higher than average rates of criminal infractions and incarceration. (*Id.* at ¶16.)

Thus, had trial counsel presented evidence that Harris suffers from ARND, a condition of FASD, there is a reasonable probability that the jury's sentence would have been affected. *See Wiggins*, 539 U.S. at 534-35; *Strickland*, 466 U.S. at 694-95. As such, Harris's death sentence should be reversed and he should be granted a new punishment phase trial.

## B. Trial Counsel Failed to Uncover and Present Information That Harris Was Exposed to Toxic Levels of Lead as a Child

In addition to fetal alcohol exposure, Harris's cognitive and childhood development were likely affected by his exposure, both in utero and during infancy, to toxic levels of lead. For fifty years, a lead smelting facility operated on a lot at the corner of Westmoreland Road and Singleton Boulevard in West Dallas. Roderick Harris's mother, Pamela Maddox, grew up near this facility, first in the housing projects on Delhi Street, and later in a house located at 3544 Nomas Street, less than half a mile from the smelter. Seventeen-year-old Pamela was still residing at the Nomas Street house when she gave birth to Roderick Harris in 1984. Harris spent the first several years of his life on Nomas Street, and spent most of the first decade of his life in a fourteen-square-mile area of West Dallas that

34

eventually was declared a Superfund site due to lead contamination from the smelting facility.

Children are highly susceptible to lead poisoning, and the toxic effects of exposure can include damage to the central nervous system, which can lead to low IQ scores and deficits in cognitive function and academic skills. Exposure can also cause behavioral problems, including ADHD. Trial counsel failed to uncover and present evidence that Harris was exposed to high levels of lead during his early childhood, which exposure provides an explanation for Harris's cognitive, adaptive, and behavioral deficits.

## 1. Toxicological Significance of Exposure to Lead

The toxic effects of exposure to lead have been recognized for more than two thousand years. (Ex. 2 at ¶8 [Aff. of Dr. Thomas Dydek].) Ingestion of lead can have many adverse health effects and can negatively affect several organ systems in the human body, including the gastrointestinal, immune, and reproductive systems, as well as the central nervous system. (*Id.*)

Children are more at risk of suffering the negative effects of lead exposure than are adults. (Ex. 2 at ¶8 [Aff. of Dr. Thomas Dydek].) This is both because children are more likely to ingest more lead than adults and because the effects of lead ingestion are more pronounced in children. (*Id.* at ¶6.) However, even before birth, fetuses in utero can absorb lead from the mother. (*Id.* at ¶7.) Absorbed lead accumulates in the bones of adults, and can re-enter the bloodstream through a process known as "bone resorption," which occurs during pregnancy. (*Id.*)

One of the primary routes of exposure to lead is through the ingestion of contaminated dirt, soil, and household dust. (Ex. 2 at ¶6 [Aff. of Dr. Thomas Dydek].) Because children spend more time on the ground (for example, while playing or crawling), they are more likely to ingest or inhale lead particulates. (*Id.*) Similarly, children have a habit of ingesting dirt, either intentionally or by way of

35

placing their dirty hands and toys in their mouths. (*Id.*) Once a child ingests contaminated material, the absorption of lead into the blood is five to ten times greater than in adults. (*Id.*) Furthermore, children are more likely to have nutritional deficits in certain minerals, such as iron or calcium, which facilitates greater absorption of lead. (*Id.*) Finally, the central nervous systems of young children are not fully developed. (*Id.*) Thus, it is more likely that lead in the bloodstream of children will reach, and negatively affect, sensitive brain tissues. (*Id.*) Adults who were exposed to high levels of lead as children exhibit damage to both grey and white matter in the brain. (*Id.* at ¶9.) Lead exposure is associated with damage to the frontal lobes, parietal lobes, basal ganglia, cerebellar hemisphere, and cerebellar vermix. (*Id.*) Aside from brain damage, the effects of lead exposure on the central nervous system include low IQ and deficits in cognitive functioning and academic skills. (*Id.* at ¶8.) Lead exposure has also been associated with higher incidences of ADHD. (*Id.*)

### 2. History of the RSR Corporation Lead Smelting Facility

In the early 1930s, a secondary lead smelting facility opened and began operations west of downtown Dallas. (Ex. 21 at 5 [Agency for Toxic Substances and Disease Registry ("ATSDR") Public Health Assessment].)[8] Secondary smelting operations recover lead from pre-existing sources, such as batteries, cables, pipes, and other metals. (Ex. 22 at 5 [EPA Superfund Record of Decision].)[9] The smelting facility in west Dallas was primarily tasked with the recovery of lead from recycled automobile batteries. (*Id.*)

---

[8] Ex. 21 is publicly available at the following website: http://www.atsdr.cdc.gov/HAC/pha/PHA.asp?docid=134&pg=0 (last visited June 8, 2014).

[9] Ex. 22 is publicly available at the following website: http://www.epa.gov/ superfund/sites/rods/fulltext/r0695095.pdf (last visited June 8, 2014).

Although the facility was originally located outside the Dallas city limits, the surrounding area was annexed by the city in the 1950s. (Ex. 21 at 6 [ATSDR Public Health Assessment].) In the years that followed, residences, schools, and a major housing project were constructed nearby. (*Id.*) Despite this metropolitan growth, air emissions from the smelter continued without control until 1968. (*Id.*) In 1971, the smelter was purchased by the RSR Corporation ("RSR"). (*Id.*) Over the next thirteen years, RSR was ordered to upgrade its emissions control devices due to enforcement actions and lawsuits brought by the City of Dallas, the State of Texas, and the Texas Air Control Board. (*Id.* at 7.) A 1983 lawsuit alleged damages from the air emissions of lead, and RSR was ordered to remove and replace contaminated soil, implement a comprehensive plan for remediation, and screen children for lead blood levels. (*Id.*) In February 1984, RSR ceased operation of the smelter and sold the facility to the Murmur Corporation. (*Id.*) Later that year, the City of Dallas denied Murmur's application for an operating permit. Remedial work, consisting of the removal of contaminated soils, began in 1984 and continued into 1985. (*Id.* at 7.) A second removal effort was initiated in 1991 by the EPA. (*Id.*) In 1993, the EPA proposed listing the RSR site and surrounding area on the National Priorities List of Superfund sites. (*Id.* at 8.)

There were several sources for the contamination that plagued the area surrounding the RSR site. (Ex. 21 at 5 [ATSDR Public Health Assessment].) Air emissions deposited lead in the residential properties surrounding the smelter, primarily in the areas north and northeast of the site. (*Id.*) Contamination also occurred due to the use of battery chips (plastic pieces of battery casings generated from the smelting activities) as residential fill and paving material. (*Id.*) Slag, a toxic byproduct of the smelting operation, was also used as residential fill in the area and deposited in nearby landfills. (*Id.*)

37

### 3. Harris Likely Was Exposed to Lead as a Young Child and May Have Suffered Adverse Effects Due to This Exposure

Harris spent much of the first decade of his life within half a mile of the epicenter of a Superfund site which exposed him to elevated levels of lead as a child. However, Harris's exposure to lead likely began before he was even born. (*See* Ex. 2 at ¶¶7, 15 [Aff. of Dr. Thomas Dydek].)

Roderick Harris's maternal grandmother, Shirley Cook, grew up at 3541 Pueblo Street in West Dallas. (Ex. 8 at ¶7 [Aff. of Shirley Cook].) Ms. Cook remembers smelling the RSR plant's emissions in the air. (*Id.* at ¶8.) The emissions smelled like "tar or sulfur, something bad like that." (*Id.*) Physical particles from the emissions landed in the neighborhood and were visible on the windshields and hoods of cars. (*Id.*) Ms. Cook saw black plastic chips in the driveways of houses in the Pueblo Street neighborhood where she grew up. (*Id.* at ¶10.)

Ms. Cook gave birth to Harris's mother, Pamela Maddox, in 1967. At the time of Ms. Maddox's birth, Ms. Cook was living in the housing projects in West Dallas. (Ex. 8 at ¶7 [Aff. of Shirley Cook].) In the early 1970s, Ms. Cook moved her family, including Ms. Maddox, to a house located at 3544 Nomas Street in West Dallas. (*Id.*) This house on Nomas Street was less than half a mile from the RSR Corporation lead smelting facility located on the southeast corner of Westmoreland Road and Singleton Boulevard. (Ex. 23 [Google Maps].) Ms. Cook found black plastic chips when digging in the yard of this house. (Ex. 8 at ¶10 [Aff. of Shirley Cook].)

The smelter was fully operational during Ms. Maddox's childhood when she would have been most at risk of ingesting toxic levels of lead. (*See* Ex. 2 at ¶¶6, 12 [Aff. of Dr. Thomas Dydek].) Ms. Cook reports that all of her children, including Ms. Maddox, played in the dirt at the house on Nomas Street. (Ex. 8 at

¶13 [Aff. of Shirley Cook].) It is likely that Ms. Maddox accumulated a significant amount of lead in her bones that could have been transferred in utero to Harris. (*See* Ex. 2 at ¶¶7, 15 [Aff. of Dr. Thomas Dydek].)

Ms. Maddox lived with her mother at 3544 Nomas Street when she became pregnant with Harris. (Ex. 11 at ¶11 [Aff. of Pamela Maddox].) She lived at that house for the duration of her pregnancy, and continued to live at the house for about a year after Harris's birth on June 12, 1984. (*Id.*) From there, Ms. Maddox and Harris moved a few houses down Nomas Street to live with Ms. Maddox's sister Sherry. (*Id.*) Ms. Maddox and Harris lived in public housing in Oak Cliff for a period of time, during which Harris would visit Ms. Cook's house on Nomas Street several times per week. (*Id.* at ¶12.) When Harris was around four years old, he and his mother moved into Ms. Cook's house on Nomas Street where they lived for about four years. (*Id.*)

As a young child, Harris frequently played in the yard of his grandmother's house (later his mother's house) at 3544 Nomas Street, and at the home of Ms. Cook's father at 3541 Pueblo Street. (Ex. 11 at ¶12 [Aff. of Pamela Maddox]; Ex. 8 at ¶12 [Aff. of Shirley Cook].) Ms. Cook and Ms. Maddox both recall that Harris played in the dirt and put dirt and dirty toys in his mouth, as many children are prone to do. (Ex. 11 at ¶13 [Aff. of Pamela Maddox]; Ex. 8 at ¶13 [Aff. of Shirley Cook].) Soils within a half mile radius of the smelter, particularly to the northeast, were found to have very high levels of lead due to air emissions from the RSR Corporation smelter. (Ex. 21 at 6-7, 52 [ATSDR Public Health Assessment].) Harris and his mother caught crawdads in the ditch near their house on Nomas Street, which they would later consume. (Ex. 12 at ¶12 [Aff. of Ramon Maddox, Sr.].)

Harris was also taken to play in nearby parks, including the park at Amelia Earhart Learning Center, where Harris later attended school for two years. (Ex. 11

at ¶13 [Aff. of Pamela Maddox]; Ex. 12 at ¶14 [Aff. of Ramon Maddox, Sr.].) Amelia Earhart Learning Center was one of the sites where the remedial removal of soil occurred in the early 1990s. (*See* Ex. 24 [Dallas News Photos].)[10] Harris then attended Priscilla Tyler Elementary School in West Dallas. (Ex. 12 at ¶14 [Aff. of Ramon Maddox, Sr.].) Harris and his family moved away from the house at 3544 Nomas Street in 1992. (*Id.* at ¶10.)

Throughout his life, and from a young age, Harris exhibited medical, psychological, and neurodevelopmental conditions that are associated and correlated with childhood exposure to lead. (Ex. 2 at ¶18 [Aff. of Dr. Thomas Dydek].) Harris was diagnosed with ADHD at the age of seven, and ADHD has been associated with exposure to lead. (*Id.* at ¶8.) Harris struggled with learning disabilities that plagued him during his time in school and required him to enroll in special education classes until he dropped out of high school in the eleventh grade. The central nervous system of children is particularly sensitive to the effects of lead, and exposure can cause declines in academic achievement and learning disabilities. (*Id.*) Lead exposure as a child can also cause damage to the brain, particularly in the frontal and parietal lobes. (*Id.* at ¶9.) Neuropsychological testing of Harris revealed damage to these areas of his brain. (Ex. 1 at ¶25 [Aff. of Dr. Natalie Brown].)

### 4. Conclusion

Capital trial counsel has a duty to conduct an investigation to uncover mitigating evidence. In the context of mitigation, evidence that a defendant has been disadvantaged is particularly important "because of the belief, long held by

---

[10] Ex. 24 consists of Photos 13, 14, and 15 from a publicly-available photo gallery found at http://www.dallasnews.com/news/photos/20121212-the-burden-of-lead-historic-photos-of-west-dallas-rsr-smelter-and-environmental-contamination.ece?ssimg=820213#ssTop820217 (last visited June 8, 2014).

this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Wiggins*, 539 U.S. at 535 (citing *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)); *see also Ex parte Gonzales*, 204 S.W.3d at 399 (granting habeas relief due to trial counsel's ineffective assistance for failing to present evidence that the defendant suffered post-traumatic stress disorder due to childhood trauma). Here, trial counsel neither discovered nor presented evidence that Harris was chronically exposed to a highly toxic substance, lead, from before his birth through the early, formative years of his life. Lead exposure is associated with a number of cognitive, behavioral, intellectual, and neurodevelopmental problems, problems which plagued Harris throughout his life. He faced disadvantages from a young age partly because of where he was born. Evidence that Harris was exposed to toxic amounts of lead would have been powerful mitigating evidence, and there is a reasonable probability that the result of his punishment phase would have been different had it been presented to the jury. *See Strickland*, 466 U.S. at 694.

## C. Trial Counsel Failed to Retain and Present Testimony from Expert Witnesses to Explain the Mitigating Impact of Harris's Life History

As discussed above, presenting lay witnesses to describe various facts about a defendant's life will typically fall short of the complete mitigation presentation necessary to explain to a jury the reasons a death sentence is not warranted. The reason is two-fold. First, a single lay witness often will be unable by his or her testimony alone to tell the entire story of a defendant in a cohesive manner. Even close family members will not have witnessed every aspect of a defendant's life; thus, a jury presented with lay witness testimony alone receives what amounts to pieces of a puzzle, rather than a linear explanation of a life history. Second, having lived through many of the events they are describing themselves, lay witnesses will almost always lack both the perspective and the training to fully explain the

41

significance of life events. Expert witness testimony is necessary to fit the pieces of the defendant's life story together and explain for the jury the significance of the resulting picture.

Just as evidence regarding the impacts of prenatal exposure to alcohol and toxic levels of lead requires the testimony of specialized expert witnesses, so too does the testimony of Harris's family members require interpretation and explanation by qualified experts. Through the testimony of Harris's mother, stepfather, brother, and cousin, the jury learned the following facts about Harris's life:

- Harris's biological father was incarcerated for most of Harris's life.
- Harris's mother and stepfather frequently drank and smoked marijuana during Harris's childhood.
- Harris received "whoopings" from his stepfather with belts or extension cords.
- Harris got in trouble at school.
- At seven years old, Harris was diagnosed with ADHD, for which he was prescribed Ritalin and placed into special education classes.
- Harris had a history of running away from home.
- As an early teenager, Harris was briefly involved in a youth street gang.
- Harris abused drugs, specifically marijuana and PCP.
- Harris was a loving father to his own children.

(64 RR at 215, 256; 65 RR at 29, 88.) Without further explanation, these factual statements resting on their own fail to communicate why a jury should find them mitigating, either individually or taken as a whole. Indeed, several of the facts—that Harris was involved in a gang, that Harris abused illegal drugs, and that Harris frequently ran away from home—on their face appear to be aggravating rather than mitigating facts.

Trial counsel's presentation of expert witnesses at Harris's punishment phase did little to explain the importance of these facts or to offer the jury a way of

42

understanding Harris's life story as a whole. Dr. John Roache was presented as an addictions expert to explain why drugs are addictive and how marijuana and PCP affect the body. (65 RR at 119.) Dr. Gilda Kessner, a psychologist, was presented to describe certain childhood risk factors for later delinquent or violent behavior—factors that have been identified through Department of Justice research. (65 RR at 152.) Both experts offered a mostly academic explanation of their topics, devoid of application to Harris's specific life story. Neither expert met with Harris or other witnesses, and both specifically denied being asked to render an opinion about Harris himself.[11] (65 RR at 141, 154, 162.)

Had trial counsel investigated further, however, and retained the assistance of expert witnesses in fields relating to Harris's specific life narrative, they would have been able to present the jury with a comprehensive and cohesive explanation of Harris's life trajectory. Such testimony would have explained why so many of the negative pieces of his life story were not Harris's fault, and why the path of his life trajectory was both predictable and sadly common. Moreover, this testimony would have turned what appeared to be many aggravating facts about Harris's life story into significantly mitigating information.

### 1. Expert Testimony Available to be Presented

Several different types of expert testimony were available to fill this role, either individually or in tandem. For example, counsel could have retained the assistance of a social worker, such as Laura Sovine. Ms. Sovine is employed by Travis County Health and Human Services where she supervises a team of social workers who provide intensive support services for families. (Ex. 5 at ¶1 [Aff. of

---

[11] Trial counsel also presented the testimony of James Aiken and S.O. Woods as experts regarding prison classification and whether there was a probability Harris would commit acts of violence, as well as the testimony of Dr. Charles Weaver, an eyewitness identification expert. (65 RR at 147, 170, 193.)

43

Laura Sovine].) In addition, she has experience working with both at-risk youth and formerly incarcerated offenders. (*Id.* at ¶2.) She is an adjunct faculty member at the University of Texas at Austin School of Social Work. (*Id.* at ¶3.) Ms. Sovine would have been able to examine how Harris's early childhood development influenced his behavior as a youth and adult.

Next, counsel could have retained an expert in the field of youth gangs, such as Charles Rotramel, to evaluate whether Harris's involvement in a youth gang was as scary and dangerous as the prosecution made it out to be. Mr. Rotramel is the founder and executive director of Youth Advocates, a non-profit youth development organization that provides assistance and support to young people throughout the Houston area. (Ex. 4 at ¶¶1-2 [Aff. of Charles Rotramel].) Mr. Rotramel has over thirty years of experience working directly with at-risk and gang-related youth in the Houston area. (*Id.* at ¶1.) His work has taken place both inside the juvenile justice and criminal justice systems as well as on the streets and in neighborhoods. (*Id.* at ¶4.) He has spoken at universities, non-profit organizations, and governmental agencies, and has testified before the Texas State Senate and House on the subjects of gangs and gang violence. (*Id.* at ¶12.)

Further, counsel could have retained an expert to examine Harris's history of behavioral issues in school, resulting discipline and suspensions, and subsequent involvement in the juvenile justice system. For example, Dr. Courtney Robinson has studied what has become known as the "school to prison pipeline." (Ex. 3 at ¶¶1-4 [Aff. of Dr. Courtney Robinson].) In addition to work experience dealing with both educational institutions and the juvenile justice system, Dr. Robinson holds a doctorate degree in cultural studies in education from the University of Texas at Austin. (*Id.* at ¶¶1, 3.) Her research has focused on the ways in which African American students (especially males) are routinely separated from the regular classroom for behavioral issues and directed toward the juvenile justice

44

system.  (*Id.* at ¶¶2, 4.)   She has specifically studied the histories of African American males incarcerated in the Dallas area, finding common life events and trajectories.  (*Id.* at ¶2.)

## 2. Harris's Life History Explained[12]

Testimony from expert witnesses like those described above would have offered the jury a stunningly different and substantially more complete understanding of the mitigating nature of Roderick Harris's life history. Specifically, the jury would have learned that, from his birth (and even before it), Roderick[13] was at a distinct disadvantage in life.  Early negative impacts to his childhood development left Roderick with several impairments to his mental health and social functioning.  Rather than address these impairments, however, his family impeded what little treatment he received and attempted to use strict discipline to solve problems.  School officials similarly reacted to Roderick's issues as behavioral problems and disciplinary issues.  Instead of positively intervening, this served to drive Roderick away from home and school, into the street life of gangs, drugs, and crime.  As opposed to a story of a deviant youth, Roderick's life history shows a sadly common trajectory of a youth funneled into the criminal justice system.

### a. Early Setbacks and Impairments

As already mentioned, Roderick was exposed to alcohol during the early stages of his mother's pregnancy and to toxic levels of lead in utero and during infancy.  These carried with them a significant risk of cognitive and developmental

---

[12] The testimony of the expert witnesses cited within this claim comes not only from the evidence presented at trial but also from the investigation done by post-conviction counsel.  These experts' affidavits are cited, as is appropriate, but, for ease of readability, their analyses and opinions have not been set out in block quotations despite being quoted directly and paraphrased.

[13] For clarity of the narrative, Mr. Harris and his family member will be referred to by their first names in this section.

45

impairments. *See* Parts A and B, *ante*. In addition, Roderick was born into a family situation that contributed to further impairments in his emotional and psychological development.

Roderick did not experience a nurturing and stable early childhood. Once home from the hospital, Roderick's mother, Pamela, continued to act as the seventeen-year-old girl she was, instead of providing stable parenting to Roderick. Pamela would frequently leave Roderick in the care of her mother, Roderick's paternal grandmother, or even neighbors living in the same West Dallas housing projects. Even after Pamela moved out of her mother's home and married Roderick's stepfather, she continued to drop off Roderick there several times a week. Roderick was left with a rotating cast of caregivers. (Ex. 5 at ¶17 [Aff. of Laura Sovine]; Ex. 11 at ¶8 [Aff. of Pamela Maddox]; Ex. 8 at ¶16 [Aff. of Shirley Cook].)

Roderick's biological father, Eric Propes, had a reputation for being a street hustler—someone out to make a quick dollar. Starting in his teenage years, Eric had a history of stealing from stores and breaking into houses. He went to prison shortly after Roderick was born. Eric was never in Roderick's life for any appreciable length of time, bouncing in and out of prison frequently. (Ex. 5 at ¶18 [Aff. of Laura Sovine]; Ex. 10 at ¶12 [Aff. of Michael Harris]; Ex. 15 at ¶¶10-18 [Aff. of Eric Propes].)

When Roderick was around three years old, his mother married Ramon Maddox, Sr. In their first years of marriage, Ramon, Sr., and Pamela did not take steps to settle the family but, instead, created further chaos and instability. Ramon, Sr., joined Pamela in frequent partying. Ramon, Sr., himself had been raised by a father who was a drug addict and who had spent time in prison, as well as by a mother who was an alcoholic. Ramon, Sr., and Pamela often went out to smoke marijuana and drink alcohol, leaving at home Roderick and, later, their other sons

46

to care for themselves at young ages. Roderick was left to care for himself and his younger brothers in much the same way that Ramon, Sr., had been left by his own parents. Sometimes Ramon, Sr., and Pamela would take the children with them to parties, staying out until three or four o'clock in the morning. It is not surprising that, for Roderick's early childhood, both of his parents were unable to model good parenting—parenting that they themselves had not received. (Ex. 5 at ¶¶20-21 [Aff. of Laura Sovine]; Ex. 13 at ¶¶5, 7 [Aff. of Ramon Maddox, Jr.]; Ex. 12 at ¶¶4, 17 [Aff. of Ramon Maddox, Sr.].)

Ramon, Sr., and Pamela had a physically abusive relationship reminiscent of abusive behaviors they had witnessed in their own childhoods. Both would be physically and verbally abusive to each other, particularly when they had been drinking. Roderick witnessed these fights and became withdrawn and upset. In addition, Roderick frequently received "whoopings" throughout his life from his parents. (Ex. 5 at ¶22 [Aff. of Laura Sovine]; Ex. 11 at ¶18 [Aff. of Pamela Maddox]; Ex. 13 at ¶6 [Aff. of Ramon Maddox, Jr.].)

In addition, a number of Roderick's family members suffered from mental illness. On Roderick's maternal side, these family members included Roderick's mother. (Ex. 11 at ¶43 [Aff. of Pamela Maddox].) Roderick's maternal great-grandmother also suffered from mental health problems, with symptoms including paranoid delusions, similar to Pamela's. (Ex. 8 at ¶4 [Aff. of Shirley Cook].) Several other family members of Roderick's appear to have mental health problems, spanning several generations. (Ex. 8 at ¶¶5-6 [Aff. of Shirley Cook]; Ex. 11 at ¶43 [Aff. of Pamela Maddox].) On Roderick's paternal side, his biological father's family tree also has several generations with family members who have mental illness, including schizophrenia and bipolar disorder. (Ex. 15 at ¶3 [Aff. of Eric Propes]; Ex. 5 at ¶14 [Aff. of Laura Sovine].)

47

According to Attachment Theory, the most important time in a child's life for the brain to develop is between the ages of zero and three. During this time, children either form a secure or an insecure (anxious) attachment. Parents who are nurturing, close in proximity, and sensitive usually will raise a child with secure attachments and, therefore, the appropriate hard-wiring of the frontal lobe—the area of the brain responsible for executive functioning, decision-making, and emotional regulation. Parents who are not sensitive tend to raise children with insecure attachments. Children in this scenario have a much lowered capacity for emotional regulation and impulse control, and they seek to control their environment in unhealthy ways to have their needs met, needs such as care and belonging. Children with insecure attachments raised in chaotic and stressful environments will, without intervention, have significant impairments in behavior and general social functioning. (Ex. 5 at ¶16 [Aff. of Laura Sovine].)

In addition to a lack of stable and nurturing parental figures, the neighborhoods Roderick grew up in were far from nurturing. Roderick's earliest memory is of stepping on a rat when he was two years old in the West Dallas housing projects where his family lived. His next memory is of seeing a naked man running through the projects when Roderick was three; a man he later learned was high on PCP. He recalls being picked on by bullies on his way home from pre-kindergarten classes and of being chased by loose dogs. Bullying, grief, and loss, abandonment by his father, a chaotic and scary environment—these were all things which further served to undermine his healthy childhood development. (Ex. 5 at ¶19 [Aff. of Laura Sovine].)

Roderick's brothers, Bradon and Ramon, Jr., were born shortly after Ramon, Sr., and Pamela were married. Roderick was four and five when they were born. Rather than creating allies for him, though, their births drove a wedge that separated him from the rest of the family. As his natural children, Ramon, Sr.,

48

favored Bradon and Ramon, Jr. Other family members could tell that Ramon, Sr., was more strict with Roderick about his behavior. Ramon, Sr., himself notes that Roderick was bothered by the attention Ramon, Sr., would give to Bradon and Ramon, Jr., and that he did things for them that made Roderick feel left out. (Ex. 5 at ¶23 [Aff. of Laura Sovine]; Ex. 12 at ¶19 [Aff. of Ramon Maddox, Sr.]; Ex. 11 at ¶17 [Aff. of Pamela Maddox].)

Because Roderick formed insecure attachments, he was more likely to have difficulty managing his emotions. When parents are non-responsive or insensitive and children do not have their needs met, they often go through frequent negative affect states with poor ability to control their emotions. As a result, from a very early age, Roderick started acting out to get attention. At home, this took the form of destructive actions—destroying items around the house or punching holes in a waterbed. From other relatives, Roderick sought attention and care, acting funny and trying to be the clown in the room. This behavior was partly brain based and partly environmentally based—when they have no positive role models, it is almost impossible for children to learn how to manage emotions such as sadness, anger, and frustration without acting out. New patterns can be learned but serious intervention is required. (Ex. 5 at ¶¶24-25 [Aff. of Laura Sovine]; Ex. 10 at ¶6 [Aff. of Michael Harris]; Ex. 12 at ¶¶8-9 [Aff. of Ramon Maddox, Sr.].)

### b. Misidentified as a Problem Child

At a young age, Roderick began to show the signs of cognitive and developmental impairments that were likely results of the alcohol and lead exposure in utero and lack of proper attachment development. Roderick was easily distracted, had a hard time sitting still, and could not stay in one place long. (Ex. 12 at ¶23 [Aff. of Ramon Maddox, Sr.]; Ex. 10 at ¶8 [Aff. of Michael Harris].) He began to wander away from the house without telling anyone. Family members would find him wandering the street, sometimes riding a bus around the city and

49

sometimes entering empty buildings. When asked why he did this, Roderick did not know. (Ex. 8 at ¶¶18-19 [Aff. of Shirley Cook].) Roderick did not have patience, acted up, had a hard time listening to his parents, and could not comprehend things when he became upset. (Ex. 5 at ¶26 [Aff. of Laura Sovine]; Ex. 11 at ¶15 [Aff. of Pamela Maddox]; Ex. 12 at ¶9 [Aff. of Ramon Maddox, Sr.]; Ex. 8 at ¶17 [Aff. of Shirley Cook].)

In addition, Roderick struggled in school, having a hard time understanding new information. Ramon, Sr., noticed that Roderick simply memorized information to get by. It seemed like Roderick knew the material, but with further examination it became clear that Roderick did not actually understand the information. (Ex. 5 at ¶28 [Aff. of Laura Sovine]; Ex. 12 at ¶25 [Aff. of Ramon Maddox, Sr.]; Ex. 11 at ¶19 [Aff. of Pamela Maddox].)

Yet these signs were misidentified by both Roderick's family and school officials as behavioral issues and rule-breaking. Roderick's stepfather considered sending Roderick to see a doctor because of his behaviors, but his mother did not think there was a problem. And the family did not have enough money to afford a doctor. So instead, Ramon, Sr., reacted by punishing Roderick for his behaviors, often with whoopings. Even when he got a whooping for running off, Roderick would not seem to understand why he would receive such punishments. (Ex. 5 at ¶27 [Aff. of Laura Sovine]; Ex. 8 at ¶¶18-19 [Aff. of Shirley Cook].)

When Roderick began getting in trouble at school, he remembers his mother, rather than providing guidance and parenting, telling the principal of the school simply to "paddle" him if he misbehaved. Without proper intervention, Roderick continued to act out. For example, around the age of six, Roderick brought razor blades to school. For this he received what would be the first of many expulsions. (Ex. 19 at 199 [Juvenile Records].) Based on his behavioral issues and poor

50

academic performance, Roderick was placed into special education programs. (Ex. 20 at 49 [Garland ISD Records]; Ex. 5 at ¶29 [Aff. of Laura Sovine].)

This misidentification of Roderick as a "problem child" continued despite evaluations by school officials and doctors that showed Roderick was struggling with cognitive and psychological impairments. In 1991, Roderick, now seven years old, was given a psychological evaluation by his school that resulted in a diagnosis of dysthymia, a condition characterized by low energy levels, low self-esteem, low capacity for pleasure in life, and sometimes suicidal ideation. (Ex. 20 at 49 [Garland ISD Records].) Around the same time, Roderick was also diagnosed by his family physician as having ADHD.[14] (Ex. 19 at 213 [Juvenile Records]; Ex. 27 at 108 [Promise House Records]; Ex. 11 at ¶20 [Aff. of Pamela Maddox]; Ex. 5 at ¶30 [Aff. of Laura Sovine].)

Instead of assisting Roderick with the necessary intervention, his diagnosis of ADHD started a struggle between school and medical officials and his parents that would last for the rest of Roderick's childhood. Although Roderick was prescribed Ritalin for his ADHD, his parents did not like how it made Roderick act like a zombie. Periodically, Roderick's stepfather made Roderick stop taking the medication. Even when he was taking it, Roderick's mother would have him skip doses. Then, when Roderick's behavior worsened, he would be referred by the school or his parents to another evaluation or treatment program. They, in turn, would re-prescribe Ritalin until his parents again took him off of it, thus repeating the negative cycle. (Ex. 12 at ¶¶26-27 [Aff. of Ramon Maddox, Sr.]; Ex. 11 at ¶¶20-21 [Aff. of Pamela Maddox] Ex. 5 at ¶31 [Aff. of Laura Sovine].)

---

[14] As discussed, *ante*, many of the symptoms characteristic of ADHD mirror the cognitive deficits and behavioral issues associated with FASD and can also be attributed to lead exposure.

51

This cycle of on-again, off-again medication was particularly unfortunate because the National Institute of Mental Health has concluded that medication is the most effective treatment for ADHD symptoms of inattention and hyperactivity. Further, behavioral therapy is the most effective treatment for impulse control issues. Roderick exhibited all of these symptoms but was never offered behavioral or any other kind of therapy, and his parents took him off the most effective medication at a young age. (Ex. 5 at ¶32 [Aff. of Laura Sovine].)

Roderick's parents focus blame for Roderick's behavioral issues on the schools he attended. They suggest that the schools did not sufficiently support his special education needs and just wanted to solve the problem through prescription drugs. As a result, his parents moved him from school to school whenever they did not think the school was helping Roderick enough. Probably as a result of this movement and Roderick's problems in school, family members report that Roderick did not have many friends growing up. He mostly kept to himself, and his closest friends were his cousins. (Ex. 5 at ¶¶34-35 [Aff. of Laura Sovine]; Ex. 12 at ¶¶18, 26-27 [Aff. of Ramon Maddox, Sr.]; Ex. 11 at ¶¶20, 35 [Aff. of Pamela Maddox].)

Roderick's relationships, though, were compromised by his cognitive and developmental impairments. His cousins remember that Roderick could only play games or socialize for a brief time before he felt compelled to move on. Roderick would start a basketball game or other sport with his cousins and then wander away suddenly after only a short time. He similarly could not sit long enough to watch a movie or television show. Roderick seemed easily distracted and impulsive. He got upset when he did not understand what was going on around him. He could not pay attention for long periods of time, struggled to follow directions, and was not good at adapting to change. (Ex. 5 at ¶35 [Aff. of Laura

52

Sovine]; Ex. 8 at ¶20 [Aff. of Shirley Cook]; Ex. 11 at ¶¶23-24 [Aff. of Pamela Maddox]; Ex. 17 at ¶4 [Aff. of Willie Propes].)

Evaluations of Roderick into his youth continued to show problems with respect to both his mental health and intellectual development. In 1994, a psychological evaluation confirmed diagnoses of dysthymia, ADHD, and developmental problems in math, reading, and writing skills. (Ex. 20 at 49-50 [Garland ISD Records].) Another evaluation conducted in 1997 similarly found diagnoses of dysthymic disorder, early onset, with anxious traits, as well as ADHD and suicidal ideation. (Ex. 20 at 50 [Garland ISD Records]; Ex. 5 at ¶36 [Aff. of Laura Sovine].)

Roderick continued to struggle in school. He acted out and started fights. He did this particularly when he was frustrated and did not understand the schoolwork. He often felt left out and picked on. He hit his desk or threw his papers. He also felt embarrassed due to his placement in special education classes and being required to ride a special school bus while his peers walked to school from their neighborhood. (Ex. 5 at ¶38 [Aff. of Laura Sovine]; Ex. 11 at ¶¶26-28 [Aff. of Pamela Maddox].)

Often, children with insecure attachments operate in "survival mode" and therefore are likely to respond to stress with a "fight or flight" mechanism in a manner more extreme than most. Roderick's defensiveness was a function of his assuming insults and feeling insecure about his learning disabilities, and, as a consequence, he lashed out in order to protect himself or survive in rough areas. (Ex. 5 at ¶39 [Aff. of Laura Sovine].)

Despite his serious mental health and developmental issues, Roderick continued to receive little or no support from the school system or his family. School reports consistently documented the diagnoses of ADHD but did not offer any behavior-modification plan or treatment other than medication. There is no

53

mention in any of Roderick's records of accommodations made for Roderick in the classroom, nor counseling or behavior modification offered to help him figure out how to work around his disorder and to learn. Roderick's parents continued to subvert his treatment, taking him off Ritalin whenever they felt he seemed "dazed" or slow to them. (Ex. 5 at ¶37 [Aff. of Laura Sovine].)

Amidst this backdrop, Roderick began to struggle with depression and began talking about his thoughts of suicide. He told his mother he wanted to jump off a bridge. His brother remembers a time Roderick tried to hang himself off the stairs with a belt. Another time he tried to cut himself. Other family members observed him depressed and suicidal. In response, Roderick's parents took him to the Timberlawn psychiatric facility in Dallas, which again prescribed Ritalin. His stepfather, however, again took him off the drug. His behavior continued to decline in school, particularly when he was no longer taking Ritalin. (Ex. 5 at ¶40 [Aff. of Laura Sovine]; Ex. 11 at ¶29 [Aff. of Pamela Maddox]; Ex. 12 at ¶28 [Aff. of Ramon Maddox, Sr.]; Ex. 13 at ¶¶14-15 [Aff. of Ramon Maddox, Jr.].)

### c. Divergent Pathways

The effect of Roderick's cognitive and psychological impairments to his development, and those impairments' subsequent misidentification as behavioral problems, ultimately created a self-fulfilling prophesy. Roderick was driven further into isolation and away from positive interventions. Instead, he found acceptance amongst numerous negative influences. At the same time, his continued self-destructive behaviors confirmed his parents' and school officials' belief that Roderick needed more punishment and discipline. These two forces set Roderick on a trajectory aimed for the juvenile justice system and, later, the criminal justice system. (Ex. 5 at ¶47 [Aff. of Laura Sovine].)

### i. Running Away

When Roderick was around thirteen years old, his parents began to leave behind their habits of partying and abuse, and to focus on their family. Both parents report that it was around this time that they learned how to manage their marriage without arguments and violence. Ramon, Sr., particularly was motivated to raise his children differently than he was parented. He became very strict with the children and was suddenly providing a lot of oversight. Ramon, Sr., started monitoring Roderick and his brothers' school work and making them participate in church activities. He did not let them stay out past a certain time or spend too much time at friends' houses. (Ex. 5 at ¶41 [Aff. of Laura Sovine]; Ex. 12 at ¶30 [Aff. of Ramon Maddox, Sr.]; Ex. 13 at ¶8 [Aff. of Ramon Maddox, Jr.].)

The suddenness and harshness of this strictness backfired for Roderick. Other family members noted how strict Ramon, Sr., had become. Roderick's cousins did not like to come to the house to play. Ramon, Sr., admits that when Roderick would not live up to his strictness, he would punish him by giving whoopings, usually with a belt or extension cord. (Ex. 5 at ¶43 [Aff. of Laura Sovine]; Ex. 12 at ¶30 [Aff. of Ramon Maddox, Sr.]; Ex. 13 at ¶12 [Aff. of Ramon Maddox, Jr.]; Ex. 11 at ¶¶31-32 [Aff. of Pamela Maddox]; Ex. 7 at ¶¶5-6 [Aff. of Shamy Conley].)

Roderick struggled within this system of parenting, as he was unable to change his behavior to accord with Ramon, Sr.'s rules. Whereas his brothers were able to adapt and learn how to avoid getting punished, Roderick was not. He would simply repeat the same behaviors that earlier had led to whoopings. (Ex. 5 at ¶45 [Aff. of Laura Sovine]; Ex. 12 at ¶30 [Aff. of Ramon Maddox, Sr.]; Ex. 13 at ¶12 [Aff. of Ramon Maddox, Jr.]; Ex. 11 at ¶¶31-32 [Aff. of Pamela Maddox]; Ex. 7 at ¶8 [Aff. of Shamy Conley].)

Probably in response to this punishment, Roderick began to run away from home. His parents and siblings could tell that Roderick would leave home in order to avoid the whoopings or when he got in trouble at school. At first, these episodes only lasted a few hours. Roderick's parents were relieved when he returned home and therefore did not punish him. As time went on, however, Roderick began staying away for longer periods. Sometimes his stepfather went out looking for him and brought him back home. Other times Roderick stayed away for a day or more, and his parents reported him as a runaway to the police. (Ex. 5 at ¶46 [Aff. of Laura Sovine]; Ex. 12 at ¶31 [Aff. of Ramon Maddox, Sr.]; Ex. 13 at ¶¶12-13 [Aff. of Ramon Maddox, Jr.]; Ex. 11 at ¶33 [Aff. of Pamela Maddox].)

### ii. Street Life and Gang Affiliation

Around this same time, Roderick began spending more time with his biological father's (Eric Propes) side of the family. Because of his feelings of ostracism or detachment from his mother's side, Roderick likely was looking for a place where he felt more connected. The cousins from his father's side also lived in the same rough neighborhood and shared that experience. Rather than being a positive role model, though, they exposed Roderick to further violence, gang activity, and drugs. (Ex. 5 at ¶48 [Aff. of Laura Sovine]; Ex. 10 at ¶¶10-11 [Aff. of Michael Harris]; Ex. 17 at ¶12 [Aff. of Willie Propes].)

Like his brothers, parents, and school officials, these cousins also noticed that Roderick mentally struggled to keep up with them. In addition to his short attention span, Roderick seemed slow to understand things. Conversations went over his head, and he became upset when someone used a word he did not know. He believed the other person was insulting him. Roderick's cousins had to explain to Roderick what was meant, even getting a dictionary out to show him the definitions of words. (Ex. 5 at ¶49 [Aff. of Laura Sovine]; Ex. 16 at ¶6 [Aff. of Kenneth Propes]; Ex. 17 at ¶4 [Aff. of Willie Propes].)

56

Because of his slowness, Roderick's cousins noted that he was taken advantage of by others. Roderick did not seem to understand risks and would get into trouble doing what others asked him to do. He also frequently became depressed around his cousins. He felt no one cared about him and that he was an outcast. It was for this reason that his cousins believed Roderick joined a gang— he wanted to fit in. (Ex. 5 at ¶50 [Aff. of Laura Sovine]; Ex. 16 at ¶¶6-7 [Aff. of Kenneth Propes]; Ex. 17 at ¶¶5-7 [Aff. of Willie Propes].)

Roderick joined a local juvenile gang known as the Fish Trap Bloods, sometime between eight and ten years old. (Ex. 4 at ¶30 [Aff. of Charles Rotramel].) Based on his life history and current circumstances, it was unsurprising that Roderick joined a gang as his profile fit the type of youth at risk for joining a gang. Juveniles who join gangs share a common set of characteristics: they are raised by parents with weak parenting skills; there is low parental involvement in their lives; they grow up in poverty conditions; they have not developed many social ties or friends; they are bullied or excluded from peer groups; and they come from neighborhoods that are in disrepair and unsafe. (*Id.* at ¶18.) Roderick's life history contained many if not all of these characteristics. Almost every risk factor for juvenile delinquency was present in his early life. (*Id.* at ¶¶30, 39-40.)

Roderick, like most youth who join gangs, was motivated to fill the void created by his failures to connect with his family, his peers, and other caring adults. A gang fills the role in the lives of its members as a place of belonging. Often, because they come from abusive and/or neglectful homes that are characterized by chaos and hostility, juvenile gang members would rather spend time with their fellow gang members than with anyone else. Because they lack social skills and are often not involved in any positive activities, they have nothing else to do and no one else to spend time with. These youths consequently see their gang as a

57

positive force in their lives—as a beneficial group rather than a criminal enterprise. With no other place of belonging, the gang became a sort of safe haven for Roderick in his tumultuous world. (Ex. 4 at ¶¶23, 31 [Aff. of Charles Rotramel].)

That a youth street gang is where Roderick found his belonging at an impressionable age had lasting negative consequences for his life trajectory. Even though most youths leave gangs before the age of twenty-one (Roderick left when he was sixteen), research reveals several consequences to gang membership. First, individuals who participated in youth street gangs are three times more likely to engage in adult criminal behavior between the ages of twenty-seven and thirty-three. Youths who join gangs learn to place value on criminal activity from an early age and start committing smaller crimes such as burglaries of automobiles and homes, graffiti, or trying to fight rival gang members. Second, individuals who participated in youth street gangs are 50% less likely to complete high school than those who do not participate. And third, former youth gang members are three times more likely to have substance abuse issues, and twice as likely to experience mental health issues such as depression and anxiety. (Ex. 4 at ¶¶26, 29 [Aff. of Charles Rotramel].)

In fact, Roderick's life trajectory following his gang membership followed these same patterns. As will be discussed later, Roderick dropped out of school in the eleventh grade and became more and more involved in criminal activity. It was also around the same time of his involvement in the Fish Trap Bloods that Roderick began using illegal drugs. At first, Roderick mainly smoked marijuana. However, he soon began smoking "wet" or marijuana cigarettes dipped in PCP. Roderick developed a PCP habit; by the time he entered high school, Roderick was

58

smoking PCP on a daily basis.[15] (Ex. 17 at ¶¶11-12 [Aff. of Willie Propes]; Ex. 13 at ¶16 [Aff. of Ramon Maddox, Jr.]; Ex. 11 at ¶36 [Aff. of Pamela Maddox].)

### iii. School to Prison Pipeline

Because school officials misidentified Roderick's impairments and struggles as disciplinary issues, formal intervention points during his teenage years funneled him into the juvenile justice system rather than to treatment and support.

In November 1998, Roderick showed up at Brandenberg Middle School, about ten miles from his home in Garland, where officials noted he was a former student. He had been moved from Brandenberg to Florence Middle School by his parents. After speaking with administrators at Florence Middle School, it was discovered that Roderick had been suspended from that school and had run away from home the day before. Roderick's mother confirmed that she had reported Roderick as a runaway. However, Roderick was placed in the Letot Center, a Dallas County Juvenile Department emergency crisis-intervention center, because his mother refused to pick him up. Roderick told staff at Letot that he wanted to stay at the facility. Instead, he was released back to his mother. (Ex. 19 at 31-37 [Juvenile Records]; Ex. 25 at 51 [Dallas Police Dep't Records]; Ex. 5 at ¶57 [Aff. of Laura Sovine].)

Again, on February 16, 1999, Roderick took his mother's car and ran away, attempting to drive to Longview, Texas, where his grandmother lived. After this episode, Roderick was taken by his parents to the Promise House youth residential

---

[15] Many times, when someone with a mental health disorder—or, like Roderick, several mental health disorders—does not receive proper medication or treatment, they seek to "self-medicate" through use of alcohol and other drugs. This often is their way of regulating their own symptoms and moods, or providing relief to often painful psychic symptoms. It is possible that Roderick's self-medication influenced how and why Roderick became so heavily involved in drugs at such an early age, in addition to the fact that it was readily available to him in his neighborhood and through his gang. (Ex. 5 at ¶53 [Aff. of Laura Sovine].)

treatment facility, where he was enrolled in an emergency shelter program. (Ex. 27 at 3-7 [Promise House Records]; Ex. 5 at ¶58 [Aff. of Laura Sovine].)

Promise House was one of the few treatment programs Roderick received that could have led to further intervention. Promise House provides support services for homeless, runaway, and at-risk youth from the ages of ten to seventeen. In addition to acting as an emergency shelter, Promise House provides individual and group counseling, as well as other educational programs. A Promise House employee who remembers Roderick describes Promise House as "a place for these kids to catch their breath and feel safe." Unfortunately, the program only lasted for thirty days. After that, youth either moved on to another facility or were sent back home. (Ex. 5 at ¶59 [Aff. of Laura Sovine]; Ex. 9 at ¶¶3-4 [Aff. of Lisa Escobedo].)

Roderick successfully completed his thirty-day program and was sent back home. Counselors noted he had trouble conforming to the rules while at Promise House. But they also noted that Roderick showed remorse for his outbursts and that he recognized a need to control his impulses. One employee remembers Roderick as a sweet boy whose biggest issue was that he struggled in his school work and ultimately gave up trying when he felt he could not do it. (Ex. 27 at 82-86 [Promise House Records]; Ex. 5 at ¶61 [Aff. of Laura Sovine]; Ex. 9 at ¶8 [Aff. of Lisa Escobedo].)

Despite his brief stay at Promise House, nothing significant changed in Roderick's life at home or at school. Once again, Roderick's stepfather made him stop taking the Ritalin that Promise House gave to Roderick because Ramon, Sr., did not like the way it made Roderick act. Roderick continued to struggle with depression and thoughts of suicide. Indeed, Roderick started threatening suicide weekly. On several occasions he grabbed a knife from the kitchen or threatened to do so, as though he were going to hurt himself. Yet Roderick's parents never

sought further treatment or counseling for his suicidal behaviors. Instead, Roderick ran away from home three more times in the fall of 1999. (Ex. 12 at ¶¶29, 32 [Aff. of Ramon Maddox, Sr.]; Ex. 5 at ¶62 [Aff. of Laura Sovine]; Ex. 25 at 55-67 [Dallas Police Dep't Records].)

Repeatedly, Roderick's mental health disorder and behavioral problems were met with anger and punishment. None of these consequences were teaching tools nor modes of counseling. They only served to punish and were based on the assumption that the problem was Roderick's anger when, in reality, the problem was Roderick's lack of coping skills with illnesses and a chaotic environment unresponsive to his needs. For example, in February 2000 Roderick took a six inch "survival" knife to school and was arrested for possession of a weapon. He was sent to a Dallas County emergency shelter and given a psychological evaluation. Dallas County Juvenile officials identified Roderick's actions as inappropriate displays of anger and an anger-management problem. Roderick was expelled from Samuell High School and sent to an alternative school program. (Ex. 19 at 16-29 [Juvenile Records]; Ex. 5 at ¶¶63-64 [Aff. of Laura Sovine].)

On April 11, 2000, Roderick received a psychological evaluation. This report noted Roderick's prior diagnoses of depression, anxiety, and ADHD. It noted that, when off his medication, Roderick was observed to be less patient, and that the incident involving Roderick bringing a knife to school had occurred while he was not medicated. The psychological evaluation also noted Roderick's history of running away from home. The evaluation further noted Roderick's depression and suicidal ideation. Regarding Roderick's mental state, the report noted that

> Roderick tries to deny and repress noxious ideation, but his defenses are not adequate to keep such thoughts out of conscious awareness for long. He has a history of fleeing when he feels threatened or overwhelmed. The data depict an individual who is anxious, dysphoric, indecisive, and pessimistic. . . . Roderick does not relate

61

well to others and appears to lack age-appropriate empathy in a naïve way. He does not know what to expect from others, particularly strangers, and apparently develops fears when isolated or otherwise under duress. Roderick is at best dysthymic, and his poor interpersonal relations leave social/emotional needs unmet. His reactions may manifest rather unpredictably and without consideration of the consequences, except that the act may ward off perceived threat.

(Ex. 20 at 65 [Garland ISD Records]; Ex. 5 at ¶65 [Aff. of Laura Sovine].) Yet, the evaluator concluded that Roderick should continue to receive special education services under a classification of "Emotional Disturbance." Roderick was sent to an anger management program and ordered to complete six months of probation and sixteen hours of community service as punishment for bringing the knife to school. (Ex. 19 at 114-17 [Juvenile Records].)

Then, while at school in September 2000, Roderick was arrested for possession of marijuana. This possession is somewhat unsurprising given that Roderick's parents modeled the behavior of smoking marijuana openly. The arrest report noted that "suitable supervision, care, or protection [was] not provided by parent, guardian, custodian, or other person" and that Roderick was in need of "suitable supervision." A detention hearing was held and Roderick was placed in detention at an emergency shelter where he was to undergo a chemical assessment. Roderick's probation officer met with him at the emergency detention shelter. Staff informed the officer that Roderick had been acting out and failed to complete orientation. When asked about it, Roderick informed the officer that he wanted to be locked up and that he did not want to go home. A psychological evaluation done at the shelter diagnosed Roderick with conduct disorder and parent-child relational problems. Roderick stayed at the emergency shelter awaiting his November court date on the marijuana charge. (Ex. 5 at ¶67 [Aff. of Laura Sovine]; Ex. 19 at 5-15, 71, 108, 162, 180, 197-201, 264-66 [Juvenile Records].)

62

Once again, Roderick received punishment rather than long-term treatment to address his underlying problems. He was sentenced to one year of probation and thirty-two hours of community service. He was also ordered to complete a thirty-day drug education program. Despite his prior statements of not wishing to return home, he was remanded into the custody of his mother. Roderick was placed in an alternative school and ordered to attend several boot camp programs. During the spring of 2001, Roderick attended the alternative school and an after-school program at the same place he had attended his anger management program. (Ex. 19 at 99-103 [Juvenile Records]; Ex. 20 at 27-29 [Garland ISD Records]; Ex. 5 at ¶¶68-69 [Aff. of Laura Sovine].)

Roderick's experience of school suspensions and punishments instead of treatment plans is not unique. African American boys are particularly at risk for being identified by schools as behavioral problems and separated into special education classes. The tendency to punish a child's impulsivity as disruptive behavior, rather than to see it as a sign of potential mental health problems, leads school officials to perceive the child as a "problem," which in turn promotes the child's own perception of himself as a "problem child." This reaction by school institutions to children like Roderick creates a substantial risk that those children will be funneled into the juvenile justice system and, subsequently, into the adult criminal justice system. This phenomenon is known as the "school to prison pipeline." (Ex. 3 at ¶¶12-14 [Aff. of Dr. Courtney Robinson]; Ex. 5 at ¶72 [Aff. of Laura Sovine].)

This pipeline is reinforced by the way young African American male students are identified for special education classes and discipline. African American students are more often referred to special education for behavioral reasons rather than learning disabilities, and African American males are three times as likely to be labeled emotionally disordered. In addition, African

63

American students were three times more likely to receive suspension, as compared to their white peers. (Ex. 3 at ¶¶19-20 [Aff. of Dr. Courtney Robinson].)

In addition, policies—such as Texas's "zero tolerance" policy—which mandate automatic suspension and other penalties for rule infractions, with no exceptions, elevate what often should be treated as misbehavior to, in essence, criminal conduct. Such policies have dramatically increased the rate of African American students' suspensions and serve to expose these students sooner and more frequently to the juvenile justice system. These students become even further at risk of self-identifying themselves as criminals and continuing on that path. (Ex. 3 at ¶¶14, 26, 28 [Aff. of Dr. Courtney Robinson].)

Roderick's experience of being assigned to special education courses for his behavioral issues and his multiple suspensions through his school career parallels what research has found regarding the "school to prison pipeline." Roderick's cognitive and psychological impairments were not treated therapeutically and constructively—he was not seen as a "troubled" but eager learner, he was seen as a "criminal." Roderick's narrative aligns with those of many incarcerated African American men from Dallas whose own struggles with the "school to prison pipeline" have been documented. Ultimately, the school to prison pipeline is caused not by African American students engaging in behaviors that are dangerous and criminal but by the reactions of school institutions to those behaviors. African American males, in particular, are disproportionately and more harshly disciplined in schools, pushed out of the educational system, and later entrenched in the criminal justice system. This was the same fate experienced by Roderick. (Ex. 3 at ¶¶24, 26, 27, 36 [Aff. of Dr. Courtney Robinson].)

### d. Inevitable Outcomes

As Roderick neared adulthood, the trajectory of his life was all but established. Without serious intervention, the numerous risk factors and influences

pushing him toward a life on the streets—a life embroiled with drug addiction and crime—were unlikely to be preempted. That intervention did not come, and, instead, Roderick continued to face life events which spurred him toward these inevitable outcomes.

Instead of returning to high school in Garland, Roderick and his family moved in August 2001 to Clayton County, Georgia, outside of Atlanta, to take care of Ramon, Sr.'s ailing mother. (Ex. 12 at ¶34 [Aff. of Ramon Maddox, Sr.]; Ex. 11 at ¶38 [Aff. of Pamela Maddox].) The choice to move to Clayton County was particularly unfortunate for Roderick. To make way for the 1994 Olympics, large numbers of low income and public housing projects were moved out of Atlanta and into Clayton County. These changes created massive instability in the culture of Clayton County, where racial unrest and violence became common. By 2001, gangs had proliferated and the area was dominated by unemployment, closed businesses, public housing projects, and racial unrest. As a young teenager without connections, friends, and support networks in this new environment, Roderick continued to engage in negative activities. (Ex. 4 at ¶¶37-38 [Aff. of Charles Rotramel].)

Shortly after arriving in Georgia, Roderick ran away from home again. His parents did not report his running away until five days later when he had not returned. Nearly two weeks after he had run away, Pamela called police and told them that Roderick had returned home. No further action was taken. Over the next year, Roderick continued to run away from home and to become increasingly involved with the criminal justice system. In February 2002, Roderick was arrested for criminal trespass of an apartment in the same complex as his family. The apartment's inhabitant, Chris Arno, told police that he previously had told Roderick to stay off his property but that Roderick was essentially homeless. Roderick had confronted Arno a few days before and demanded to stay in Arno's

65

apartment. Arno refused but later found Roderick sleeping on his front porch and called the police. Roderick told police that he had left his family's apartment because of problems with his parents. He stated that he was staying on Arno's front porch to avoid "homeboys" that were looking for him. The police arrested Roderick for trespassing. Roderick was arrested twice more for other incidents like this before the family returned to Dallas in October 2002. (Ex. 26 at 10-24 [Clayton County Records]; Ex. 5 at ¶¶75-76 [Aff. of Laura Sovine].)

Upon returning to Dallas, Roderick spiraled into the street life that would eventually lead to his arrest for capital murder. After briefly being enrolled in school, Roderick dropped out before completing the eleventh grade. Once again, school evaluations noted that Roderick had a history of runaway episodes, suicidal gestures, poor frustration tolerance, and impulsivity, as well as his previous diagnoses of depression, anxiety, and ADHD. Yet there again appeared to be little to no effort on the part of school officials or Roderick's parents to guide him toward serious mental health intervention. Instead, the evaluations erroneously stated that "[t]he culture and lifestyle experienced by the student have provided an atmosphere conducive to the development of positive learning and behavioral patterns. There appears to be no lack of previous educational opportunities as indicated by the student's sociological status." (Ex. 5 at ¶77 [Aff. of Laura Sovine]; Ex. 20 at 39 [Garland ISD Records].)

Once Roderick dropped out of school, his parents gave him an ultimatum— go back to school or live somewhere else. In response, Roderick left home for the final time. He started living with various family members throughout the Dallas area, drifting from home to home or spending periods of time living on the streets. He became involved in several romantic relationships and would live with his girlfriends for periods of time. By the age of twenty-four, Roderick had three children with two different mothers. But without steady employment, and having

66

poor parenting skills learned from his own childhood, Roderick was not able to support a family or be a stable father figure. (Ex. 5 at ¶78 [Aff. of Laura Sovine]; Ex. 12 at ¶35 [Aff. of Ramon Maddox, Sr.]; Ex. 11 at ¶¶39-40 [Aff. of Pamela Maddox]; Ex. 10 at ¶¶9-10 [Aff. of Michael Harris]; Ex. 7 at ¶¶9-10, 12 [Aff. of Shamy Conley].)

Roderick struggled to stay off the streets and out of trouble. From the time he dropped out of high school, Roderick was on probation for various drug possession cases and burglaries. He frequently failed to appear for probation meetings or drug testing and was often behind in paying his probation fees. At one point, he was robbed at gunpoint; instead of telling anyone, however, he started carrying a gun for protection. He held down very little in the way of steady employment. Selling drugs became his only stable source of income. In addition, Roderick still was addicted to PCP. As his addiction to the drug grew worse, so did his behavior and his reactions to it. He would become paranoid while he was high, believing people were after him. He would have hallucinations and hear voices. Roderick descended further and further into a world of street life, drug addiction, and crime. (Ex. 5 at ¶¶79-80 [Aff. of Laura Sovine]; Ex. 12 at ¶¶36-37 [Aff. of Ramon Maddox, Sr.]; Ex. 10 at ¶14 [Aff. of Michael Harris]; Ex. 17 at ¶13 [Aff. of Willie Propes].)

### 3. Conclusion

Had counsel presented this narrative of Harris's life history, complete with explanation of it by expert witnesses, the jury would have learned significantly more and different information than it did. Moreover, the jury would have been given a way to understand this information, a context, in order to determine that it was mitigating. Expert witnesses could have explained how these life events came together to shape the person Harris became, and that Harris himself was not the root cause of his actions.

67

To understand how a person comes to take certain actions in life, one must look at what elements of his life were brought to bear on that decision. Often what appear to be unexplainable, irrational actions can be traced to life events that occurred in the person's past. Roderick's current circumstances seem to be the result of a complex set of both biological, individual, environmental, and systemic risk factors and issues, all interacting with the other to create a "perfect storm."

(Ex. 5 at ¶8 [Aff. of Laura Sovine].) Rather, Harris was disadvantaged from the moment of his birth and put into a trajectory designed for failure.

[Negative factors of the kind Roderick faced] will create an insecure attachment, which will hard wire the brain for less success in learning and executive functioning. Add to that a genetic predisposition for and then development of mental health diagnoses, and a family and school system who do not provide treatment or support, and the odds are a child will not be successful. When the child is not successful, and does not know why, and does not have tools to learn how to succeed, he will continue along that path, as Roderick seems to have done.

(Ex. 5 at ¶82 [Aff. of Laura Sovine].)

Indeed what is noteworthy about Harris's case is the amount of contacts with adults that Harris had that could have led to effective interventions. Records indicate that Harris had contact with numerous adults (including social workers, detention officers, parole officers, and teachers) who could have connected him to resources that might have helped him turn his life in a different direction. (Ex. 4 at ¶41 [Aff. of Charles Rotramel].) That this did not happen had more to do with systemic issues than it did with Harris's own behavior.

A careful review of Roderick's records from his adolescence exposes a critical failure of the educational, mental health, and child welfare systems to assist a young man who was doing everything he could to ask for help. Roderick attempted suicide, expressed that he felt depressed and worthless, ran away from home repeatedly, asked to be

68

locked up rather than go home, and told adults repeatedly that his home environment was not acceptable. The absence of effective interventions is the most significant factor that led to Roderick's youth gang membership and later involvement in the criminal justice system.

(Ex. 4 at ¶43 [Aff. of Charles Rotramel].)

This trajectory was also not unique to Harris. The institutional and systemic forces that send young African American males away from schools and into the prison system is a problem still being addressed by our society.

> Identifiable circumstances have led to the over-representation of African American men in the school to prison pipeline. ... The narrative of Mr. Harris and so many formerly incarcerated African American men illuminate the circumstances that collide to make incarceration a more likely outcome in the lives of African American youth. The construction of the pipeline is the combination of integration, racial disparity in special education, and zero tolerance policies that exasperated the problem of how African American students were disciplined. This combination provided an entryway into the pipeline leading from school to prison.

(Ex. 3 at ¶33 [Aff. of Dr. Courtney Robinson].)

Ultimately, the jury would have been left with the inescapable conclusion that the events and circumstances that led Harris to the crimes he committed as an adult were not entirely of his own making. *See* Blume, *ante* ("[E]xplain to the jury how a child who was born into this world innocent developed into the person who committed this terrible crime.").

## D. Trial Counsel's Failure to Present This Mitigating Information Was Deficient and Prejudiced Harris's Trial

The information available to be presented at Harris's capital trial in favor of a life sentence was significantly greater that what his jury heard. *See Walbey v. Quarterman*, 309 Fed. App'x 795, 802 (5th Cir. 2009) ("This standard clearly contemplates that even when *some* mitigating evidence is presented at trial,

prejudice is still possible if that evidence is substantially incomplete." (emphasis in original)). Trial counsel's failure to investigate and develop this information did not meet professional norms expected of capital counsel and constituted deficient performance. Had such testimony been presented, there is a reasonable probability that the outcome of Harris's trial would have been different. *See Strickland*, 466 U.S. at 694; *Ex parte Ellis*, 233 S.W.3d 324, 329-30 (Tex. Crim. App. 2007); *Ex parte Chandler*, 182 S.W.3d 350, 353 (Tex. Crim. App. 2005).

## CLAIM TWO

## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT A GANG EXPERT TO OFFER AN EXPERT OPINION TO REBUT THE PROSECUTION'S EVIDENCE OF HARRIS'S GANG INVOLVEMENT

During the punishment phase of trial, a feature of the State's case for the death penalty was the admission of evidence that Harris belonged to a gang. The State used this evidence to argue that there was a probability Harris would commit criminal acts of violence based on his choice of living a "gang lifestyle" and subsequent criminal conduct. However, the testimony of a gang expert would have informed jurors Harris was only a former member of a juvenile gang and that certain sociological, environmental, and developmental factors led to Harris's affiliation. Trial counsel's failure to offer an expert opinion regarding Harris's gang affiliation to rebut the State's evidence fell below the generally recognized standard of care. Thus, Harris's sentence of death was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

### A. Relevant Facts

Prior to Harris's trial, the Court granted the State's motion requesting permission to photograph Harris's tattoos, as they were "potentially gang-related."

70

(2 CR at 613-14.) The State later filed notice that the State intended to introduce evidence at trial that Harris was "a member of a criminal street gang known as 'Bloods.'" (2 CR at 643.)

At punishment, the State presented testimony from Detective Barrett Nelson of the Dallas Police Department. (62 RR at 43.) Nelson was a member of the gang unit in Dallas for fifteen years and was offered as an expert witness on the subject of gangs. According to Nelson, Texas law defines a gang as a group of more than three individuals with common identifying symbols that commits a crime. (*Id.* at 45.) Nelson testified that gang members can be identified through their tattoos, clothing, and their geographical location. (*Id.* at 43-46.)

In preparation for trial, Nelson analyzed several photographs of Harris's tattoos. Nelson testified that these tattoos contained features that indicated Harris was a member of a gang known as the Fish Trap Bloods. (62 RR at 46-53.) Additionally, Nelson reviewed a drawing allegedly made by Harris. This paper contained symbols that are affiliated with the Bloods. (*Id.* at 54-55.) Nelson further testified that Harris was in possession of several red items during the commission of the underlying offense. Red is a color affiliated with the Bloods. (*Id.* at 64.)

On cross-examination, Nelson admitted that the Fish Trap Bloods were not an organized criminal street gang, and that the Fish Trap housing projects no longer exist. Nelson also testified that the Fish Trap Bloods committed crimes as individuals, not as a collective. (62 RR at 65-67.)

Harris's mother, Pamela Maddox, did not know whether Harris was in a gang, nor did she notice Harris's tattoos when he was fourteen years old. (64 RR at 246-47.) Similarly, Harris's cousin, Shamy Conley, testified that did not know anything about Harris's alleged gang activity. (65 RR at 93.) Harris's younger brother, Ramon Maddox, Jr., testified that Harris had joined a neighborhood gang

71

around the age of ten years old. (64 RR at 268.) Harris's stepfather, Ramon Maddox, Sr., testified that he had only heard about Harris possibly being in a gang, but he never asked Harris about his tattoos. (65 RR at 79-80.)

During closing arguments, the State discussed Harris's gang affiliation several times. The State argued that Harris was a member of "The Bloods," a gang that "engaged in criminal acts of violence." (66 RR at 29.) Furthermore, the State claimed that Harris was a "hustler" from the "hood," a violent gang member, and as such, was someone who would resort to violence and threats to accomplish his goals. (*Id.* at 39.) According to the State, Harris liked the "gang lifestyle" and adopted it from an early age. (*Id.* at 79, 87.)

## B. Trial Counsel Was Ineffective for Failing to Rebut the Prosecution's Evidence of Harris's Gang Affiliation by Presenting Testimony from a Gang Expert

As previously discussed in Claim One, *ante*, trial counsel could have sought out the testimony of an expert witness who could have testified about youth gang involvement. Someone like Charles Rotramel, who has significant experience working with disaffected youth and street gangs, would have been able to speak to the jury about two pivotal pieces of information the jury needed to understand when assessing the probability that Harris would commit future violent acts. (Ex. 4 at ¶¶1-13 [Aff. of Charles Rotramel].) First, Mr. Rotramel could have explained that youth gangs are not the violent, criminal organizations that are regularly portrayed by popular media. Second, Mr. Rotramel could have explained that Harris himself had only been involved in a gang as a youth, was no longer in a gang, and therefore would not automatically be part of a gang in prison.

### 1. The Truth About Youth Gangs

In Mr. Rotramel's experience, many adults assume that juvenile street gangs function like adult criminal gangs or drug gangs. They assume these gangs have a tight leadership group that dictates the gang's activities and determines its next

72

movements. They assume that juvenile street gangs are involved in various kinds of criminal enterprises such as the drug trade, prostitution, and armed robberies. And many adults assume that it is impossible to get out of a gang once a youth gets in. (Ex. 4 at ¶26 [Aff. of Charles Rotramel].)

In fact, these assumptions are false. Juvenile street gangs are not nearly the dangerous criminal enterprise people fear. Most often these youth take only an opportunistic approach to crime—focusing on burglaries of automobiles and homes, or graffiti, or trying to fight rival gang members. While these juvenile street gangs can certainly become violent at times, the violence is often limited in scope to other rival juvenile street gang members. Because of their young age, most juvenile street gang members are not trusted enough by major drug traffickers to be involved in significant elements of the drug trade. Likewise, because membership in juvenile street gangs is fluid, there often is not a reliable core of members to take on a major role in a criminal enterprise. (Ex. 4 at ¶¶20, 26 [Aff. of Charles Rotramel].)

In addition, the fact that Harris was involved with a youth gang had no bearing on whether he would be a member of an adult gang in prison. Typically, juvenile street gangs are unrelated to adult criminal gangs. Research shows that juvenile gang membership rarely involves "graduation" to adult criminal gangs. Indeed, adult prison gangs and drug gangs often view juvenile street gangs with disdain because they are seen as "kiddie crime" rather than organized criminal activity. Furthermore, adult criminal gangs do not desire to have juveniles as members because they are viewed as irrational, unreliable, and impetuous. Even when juvenile street gang members enter into the adult criminal justice system, adult gang members often refuse entry into the more serious criminal enterprises because these juveniles are seen as a poor investment. (Ex. 4 at ¶20 [Aff. of Charles Rotramel].)

73

## 2. Harris's Leaving of the Gang

Even if Harris's involvement in a gang was somehow relevant to the question of whether there was a probability Harris would commit acts of violence, Mr. Rotramel also could have explained to the jury that all evidence showed that Harris left the gang before turning eighteen, like the majority of youth gang members do. There is a perception by the general public that juvenile street gangs are tightly knit units where kids join but they cannot get out. This perception is false. Actually, juvenile street gang membership is fluid, and changes frequently. Juveniles get into gangs and then often quickly get out of them. Sometimes they join rival gangs. Because juvenile street gangs are so closely tied to a specific neighborhood, when youth move out of the neighborhood they often leave behind their gang membership. Unlike adult prison gangs, it is fairly easy for a youth to leave a juvenile street gang. They can be "jumped" or "cliqued" out, or they can simply "fade away" by disappearing from the gang's daily activities. Juvenile street gangs often lack the cohesion and camaraderie associated with adult gang membership. This is because juvenile gang members lack strong social bonds, and they mistrust even their own fellow gang members. Also, because they are adolescents, they often move on to other pursuits quickly and without much forethought. (Ex. 4 at ¶21 [Aff. of Charles Rotramel].)

Harris left the Fish Trap Blood gang by being "jumped out," around age sixteen. This choice by Harris is not surprising. He had moved many times since joining the gang and was still reporting by age sixteen that he did not have any friends or feel connected to anyone. The gang served no purpose in his life at that point. He did not spend time with the gang's members and did not benefit in any way from gang membership. Harris made the decision to definitively leave the gang in the most conclusive manner possible by getting "jumped out." This indicates that he had no allegiance to the gang or its members and saw no reason to

74

continue his membership. Such decisions are extremely common for juvenile gang members who can join on a whim and leave the gang just as quickly. (Ex. 4 at ¶42 [Aff. of Charles Rotramel].)

### C. Harris was Prejudiced by Trial Counsel's Failure to Present Testimony from a Gang Expert

Through the testimony of Detective Barrett Nelson, the prosecution attempted to persuade the jury that Harris's gang affiliation made him a "future danger" and supported the imposition of the death penalty. Trial counsel failed to present any expert testimony to challenge the prosecution's assertions regarding Harris's gang affiliation and its meaning. In reality, Harris's membership in a youth gang was far less significant, scary, or dangerous that the prosecution made it out to be. In addition, Harris's membership in a youth gang meant that he easily left when he no longer felt the social need to be in the gang, and there was little likelihood that his former membership in a youth gang would translate to membership in an adult prison gang. Trial counsel's failure to present expert witness testimony, such as that provided by Charles Rotramel, on a subject that was almost certainly going to be brought up by the prosecution (and was) constituted deficient performance that prejudiced Harris's trial.

## CLAIM THREE

## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO INHERENTLY PREJUDICIAL TESTIMONY INFORMING THE JURY THAT HARRIS WAS RESTRAINED

It is axiomatic that, in most cases, a jury's knowledge that a criminal defendant is shackled or restrained during trial proceedings undermines the presumption of innocence and is inherently prejudicial. Harris's trial counsel were ineffective when they failed to object to a State witness's testimony that informed the jury Harris had been restrained during trial by a remotely activated custody

75

control device, or stun belt. Trial counsel then doubled down on their error by affirmatively eliciting further testimony from the witness about the stun belt. Trial counsel's failure to object to testimony about the restraint on cross examination, and subsequent questions, violated Harris's rights under the state and federal Constitutions and United States Supreme Court and Texas case law.

**A. Restraint Evidence Presented to Jury at Harris's Trial**

During the punishment phase of Harris's trial, the State called as a witness Bobby Moorehead, a deputy sheriff with the Dallas County Sheriff's Department who had been a bailiff during voir dire in Harris's trial. (65 RR at 234.) The State called Deputy Moorehead to identify two drawings Harris made during voir dire, and the drawings were entered into evidence. (*Id.* at 234-35.)

On cross examination, trial counsel elicited testimony from Deputy Moorehead establishing that he had spent significant time with Harris during the twelve weeks of voir dire and that, during that time, Harris had not been disrespectful to him or caused him any trouble. (65 RR at 237, 239.) Trial counsel made a broad, open-ended request to the State's witness that he "[g]o ahead and tell them about the elevator incident." (*Id.* at 240.) According to Deputy Moorehead, at some point during voir dire, he and his partner had been transporting Harris to the courtroom via elevator and, for some unknown reason, the elevator doors closed, leaving Harris alone on the elevator. (*Id.* at 240-42.) Deputy Moorehead testified that Harris was not in handcuffs or leg cuffs at the time of this incident. (*Id.* at 242.) After the doors closed, the elevator proceeded to another floor and two court reporters embarked. (*Id.* at 243-44.) Eventually, the elevator with Harris and the court reporters returned. (*Id.*) Deputy Moorehead testified that, to his knowledge, Harris did not attempt to escape or otherwise take advantage of the incident. (*Id.* at 245.) Deputy Moorehead also confirmed that Harris "did not cause" the elevator incident. (*Id.* 242.)

76

During this testimony, Deputy Moorehead also stated that he had placed a remotely activated custody control device on Harris which he controlled. (65 at 241.) Trial counsel did not object to the witness proffering this testimony before the jury. (*Id.*) Instead, trial counsel engaged in the following exchange with the witness:

A.   I placed a device on Mr. Harris called a RACC belt, R-A-C-C. That stands for remotely activated custody control devise. I had the control to the device. The device is capable –

Q.   Let me stop you there. That is a stun belt so in case they act up, you can zap them?

A.   Some people refer to it as a stun belt.

Q.   All right.

A.   It has the capability of shocking a person with approximately 75 to 85,000 volts zero amperage, but it does incapacitate the person that's wearing it.

(*Id.*) Later in the cross examination, trial counsel also asked Deputy Moorehead to confirm that use of the stun belt was "standard procedure in these types of cases," which he did. (*Id.* at 242-43.) When trial counsel subsequently asked Deputy Moorehead to confirm that Harris had not attempted to escape or otherwise take advantage of the incident, Deputy Moorehead testified that he had not but also stated that "Mr. Harris knew that I could stop him at the point. He had been told what the belt would do and I don't think there was ever a doubt in his mind that I would activate it." (*Id.* at 245.)

On redirect examination, the State asked Deputy Moorehead whether Harris wore the stun belt "every single day" of the twelve weeks of voir dire, and Deputy Moorehead confirmed he did. (65 RR at 246.) The State also asked several other questions eliciting additional testimony about the stun belt, including:

- Deputy Moorehead or one of the other bailiffs had control of the stun belt's remote activation device at all times. (*Id.*)

77

- Harris knew "from day one what would happen if the belt were activated" because he had to sign a form acknowledging that he was aware of the stun belt's capabilities every morning. (*Id.* at 246-47.)
- Harris told Deputy Moorehead afterwards that he thought Deputy Moorehead was going to shock him during the incident. (*Id.* at 247.)

Trial counsel failed to object to this entire line of questioning. (*Id.* at 246-47.) Instead, trial counsel merely confirmed on recross that Deputy Moorehead had not shocked Harris. (*Id.* at 247.)

## B. Restraint Evidence Was Objectionable

Courts have long recognized a criminal defendant's right to avoid appearing before a jury in visible shackles. *See, e.g., Deck v. Missouri*, 544 U.S. 622, 630 (2005); *Bell v. State*, 415 S.W.3d 278, 281-83 (Tex. Crim. App. 2013). The Supreme Court has acknowledged that, although use of visible restraints is allowed in certain exceptional circumstances, the law generally "forbids" such use during the guilt or penalty phase for several reasons. *Deck*, 544 U.S. at 626. Chief among them is the deleterious effect a jury's view of a defendant in shackles would have on the bedrock of the justice system—the presumption of innocence. *Id.* at 630; *see also Bell*, 415 S.W.3d at 282.

The Supreme Court has found that "[v]isible shackling undermines the presumption of innocence and the related fairness of the factfinding process." *Deck*, 544 U.S. at 630. Specifically, it has held that visible shackles or restraints "suggest[] to the jury that the justice system itself sees a 'need to separate a defendant from the community at large.'" *Id.* (quoting *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986)). Consequently, the Supreme Court determined that unjustified visible shackling or restraint of a defendant before a jury is an "inherently prejudicial" due process violation. *Id.* at 635. Likewise, Texas courts have found that "shackling error may rise to the level of constitutional error when

78

the record reflects a reasonable probability that the jury was aware of the defendant's shackles." *Bell*, 415 S.W.3d at 283.

It is defense counsel's duty to protect a defendant from this prejudice—both at trial and on appeal—by objecting when a jury is being informed of a defendant's restraints or shackles. Significantly, if defense counsel fails to do so, then the issue is waived on appeal. *See Cedillos v. State*, 250 S.W.3d 145, 150 (Tex. App.—Eastland 2008, no pet.) ("Because appellant did not object on the record to the use of restraints in the jury's presence, the issue is waived, and appellant's first issue is overruled."). This is the case even where the record indicates that the jury was aware of the defendant's restraints. *Id.* at 149-50. That is, even the "most basic rights of criminal defendants are subject to waiver." *Id.* at 149 (citing *Peretz v. United States*, 501 U.S. 923, 936 (1991)).

Where defense counsel properly objects to a defendant appearing before a jury in restraints and the trial counsel overrules the objection without setting out an adequate basis on the record for why visible restraints are necessary under the particular facts of the case, the issue is preserved for appeal. *See, e.g., Boone v. State*, 230 S.W.3d 907, 909-11 (Tex. App.—Houston 2007, no pet.) (reversing and remanding for a new trial); *Wiseman v. State*, 223 S.W.3d 45, 48-49 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (same). On appeal, an appellate court must determine whether a jury's knowledge of the defendant's shackling "constituted harmful error." *Wiseman*, 223 S.W.3d at 51. "The test [] is whether [the appellate court] can conclude beyond a reasonable doubt that the shackles did not contribute to appellant's conviction or punishment." *Id.* If it cannot, the defendant is entitled to a remand. *Id.* at 52.

79

## C. Trial Counsel Was Ineffective for Failing to Object to Restraint Evidence

Counsel in any trial has an affirmative duty to make timely objections to improper testimony, state the specific grounds for the objection and obtain a ruling on the objection from the trial court. *See Beall v. Ditmore*, 867 S.W.2d 791, 793 (Tex. App.—El Paso 1993, no pet.) (civil trial); *Saldano v. State*, 70 S.W.3d 873, 889 (Tex. Crim. App. 2002) (criminal trial). Failure to do so results in waiver of the issue on appeal. *Saldano*, 70 S.W.3d at 889. This duty is amplified in a capital trial where trial counsel has a duty to "protect[] the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited." *ABA Guidelines*, Guideline 10.8(A)(3)(c). The *ABA Guidelines* advise that trial counsel in a capital case should "know and follow the procedural requirements for issue preservation and act with the understanding that the failure to raise an issue by motion, objection or other appropriate procedure may well forfeit the ability of the client to obtain relief on that issue in subsequent proceedings." *ABA Guidelines*, Guideline 10.8 (commentary).

Generally, evidence that a criminal defendant is or has been restrained during trial proceedings is inadmissible, as the defendant's presumption of innocence is threatened when jurors at his trial have knowledge that a criminal defendant is or has been restrained. Indeed, such knowledge is inherently prejudicial, as it allows jurors to make negative assumptions that the justice system believes that the defendant is dangerous and that the community at large needs to be protected from him or her. These implicit messages to jurors can undoubtedly negate the jurors' obligations to presume that the defendant is innocent until proven guilty.

Likewise, the jury's knowledge of a criminal defendant's restraints can severely impact the punishment phase of a trial. This is particularly true in the

punishment phase of a capital trial, where the jury must decide whether the defendant poses a future danger in the course of deciding whether the death penalty should be imposed. *See Deck*, 544 U.S. at 630 (holding visible restrains during punishment phase violates due process); *Bell*, 415 S.W.3d at 284 ("The fact that a defendant is shackled without cause gives the jury the perception that he is a much more dangerous criminal and may prevent him from receiving a fair trial.") (Meyers, J., dissenting); *Long v. State*, 823 S.W.2d 259, 284 (Tex. Crim. App. 1992) ("What better evidence could there be to show dangerousness than to have the defendant shackled while being tried?") (Maloney, J., dissenting); *see also Marquez v. Collins*, 11 F.3d 1241, 1243 (5th Cir. 1994) ("Shackling carries the message that the state and the judge think the defendant is dangerous, even in the courtroom.").

Trial counsel opened the door for the prosecution to elicit further negative and otherwise-inadmissible testimony regarding the stun belt from the witness. Specifically, the State took advantage of trial counsel's errors by procuring additional testimony that downplayed Harris's good behavior by implying that Harris failed to take advantage of the elevator incident only because of the stun belt. For example, Deputy Moorehead proffered testimony that Harris was reminded every morning for twelve weeks of what the stun belt could do to him if activated. (65 RR at 246-47.) The State even secured testimony from the witness that Harris had told him after the elevator incident that he had been afraid of the stun belt—clearly inadmissible hearsay testimony that trial counsel failed to challenge. (*Id.* at 247.)

In sum, trial counsel allowed a witness on cross examination to give unhelpful testimony that Harris had been restrained during trial[16] and made no effort to keep that inadmissible information away from the jury. Trial counsel did not request the jury be instructed to disregard the harmful testimony, but instead opened the door to additional testimony about the stun belt. This failure to keep inherently prejudicial testimony away from the jury negated trial counsel's purpose at the punishment phase and constitutes deficient performance. *See, e.g., Garcia v. State*, 308 S.W.3d 62, 68 (Tex. App.—San Antonio 2009, no pet.) (trial counsel ineffective where "there could have been no reasonable trial strategy" to "elicit and open the door to" inherently prejudicial extraneous offense evidence); *Walker v. State*, 195 S.W.3d 250, 263 (Tex. App.—San Antonio 2006) (trial counsel ineffective for failing to object to inherently prejudicial evidence that "afforded the jury an evidentiary basis for choosing to believe" the State's narrative of the case); *Hall v. State*, 161 S.W.3d 142, 154 (Tex. App.—Texarkana 2005) (trial counsel ineffective for failing to object to "numerous . . . prejudicial matters"); *Mares v. State*, 52 S.W.3d 886, 893 (Tex. App.—San Antonio 2001) (trial counsel ineffective where "[t]here can be no strategy in failing to interpose an objection" to inadmissible testimony that was "directly contrary" to the defense's goal at the punishment phase).

## D. Harris Was Prejudiced by Trial Counsel's Failure to Object

Trial counsel repeatedly allowed extremely harmful, inadmissible testimony to be presented to the jury. Indeed, courts have routinely characterized this type of

---

[16] Although Deputy Moorehead's testimony only referenced use of the stun belt during voir dire, no other testimony was offered establishing whether or not Harris was restrained only during voir dire. That is, there was no evidence provided suggesting that Harris was not restrained throughout the trial. Thus, the jury reasonably could have presumed that Harris was restrained as he was sitting there during the punishment phase.

82

presentation to the jury as "inherently prejudicial" because they acknowledge that a jury's knowledge of a criminal defendant's restraints during trial severely erodes the bedrock of the justice system, the presumption of innocence. *See, e.g., Deck*, 544 U.S. at 630; *Bell*, 415 S.W.3d at 282. This is particularly the case here, where Deputy Moorehead's testimony about the stun belt was not only inadmissible on its face, it nullified any positive testimony trial counsel elicited that showed Harris did not pose a future harm.

Had trial counsel not elicited Deputy Moorehead's inadmissible testimony about the stun belt and requested it be stricken once it was before the jury, there is a reasonable probability the jury would have determined that Harris would commit future acts of violence. *See ABA Guidelines*, Guideline 10.11 (commentary) ("Finally, in preparing a defense presentation on mitigation counsel must try to anticipate the evidence that may be admitted in response and to *tailor the presentation to avoid opening the door to damaging rebuttal evidence* that would otherwise be inadmissible." (emphasis added)). Such a finding on the first special issue—whether there is a probability that the defendant constitutes a continuing threat to society—would have resulted in a life sentence rather than the death penalty. Because trial counsel's performance was deficient in this regard, and Harris suffered prejudice, he is entitled to a new hearing on punishment.[17]

---

[17] To the extent that these arguments should have been raised on appeal, appellate counsel was ineffective for failing to present them. *See Smith*, 528 U.S. at 285.

## CLAIM FOUR

## HARRIS WAS DENIED DUE PROCESS BY TRIAL COUNSEL'S FAILURE TO OBJECT OT THE ADMISSION OF FORENSIC EVIDENCE CONCERNING CARLOS GALLARDO

During the guilt/innocence phase of Harris's trial for the murder of Alfredo Gallardo, the State offered into evidence testimony and exhibits concerning the death of the victim's brother, Carlos. Evidence of this extraneous offense was inadmissible and unduly prejudiced Harris's case, particularly as the testimony and exhibits were substantial and needlessly inflammatory. And while the trial court erred by overruling counsel's pretrial objections to the admission of Carlos's autopsy photographs, trial and appellate counsel themselves rendered ineffective assistance by failing to preserve and raise, respectively, the admissibility of the medical examiner's testimony, as well as the issue of its being both excessive and graphic. Collectively and individually, these errors deprived Harris of his rights under the Texas and United States Constitutions, Texas statutory law, and United States Supreme Court and Texas case law; his conviction, therefore, should be reversed.

### A. Relevant Facts

On May 1, 2009, a grand jury indictment was filed charging Harris with the capital murder of Alfredo Gallardo, committed during the commission of a robbery of Alfredo's home in Dallas County. (1 CR at 7; *see also* 58 RR at 17-18.) On the second day of that trial, Dallas County Medical Examiner Reade Quinton was called to offer testimony concerning his autopsy of Carlos Gallardo, Alfredo's brother, who like Alfredo had been shot and killed during the same robbery. (59 RR at 289-302.)

To assist Dr. Quinton in his testimony, the State offered five photographic exhibits into evidence—State's Exhibits 23, 141, 142, 143, and 144. (59 RR at

84

293.) Trial counsel objected to these autopsy photographs at a pretrial hearing but was overruled. (59 RR at 292.)

In addition to describing these photographic depictions, Dr. Quinton also provided, without objection, the following testimony on direct examination:

> Q.    Describe for the jury what the bullet is actually doing as it travels through [the left side of Carlos's face]; the damage it is doing, basically?
>
> A.    Okay. Well, as it enters the left side of the face, basically, it's going through the maxilla, which is the bony area sort of behind the nose. It then enters sort of the nasal pharynx area, which is part of the upper airway, goes through the mandible, which is part of the jaw here, and then exits. It's a highly, highly vascular region, a lot of large vessels like the carotid arteries pass through that area.
>
> Q.    So based on that, is it fair to say, you would expect a massive blood loss from this particular gunshot sound?
>
> A.    Yes, that's correct.
>
> Q.    Would it be painful for an individual to sustain a gunshot wound through the nose and out the side of his face?
>
> A.    Yes.

(59 RR at 294-95.)

In addition to testifying to the gunshot wound to Carlos's face, Dr. Quinton also offered testimony concerning a second gunshot wound to Carlos's left shoulder. (59 RR at 296.) As before, the testimony addressed the bullet's trajectory, as well as the damage it inflicted on Carlos; specifically, Dr. Quinton testified that

> [the bullet] enters the left shoulder and is basically coming straight across the body and going slightly downward as well. It passes through the shoulder, enters the left pleural cavity, so the space that contains the lung, basically goes through both lobes of the lung – of the left lung, and stops right around the aorta, basically grazes the aorta as it passes by.

(*Id.*) Dr. Quinton then added: "The left chest cavity had around – slightly over 800 milliliters of blood in the chest cavity, which is about – to put it in normal terms, is about half a 2-liter bottle of Coke." (*Id.*) Again, trial counsel offered no objection to this or any other part of Dr. Quinton's testimony.

## B. Legal Standards

The Texas Rules of Evidence articulate the standards by which evidence is to be admitted or rejected in both criminal and civil proceedings. TEX. R. EVID. 101(b). With respect to extraneous offense evidence proffered during a trial's guilt/innocence phase, Texas courts determine admissibility through a two-part analysis. First, the extraneous offense evidence must be relevant per Rule 401 of the Texas Rules of Evidence. *Rogers v. State*, 853 S.W.2d 29, 32 (Tex. Crim. App. 1993). If it is relevant, then the court must ensure that the evidence is admissible "as an exception under Rule 404(b)." *Id.* (internal quotations omitted). Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith," but it qualifies this prohibition by allowing for such evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, plan knowledge, identity, or absence of mistake or accident." TEX. R. EVID. 404(b). Furthermore, the CCA has distinguished two types of extraneous offense evidence: (1) evidence of other offenses connected with the primary offense (referred to as "same transaction contextual evidence"); and (2) general background evidence (referred to as "background contextual evidence"). *Rogers*, 853 S.W.2d at 33 (citing *Mayes v. State*, 816 S.W.2d 79, 86-87 (Tex. Crim. App. 1991)). Same transaction contextual evidence are those "acts, words, and conduct [of a defendant] at the time of the commission of the offense" or at the time of the defendant's arrest, *id.* at 33 n.6 (emphasis omitted), and it "is admissible as an

exception under Rule 404(b) where such evidence is *necessary* to the jury's understanding of the instant offense." *Id.* at 33 (emphasis in original).[18]

As a corollary concern, Rule 403 calls for the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. The CCA has shed light on the meaning of Rule 403's "unfair prejudice" standard by explaining that "[t]he prejudicial effect may be created by the tendency of the evidence to prove some adverse fact not properly in issue or unfairly to excite emotions against the defendant." *Montgomery v. State*, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990) (internal quotations omitted). It also has specified four non-exhaustive factors for Rule 403 analysis, *viz.*, (1) the probative value of the evidence; (2) the potential of the evidence to influence the jury in an irrational and indelible way; (3) the time required for the proponent to develop the evidence; and (4) the proponent's need for the evidence. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2005) (citing *Montgomery*, 810 S.W.2d at 389-90). A trial court's improper application of Rule 403 is subject to harm analysis. *See Moreno v. State*, 22 S.W.3d 482, 487 (Tex. Crim. App. 1999) (citing *Montgomery*, 810 S.W.2d at 391).

As between testimony and photographic evidence, the CCA has held that, "[g]enerally, a photograph is admissible if verbal testimony as to matters depicted in the photograph is also admissible." *Gallo v. State*, 239 S.W.3d 757, 762 (Tex.

---

[18] Necessity in this context may be understood as when "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, whether direct or circumstantial, of any one of them *cannot be given without showing the others.*" *Mayes*, 816 S.W.2d at 86 n.4 (emphasis added) (citing *Nichols v. State*, 260 S.W. 1050 (Tex. Crim. App. 1924)).

87

Crim. App. 2007) (citing *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997); *Long*, 823 S.W.2d at 271-72, *superseded by rule on other grounds by Bell*, 415 S.W.3d at 282). Admissibility is a function of the Texas Rules of Evidence, most commonly Rules 401 and 403. *Id.*

Trial courts are "entitled to broad discretion in ruling on a Rule 403 objection," *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005), and they likewise are entitled to considerable deference with respect to their interpretations and applications of the other rules of evidence. *See, e.g., Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011) ("A trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard. *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005)[.]"). However, these rulings necessarily exist only after trial counsel timely objects to unfairly prejudicial evidence, including witness testimony. Trial counsel therefore has a duty to ensure, by way of timely objection, that his client is protected from the impact of such testimony. *See Strickland*, 466 U.S. at 687-89 (remarking on the breadth of counsel's responsibilities); *Moreno*, 22 S.W.3d at 484, 489 (a claim of error having been properly preserved, finding that the trial court erred in applying Rule 403); *see also Mozon v. State*, 991 S.W.2d 841, 846 (Tex. Crim. App. 1999) (the State having timely objected to the admission of victim character evidence, reviewing a trial court's application of Rule 403). Appellate counsel likewise has a duty to review the record and to present to a reviewing court any potentially meritorious claims. *Meza*, 206 S.W.3d at 689. "An applicant must demonstrate that counsel's decision not to raise a particular point of error was objectively unreasonable and that there is a reasonable probability that, but for counsel's failure to raise that issue, the applicant would have prevailed on appeal." *Ex parte Santana*, 227 S.W.3d at 704-05 (citing *Smith*, 528 U.S. at 285-86).

88

## C. Trial Counsel Performed Ineffectively by Failing to Object to Testimony and Exhibits Concerning the Death of Carlos Gallardo

As indicated, Harris faced a capital charge not on double-homicide grounds but, instead, for the murder of Alfredo Gallardo while "in the course of committing and attempting to commit the offense of robbery of [Alfredo Gallardo]." (1 CR at 7 (emphasis omitted) (tracking the language of Section 19.03(a)(2) of the Texas Penal Code).) Whereas testimony and other evidence concerning Alfredo's death was probative—as was evidence showing that Harris had robbed the Gallardo family—evidence concerning Carlos's death was not. But even were one to assume the contrary, the State's decision not to indict Harris for Carlos's murder correspondingly diminished the relevance of Carlos's death to an adjudication of Harris's guilt with respect to the death of Alfredo, and then to such a degree that the evidence adduced at trial became more prejudicial than probative. Thus, in multiple respects trial counsel performed ineffectively by failing to object to the testimony of Dr. Quinton, who performed the autopsy of Carlos, as well as to the admission into evidence of exhibits to assist Dr. Quinton with his testimony.

### 1. Carlos's Death Stemmed from an Extraneous Offense the Details of Which Were Inadmissible

On several occasions during the guilt/innocence phase, the State called the jury's attention to Carlos's death. (*See, e.g.,* 58 RR at 21-22 (State's opening argument); 59 RR at 249-254 (testimony of trace evidence examiner); *id.* at 289-302 (testimony of Reade Quinton); 60 RR at 98, 113 (State's closing argument).) In the State's view, Harris's shooting of Alfredo and Carlos were part of the same transaction, and Carlos's death was relevant to an adjudication of Harris's culpability for Alfredo's death insomuch as the perceived similarity between the two men's gunshot wounds helped to establish Harris's intentions:

> MR. BROOKS: And if this thing was anything but intentional, how do you explain Carlos being dead? If this thing was anything other

89

than being intentional, how do you explain Carlos dead *with almost identical wounds as his brother*, Alfredo? You can't explain it other than saying it is intentional.

(60 RR at 113 (emphasis added).)[19] The State also argued that the two shootings were similar on the basis of physical proximity, and it sought, through testimony concerning the absence of stippling[20] around Alfredo's gunshot wound to the chest and Carlos's gunshot wound to the shoulder to establish that both Alfredo and Carlos were greater than three feet away from Harris when he discharged the gun. (59 RR at 272, 295.)

In fact, the brothers' wounds were not "almost identical,"[21] nor were they the result of the same transaction. According to Yahaira Gallardo's eyewitness testimony, her father Alfredo was shot as he and Harris struggled in the bathtub: "I thought like my dad fell on top of [Harris] and that's when the shooting came out, like he was shooting." (58 RR at 103.) This was a discrete event that occurred before Carlos was shot; insight into it was not gained by exploring the details of

---

[19] (*Cf.* 58 RR at 185-86 (brief argument by the State to remove from the jury's charge a limiting instruction, initially included per Rule 404(b): "Because these offenses all occurred in the course of the case in chief, it is all the same transaction evidence. The limiting instruction is not required.").)

[20] As explained by Dallas County Medical Examiner Joni McClain, stippling is "where gunpowder particles strike the skin." (59 RR at 271.) Evidence of stippling can enable one to estimate the distance between a discharged firearm and a gunshot wound. (*See, e.g., id.* at 272.)

[21] Specifically, Alfredo sustained gunshot wounds to his left cheek and to the left side of his chest (State's Ex. 140, at 2), whereas Carlos sustained gunshot wounds "on the side of [his] nose" and "on the lateral left shoulder" (State's Ex. 146, at 2). The State also nearly misled the jury by drawing attention to the absence of stippling on Alfredo's gunshot wound to the chest, (59 RR at 272), for there would be no stippling—even from a close-proximity discharge—if Alfredo was wearing a shirt at the time he was shot, which he inarguably was. (*See* 60 RR at 80 (testimony of Yahaira Gallardo).)

90

Carlos's death. (*See id.* at 102-07.)[22] Accordingly, Dr. Quinton's testimony—and the exhibits to support that testimony—were irrelevant and constituted impermissible character evidence of the sort prohibited by the Texas Rules of Evidence. *See* TEX. R. EVID. 402 ("Evidence which is not relevant is inadmissible."); TEX. R. EVID. 404(b). *See also Rogers,* 853 S.W.3d at 32 n.3 ("[Rule 404(b)] codifie[s] the common law principle that a defendant should be tried only for the offense for which he is charged and not for being a criminal generally.").[23]

The CCA has observed that "[o]ne should be tried for only the crime for which he is indicted, and not for being a criminal generally." *Stone v. State,* 17 S.W.3d 348, 353-54 (Tex. Crim. App. 2000). Likewise, in *Robertson v. State* the Court held that counsel had "performed deficiently under the first prong of *Strickland* by allowing the jury to hear prejudicial and clearly inadmissible evidence because this evidence could serve no strategic value." 777 S.W.2d 427, 429-30 (Tex. Crim. App. 1989). Although trial counsels' performances in *Stone* and *Robertson* may have been especially slack given that counsel themselves had introduced the extraneous offense evidence, the result is no different whether one actively undermines his client's case or sits idly by as the State does so through the introduction of irrelevant, prejudicial evidence.

---

[22] Neither the State nor the defense ever offered a version of events that had Alfredo being shot after Carlos. (*See, e.g.,* 58 RR at 21-22 (in State's opening argument, averring that Alfredo was shot before Carlos).)

[23] The State further distracted from the issues to be decided by the jury by soliciting testimony from a Dallas County Crime Laboratory trace evidence examiner concerning her analysis of Carlos's clothing, (*see* 59 RR at 249-54), and it compounded its error by proffering as evidence the examiner's notes. (*See* State's Ex. 127.)

## 2. Assuming that Details Concerning Carlos's Death Were Admissible, Dr. Quinton's Testimony and the Supporting Autopsy Photographs Were Unduly Graphic and Prejudicial

Although the indictment in Harris's case focused solely on Alfredo's death, the State nevertheless called Dr. Quinton to testify regarding his autopsy of Carlos, and to do so at length and with a degree of specificity which unduly prejudiced Harris. The vascularity of the nasal pharynx area, amount of blood loss, and—most egregiously—degree to which Carlos experienced pain held no probative value for a jury empaneled to assess Harris's culpability in the death of Alfredo. (*See* 59 RR at 295.) Furthermore, this testimony had the potential to influence the jury in an irrational and indelible way by calling attention to Carlos's disfigurement and suffering, neither of which operated as a fact of consequence or helped to resolve the ultimate issue of Harris's capital trial. *See Rankin v. State,* 974 S.W.2d 707, 709-10 (Tex. Crim. App. 1996), *withdrawn in part and on other grounds,* 974 S.W.2d at 717 (Tex. Crim. App. 1998). The State also had no legitimate need to solicit this testimony from Dr. Quinton, which it did by asking about "the damage [the bullet] is doing," whether one "would expect a massive blood loss from this particular gunshot wound," and whether it would "be painful for an individual to sustain a gunshot wound through the nose and out the side of his face." (59 RR at 294-95.)[24] Whether and how Harris shot Carlos arguably was relevant to inferring his mental state when, moments before, he shot Alfredo, but the four Rule 403 factors explicitly mentioned in *Montgomery* and reiterated in *Shuffield* weigh against permitting this testimony by Dr. Quinton.

---

[24] (*Compare* 59 RR at 294 ("Describe for the jury what the bullet is actually doing as it travels through [the left side of Carlos's face]; *the damage it is doing, basically?*" (emphasis added)), *with id.* at 295-96 ("Would you describe for the jury the gunshot wound they're looking at in State's Exhibit 144, *where it goes through Carlos' body?*" (emphasis added)).)

92

Rather than provide the trial court with an opportunity to analyze Dr. Quinton's testimony to determine whether, based on Rule 403, its content was more probative than prejudicial, trial counsel failed to object to this or any other part of his testimony. The substance of Dr. Quinton's testimony risked arousing the jury's sympathies. Trial counsel therefore cannot be said to have provided objectively-reasonable assistance such as to assure this Court that Harris's trial on the merits was fair. *See Porter*, 558 U.S. at 38-39 (quoting *Strickland*, 466 U.S. at 688); *Smith*, 528 U.S. at 285.

Moreover, counsel's failure to object to Dr. Quinton's testimony prejudiced Harris's case. The State, for its part, recognized the rhetorical value of drawing attention to Carlos's death, for prosecutors in their closing arguments twice compared the manner of Alfredo's death to that of Carlos's in an effort to demonstrate Harris's intent. (60 RR at 98, 113.) Indeed, on both occasions the State went so far as to claim that this comparison—a comparison which remains highly questionable[25]—was dispositive of the question of intent. (*Id.*) Its decision to focus on Carlos's death thereby magnified the improper effect of Dr. Quinton's testimony. In short, the damage wrought by the bullets which struck Carlos and the acuity of the pain he experienced held no probative value whatsoever. By drawing attention to Carlos's gunshot wounds, the State increased the probability that its improper questioning of Dr. Quinton would affect the jury's decision-making and, therefore, that an adjudication of Harris's guilt would be prejudiced.

These failure further hamstrung Harris's defense by limiting the effectiveness of counsel's arguments against the introduction of the unduly prejudicial photographs of Carlos Gallardo, which photographs were admitted into evidence during Dr. Quinton's direct examination. (59 RR at 292.) At a pretrial

---

[25] *See* Part C-1, *ante*.

93

hearing, the trial court itself recognized these depictions to be "gruesome," yet it rationalized their admission upon musing, "that's what happens when you have a murder trial." (55 RR at 14.)

To be sure, "a trial court does not err merely because it admits into evidence photographs which are gruesome," *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995), but as gruesome photographs become less relevant to the crime charged so too does their presentation to the jury become more objectionable on Rule 403 grounds. On one end of the spectrum would be cases such as *Sonnier v. State* and *Shuffield v. State*. In *Sonnier*, the CCA upheld the trial court's ruling respecting graphical depictions of the two victims because "they depict[ed] nothing more than the reality of the brutal crime committed." (*Id.* at 514, 519). And in *Shuffield*, the Court likewise agreed that images of the victim "show[ed] only the injuries that the victim received and are no more gruesome than would be expected." *Shuffield*, 189 S.W.3d at 787-88.

In Harris's case, however, the autopsy photographs of Carlos had no bearing on the crime for which Harris was charged, *viz.*, the robbery and murder of Alfredo Gallardo. By the trial court's own comments while overruling counsel's Rule 403 objection—again, "that's what happens when you have a murder trial" (55 RR at 14)—it is clear that this ruling was based, in part, on the mistaken assumption that the extraneous offense of Harris shooting Carlos could inform the jury's decision-making with regards to the charged offense. Had trial counsel argued against the introduction of this extraneous offense evidence, the trial court would have been called upon to perform an entirely different Rule 403 calculation with respect to the autopsy photographs—one far more favorable to Harris, the result of which more likely would have favored suppression of the "gruesome" photographic evidence.

94

## D. Conclusion

During the guilt/innocence phase of Harris's trial, the State introduced detailed forensic evidence regarding the death of Carlos Gallardo. This evidence, however, was not probative as to any element of the crime for which Harris was indicted—namely, the capital murder of Carlos's brother, Alfredo. The prejudicial nature of the State's evidence regarding Carlos's death far outweighed any probative value and surpassed what might even be permissible as "contextual evidence." By failing to object to the admission of this evidence, trial counsel's performance was deficient. And as there is a reasonable probability that a jury would have reached a different verdict had this evidence been excluded, Harris should receive a new trial. *See Strickland*, 466 U.S. at 688.[26]

## CLAIM FIVE

## HARRIS WAS DENIED DUE PROCESS BY TRIAL COUNSEL'S FAILURES TO OBJECT TO PREJUDICIAL, CUMULATIVE, AND INADMISSIBLE EVIDENCE

During the guilt/innocence phase of Harris's trial, counsel routinely failed to object to testimony and exhibits which individually and collectively prejudiced their client's case. While the Texas Rules of Evidence exist to prevent the admission of such evidence, these rules remain no more than a dead letter when counsel at both the trial and appellate level decline or forget to invoke them. In Harris's case, the excludable evidence served to cast him in an unfavorable light without contributing meaningfully to the issues before the jury. By these errors Harris was deprived of his rights under the Texas and United States Constitutions,

---

[26] To the extent that these arguments should have been raised on appeal, appellate counsel was ineffective for failing to present them. *See Smith*, 528 U.S. at 285.

95

Texas statutory law, and United States Supreme Court and Texas case law; his conviction, therefore, should be reversed.

## A. Relevant Facts

As Harris exited the Gallardos' trailer, he immediately confronted first-responders from the Dallas Police Department who yelled to him to get on the ground. (*See* 58 RR at 166, 173.) Harris fired his weapon—a .40-caliber pistol—while fleeing toward the back of the trailer, where he ran into and was shot by another officer, Justin Bowen. (*Id.* at 211-14.) Shortly thereafter, Officer Bronc McCoy and another officer entered the trailer and discovered Alfredo and Carlos Gallardo in the bathroom, both men clearly wounded. (59 RR at 14, 18, 39.) The officers concluded that Carlos was dead but that Alfredo was still alive. (*Id.* at 18.) Officer McCoy then attempted to revive Alfredo by performing CPR, during which time a third officer, Daniel Fogle, entered the bathroom and began to assist. (*Id.* at 20-21, 39.) Without trial counsel objection, both Officer McCoy and Officer Fogle testified at length regarding their unsuccessful efforts to save Alfredo's life. (*See id.* at 18-25, 39-41.)

Additionally, at the crime scene investigators found a 1987 Ford Crown Victoria which they later determined was Harris's vehicle. The car was impounded, and, pursuant to a search warrant, photographed and searched by Detective Donald Whitsitt of the Dallas Police Department. (*Id.* at 132.) Nine items were collected from the vehicle, including a .22-caliber submachine gun, .22-caliber ammunition, gloves, and .40-caliber ammunition. (*Id.* at 138.) Again without trial counsel objection, these items were admitted into evidence during the guilt/innocence phase of Harris's trial. (*See* State's Exs. 107, 109, 110, 111A-D.)

## B. Legal Standards

As mentioned in Claim Four, *ante*, Rule 403 calls for the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger

96

of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. In other words, "[t]he prejudicial effect may be created by the tendency of the evidence to prove some adverse fact not properly in issue or unfairly to excite emotions against the defendant." *Montgomery*, 810 S.W.2d at 378 (internal quotations omitted). If relevant evidence has low probative value or a meaningful potential to influence the jury in an irrational and indelible way, or if its proponent will require significant time to develop the evidence or has a pressing need for it, then the Rule 403 balancing test will favor exclusion over admission. *Shuffield*, 189 S.W.3d at 787 (citing *Montgomery*, 810 S.W.2d at 389-90). Finally, and as is touched upon throughout this Application, both trial and appellate counsel have a duty to zealously represent their clients, which necessarily includes arguing against the admission of irrelevant and unfairly prejudicial evidence. *See Strickland*, 466 U.S. at 687-89 (remarking on the breadth of counsel's responsibilities); *Moreno*, 22 S.W.3d at 484 (a claim of error having been properly preserved, finding that the trial court erred in applying Rule 403); *Meza*, 206 S.W.3d at 689. If there exists a reasonable probability that a jury would have reached a different verdict had such evidence been excluded, a defendant must receive a new trial. *See Strickland*, 466 U.S. at 694.

## C. Trial Counsel Performed Ineffectively by Failing to Object to Prejudicial and Cumulative Testimony Concerning the Crime Scene and Harris's Shooting at Police Officers, as well as to Prejudicial and Inadmissible Evidence Seized from the Ford Crown Victoria

During its case-in-chief, the State solicited testimony and proffered exhibits to which trial counsel should have objected. Had they done so, evidence that was individually and collectively prejudicial to Harris likely would have been excluded, thereby improving the overall fairness of the proceedings. That excludable evidence is discussed below in two parts: first, the crime scene descriptions and

97

references to Harris's shooting at Dallas police officers; and, second, evidence seized from the Ford Crown Victoria.

## 1. Crime Scene Descriptions and References to Harris's Shooting at Dallas Police Officers

On the second day of Harris's trial, the State called as witnesses Dallas Police Officers Bronc McCoy and Daniel Fogle. (59 RR at 8, 28.) Both Officer McCoy and Officer Fogle were among the first police officers to enter the Gallardos' trailer, which they did shortly after Harris had been shot and restrained as he attempted to flee the scene. (*Id.* at 13, 37-38.) In addition to the "very graphic" photographs proffered by the State to aid Officers McCoy and Fogle in their testimony, (*id.* at 16 (comment by the trial court); *see also* State's Exs. 31-42 (crime scene photographs)), the prosecution solicited testimony from Officers McCoy and Fogle concerning their discovery of Alfredo—then dying—as well as his deceased brother, Carlos.

The two officers' descriptions of the crime scene embody Rule 403's admonition against "unfair prejudice" and "needless[ly] . . . cumulative evidence." TEX. R. EVID. 403. At length, and in gruesome and inflammatory detail, each officer recounted finding Alfredo's near-lifeless body as he lay in the Gallardos' bathtub, bleeding profusely and struggling for air. For his part, Officer McCoy testified that, "[i]t sounded like [Alfredo] was gurgling on his blood" (59 RR at 18), "he was covered in blood" (*id.* at 20), "[h]e had one massive [gunshot wound] into his face" (*id.*), "[w]hen I started doing CPR, the more I compressed, the more blood came out [of his gunshot wounds]" (*id.*) "when I did the chest compressions, more blood would come from his face and his chest" (*id.* at 21), "[h]e was very slick, I was very slick, we were sweating" (*id.*) "he was covered in blood" (*id.*), "every time I did a chest compression on him, the blood would squirt out everywhere" (*id.*), "[h]e was a large individual and was covered in blood" (*id.* at

98

22), "I could hear his blood flowing down the bathtub" (*id.*), "[h]e was losing so much blood" (*id.*), "we just started grabbing towels and wiping him down" (*id.* at 23), "I was pretty saturated in his blood" (*id.* at 25), "I didn't want his family to see me like that" (*id.*).

In similar fashion, Officer Rivera testified that, "[Alfredo] had what appeared to be a bubbling chest wound from one of the bullet holes," (59 RR at 39), "[the chest wound] appeared to be bubbling, which meant that air was coming in and out of the lungs through that wound" (*id.* at 40), "the blood looked to be bubbling when [Officer McCoy] was doing CPR" (*id.*), "[Alfredo] was definitely seriously injured, basically, barely hanging on to life at that point" (*id.*), "the gentleman in the bathtub was still kind of gurgling and making noises at that point, just to indicate he was still alive" (*id.* at 41), "[h]e was, basically, I think, choking on blood, attempting to breathe" (*id.*).

Even if one might reasonably maintain that some discussion of Officer McCoy's and Officer Fogle's efforts to resuscitate Alfredo was relevant to an adjudication of Harris's culpability for Alfredo's death—an assertion Harris contests—the probative value of the two officers' testimony did not outweigh the dangers of unfair prejudice and of needlessly presenting cumulative evidence. *See* TEX. R. EVID. 403. Whether blood "squirt[s]" or "bubble[s]" from an open wound and makes a recognizable sound as it flows down a bathtub drain were not issues properly before the jury, and those details, coupled with the pitiable and gratuitous description of Alfredo, were guaranteed to "unfairly [] excite emotions against the defendant." *Montgomery*, 810 S.W.2d at 378 (internal quotations omitted).

It also is important to consider the State's active role in soliciting this unduly prejudicial testimony. A sampling of the prosecutor's questions illustrates the point:

Q. And given the amount of blood around his face, did it surprise you [Officer McCoy] that he didn't have a pulse?

. . .

Q. And when you first arrived, you said that his face, in particular, was pretty slick and had a lot of blood. Is that representative of the amount of blood or did he have more when you first –

. . .

Q. And when you say that you did not know if he was shot or stabbed, describe for the jury how it is that you can't know something like that.

. . .

Q. Okay. And when you [Officer Fogle] said that it was a – I think you described it as sucking chest wound; is that right?

. . .

Q. How did you know air was coming in and out [of the lungs through Alfredo's chest wound]?

. . .

Q. And what condition did you think this individual was in when you observed him?

. . .

Q. And that gurgling, have you heard something like that before?

. . .

Q. And describe for the jury what your thought was when you heard that [gurgling sound].

(59 RR at 19, 21-22, 39-41.) To be sure, Harris's trial could not have been an anesthetized presentation of the events of March 17, 2009, but this concession does not absolve the State for its repetitive attention to graphic details wholly irrelevant to the jury's guilt/innocence determination, nor does it approbate trial counsel's failures to object to each excessive reference to the victim's disfigurement and suffering.

In addition, and not unlike the unfairly prejudicial and cumulative description of the crime scene provided by Officers McCoy and Fogle, recurrent references to Harris's shooting at first-responders as he exited the Gallardos' trailer also infected Harris's trial with undue prejudice. Five of the seven Dallas police

100

officers who testified during the State's case-in-chief addressed the subject. (*See* 58 RR at 166-67, 172-73, 191, 212; 59 RR at 31-32.) This fact was minimally relevant to an adjudication of Harris's culpability in the shooting death of Alfredo; by its third or fourth mention, whether Harris had fired at officers of the Dallas Police Department ceased to edify, became cumulative, and should have been objected to by trial counsel. In failing to do so, counsel allowed the jury's attention to be drawn needlessly and repeatedly to Harris's conduct after he exited the Gallardos' trailer, the negative character of which further undermined the fairness of Harris's capital trial for the murder of Alfredo.

## 2. Evidence Seized from the Ford Crown Victoria

During its case-in-chief, the State admitted into evidence a .22-caliber submachine gun, .22-caliber ammunition, and gloves which had been seized pursuant to a search of a 1987 Ford Crown Victoria which had been parked outside of the Gallardos' trailer and impounded.[27] (*See* 59 RR at 139 (admitting State's Ex. 107 (.22-caliber submachine gun)); *id.* at 140 (admitting State's Exs. 111A-D (gloves)); 60 RR at 66 (admitting State's Ex. 109 (.22-caliber ammunition)).) The submachine gun had not been used in the robbery or the shooting, and the forensic evidence confirmed that Alfredo had been shot with a .40-caliber weapon— specifically, a Glock .40 Smith and Wesson. (60 RR at 65; *see also* 59 RR at 91 (admitting State's Ex. 89).)

The seized items did not "illuminate[] a circumstance otherwise dimly perceived by the fact-finder," thus did they lack the legitimate purpose served by background information. *Mayes*, 816 S.W.2d at 85. While it might have been bad enough for the jury to hear evidence irrelevant to the robbery of the Gallardos and

---

[27] Also seized from Harris's car was .40-caliber ammunition. (*See* 59 RR at 141 (admitting State's Ex. 110).)

shooting of Alfredo,[28] the connotations of these items helped to foster a prejudicial image of Harris as a danger to the community. Accordingly, whether on Rule 401, Rule 403, or 404(b) grounds, the evidence seized from Harris's vehicle should have been objected to and excluded from the guilt/innocence phase of his trial.

Trial counsel also failed to object to the admission into evidence of the Dallas County Jail booking sheet which the State proffered during its direct examination of Eduardo Arturo Ibarra, a Dallas police detective assigned to the Special Investigations Unit. (*See* 59 RR at 179-80.) Importantly, among the evidence adduced at trial the booking sheet was the only link between Harris and the vehicle which held the .22-caliber submachine gun, .22-caliber ammunition, and gloves. (*Compare* State's Ex. 46 (booking sheet listing Harris's license plate as "RDP 641"), *with* State's Ex. 45 (showing the license plate of the impounded 1987 Ford Crown Victoria as "RDP 641").) Had the booking sheet been excluded by way of a timely objection, a proper foundation would not have been laid to introduce these items into evidence.[29]

And the booking sheet should have been excluded. As the CCA has written, "[h]earsay is without probative value." *Frazier v. State*, 600 S.W.2d 271, 272 (Tex. Crim. App. 1979). The contents of an unauthenticated booking sheet are hearsay; accordingly, they "should not [be] admitted for any purpose." *Long v. State*, 590 S.W.2d 138, 140 (Tex. Crim. App. 1979) (panel decision). To remove this bar, a party that seeks to proffer into evidence a booking sheet must

---

[28] Among Rule 403's several concerns is the "danger of . . . confusion of the issues." TEX. R. EVID. 403.

[29] In fact, the State proffered the booking sheet *after* it had proffered the .22-caliber submachine gun, .22-caliber ammunition, and gloves. Thus, even if the booking sheet had been admissible, the State still would have erred by referring to "Roderick Harris' vehicle" during its discussion of the seized items. (*See, e.g.*, 59 RR at 132.)

102

authenticate the booking sheet per Rule 901 of the Texas Rules of Evidence or comparable, satisfactory means. *Id.*; *see also* TEX. R. EVID. 901 (addressing the evidentiary requirement of authentication or identification).

In Harris's case, the Dallas County Jail booking sheet proffered by the State lacked the hallmarks of authentication which so troubled the Court in *Long*. (*See* State's Ex. 46.) Specifically, the county jail's booking sheet was neither certified nor signed, and it was offered into evidence during the direct examination of Detective Ibarra who gave no testimony concerning the preparation of the booking sheet—whether by his own hand or as a witness thereto. (*See* 59 RR at 179-80.) In addition, no steps were taken by the State to authenticate the booking sheet pursuant to Rule 902 of the Texas Rules of Evidence. *See, e.g.*, TEX. R. EVID. 902(10) (providing for self-authentication of business records); *Wood v. State*, No. 09-10-00195-CR, 2012 WL 1448333, at *7 (Tex. App.—Beaumont Apr. 25, 2012) (finding a booking sheet admissible because a custodian of records completed a business records affidavit). Thus, as was the case in *Long*, the booking sheet admitted into evidence at Harris's trial should have been excluded under the hearsay rule. *See* TEX. R. EVID. 802 ("Hearsay is not admissible except as provided by statute or these rules or by other rules prescribed pursuant to statutory authority."). More precisely, trial counsel should have objected to the State's proffer of the booking sheet, the law on this point being unmistakable. And appellate counsel should have raised this issue on direct appeal so as to vindicate Harris's right to a fair trial uncontaminated by prejudicial and inadmissible evidence. *See Smith*, 528 U.S. at 285.

## D. Conclusion

During the guilt/innocence phase of Harris's trial, counsel routinely failed to guard against excludable evidence—evidence either irrelevant or unfairly prejudicial to an adjudication of Harris's culpability for the capital murder of

103

Alfredo Gallardo. Being such, this evidence should have been objected to by trial counsel, and their failure to do so should have been an error raised on direct appeal. As there exists a reasonable probability that a jury would have reached a different verdict had this evidence been excluded, Harris should receive a new trial. *See Strickland*, 466 U.S. at 694; *Smith*, 528 U.S. at 285.

## CLAIM SIX

### HARRIS'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE TRIAL COURT REFUSED TO INSTRUCT THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE

The jury instruction in the Texas capital sentencing scheme violates Harris's applicable state and federal Constitutional rights, as well as state statutory law and state case law. Therefore, Harris's death sentence should be vacated.

Under Texas law, up to three special issues are submitted to the jury during the sentencing phase of a capital trial: (1) whether there is a probability that the defendant constitutes a continuing threat to society; (2) whether the defendant actually caused, intended, or anticipated the death of the deceased; (3) and whether, considering all the evidence, there are sufficient mitigating circumstances to warrant life without parole rather than death.[30] TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1)-(2), (e)(1).

The court shall sentence a defendant to death if jury answers "Yes" to the first two special issues and "No" to the third special issue. If the jury returns a "No" answer to either of the first two special issues, a "Yes" to the third special issue, or if the jury is unable to answer all of the questions submitted to them under

---

[30] The second special issue is used in cases where the jury has found a defendant guilty under the law of parties. TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(2). In Harris's case the jury was only given the first and third special issues. (66 RR at 24-25.)

104

these guidelines, the court shall sentence the defendant to life without parole. TEX. CODE CRIM. PROC. art. 37.071, § 2(g).

However, the jury is statutorily misinformed about the full impact of the way it answers these special issues. The jury is instructed that it cannot answer "Yes" to either of the first two special issues without unanimous agreement and that it cannot answer "No" to those questions unless at least ten jurors agree. TEX. CODE CRIM. PROC. art. 37.071, § 2(d)(2). Similarly, the jury is to be instructed that it may not answer "No" to the third special issue without unanimous agreement and that it may only answer "Yes" if at least ten or more jurors agree. TEX. CODE CRIM. PROC. art. 37.071, § 2(f)(2). The jury is informed by the judge that if the jury unanimously finds a mitigating circumstance under the third special issue, the defendant will be sentenced to life without parole. TEX. CODE CRIM. PROC. art. 37.071, § 2(e)(2). Yet, the jury is not instructed about, and indeed is prohibited from being informed of, the effect of failure to agree on any of the questions submitted to them, which also renders a life without parole sentence. TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1).

Despite objections from defense counsel that this statutory "10-12 Rule" would mislead the jury, the trial court instructed the jury in accordance with the statute. Indeed, post-conviction investigation has revealed that at least one juror at Harris's trial believed that the mitigation evidence presented on Harris's behalf warranted a sentence of life without parole rather than death. However, because she believed that the jury's decision needed to be unanimous and she could not change the minds of the other jurors, she changed her vote—even though she still believed that there was sufficient evidence to mitigate against a death verdict. Following deliberations, the jury returned unanimous answers of "Yes" to the continuing threat question and "No" to the mitigating circumstances question. (66 RR at 103-04.)

105

Because this statutory scheme misinforms the jury and brings outside considerations that impermissibly bear on the jury's verdict, the Texas statute violates the principles of the Eighth and Fourteenth Amendments, depriving Harris of a fair sentencing trial.

## A. As Applied to Harris's Jury, the "10-12 Rule" Unconstitutionally Impaired a Juror's Ability to Answer Special Issue Three

The Court of Criminal Appeals has held that a juror's free exercise of his or her own judgment of the merits of each case should not be inhibited by statute or jury instruction. *Draughon v. State*, 831 S.W.2d 331, 338 (Tex. Crim. App. 1992) (citing *Mills v. Maryland*, 486 U.S. 367 (1988)). Further, the court in *Draughon* specifically recognized that this is a danger of the "10-12 Rule" and the statutory prohibition of informing the jurors of the true effect of a hung jury. *Id.* That is, the court determined that "the danger that jurors, unaware of the operation of the law, might mistakenly think a sentence other than death to be impossible unless ten of them agree" was constitutionally suspect. *Id.* In an effort to minimize this danger, the court stated that "no juror would be misled" into thinking a vote for death should be given unless ten or more jurors agreed to a life sentence. *Id.*

Yet this scenario—which the CCA believed would never occur in practice— actually occurred here. Juror Mackey participated in deliberations at both the guilt and punishment phases of Harris's trial. (Ex. 14 at ¶2 [Aff. of Juror Mackey].) After hearing punishment phase testimony proffered by the State and the defense, Juror Mackey believed that "there were several mitigating circumstances which warranted a sentence of life imprisonment without the possibility of parole" rather than a death sentence. (*Id.* at ¶4.) Specifically, Juror Mackey thought that Harris's age, drug use, lack of intervention and family influences were persuasive mitigating factors favoring a life sentence. (*Id.*) Juror Mackey has stated that at

106

least two other jurors, Juror Lagrone and Juror Hawkins, likewise initially favored a life sentence during deliberations. (*Id.* at ¶9.)

However, Juror Mackey could not persuade other jurors to vote against the death penalty. (Ex. 14 at ¶¶5, 10 [Aff. of Juror Mackey].) The jury foreman, Juror Golz, pushed for the jury's vote to be unanimous. (*Id.* at ¶11.) Additionally, the jury specifically discussed during punishment phase deliberations whether a non-unanimous verdict would result in a mistrial. (*Id.* at ¶8.) According to Juror Mackey, at least one other juror expressed belief during that conversation that Harris would "get off" if the jury did not reach a unanimous verdict. (*Id.*) The jury even attempted to obtain clarification of this point from the court by sending the question to the judge. (*Id.*; *see also* 66 RR at 98; 2 CR at 692.) In response, the court merely requested that the jury continue to deliberate, indicating to the jury that the judge "could not answer our question." (Ex. 14 at ¶8 [Aff. of Juror Mackey]; *see also* 66 RR 98; 2 CR 692.)

As deliberations progressed, the three jurors who initially voted for life— including Juror Mackey—eventually changed their votes. (Ex. 14 at ¶9 [Aff. of Juror Mackey].) Juror Lagrone did so after further discussing the language of the instructions. (*Id.*) Juror Hawkins held out the longest even though she "seemed very opposed to giving the death penalty" and changed her vote, in Juror Mackey's opinion, "so that everyone could go home." (*Id.*)

According to Juror Mackey, she eventually changed her vote because she could not convince the other jurors to give "any weight" to her position that mitigating circumstances favored a life sentence and she "could not convince anyone else to vote for life" to get the unanimous vote Juror Golz wanted (Ex. 14 at ¶¶10, 11 [Aff. of Juror Mackey].) Although Juror Mackey would have continued to deliberate, she "did not feel there were any options left." (*Id.* at ¶11.)

107

She believed then and still believes that "there were sufficient mitigating circumstances to give Mr. Harris a life sentence." (*Id.* at ¶12.)

Juror Mackey's ability to exercise her individual judgment was impaired by the fraudulent statutorily-mandated jury instruction that deliberately misstate the realities of the capital sentencing scheme in Texas. Based on the jury's apparent understanding of the court's instructions, Juror Mackey would have needed to convince at least nine of her fellow jurors to answer a special issue in favor of a life sentence to end the deliberative process. However, accomplishing this was an impossible task, according to Juror Mackey. Consequently, Juror Mackey turned to other considerations to resolve the impasse in the jury room.

As demonstrated by Juror Mackey, the "10-12 Rule" encourages the consideration of impermissible outside influences during jury deliberations. By misleading jurors as to the result of their failure to reach a unanimous or ten vote agreement, the statute improperly coerces juries into death sentences on the basis of stimuli divorced from the merits of the case.

It is a classic and common feature of American jurisprudence that when a jury is unable to agree a mistrial may be declared and a new trial held. *Arizona v. Washington*, 434 U.S. 497, 509 (1978); *Downum v. United States*, 372 U.S. 734, 736 (1963). Yet this option is so costly and cumbersome, the law presumes that jurors should enter deliberations able to be swayed in their opinion in order to reach a verdict. *Allen v. United States*, 164 U.S. 492, 501 (1896). A reasonable juror should feel the weight of the instructions from the trial court and attempt to avoid reaching an impasse.

This concern over having a mistrial understandably rises to new heights in a capital case. Unlike nearly all other cases, the constitutionally required procedures and safeguards that take place in a capital trial create an atmosphere in which a juror is keenly aware of the expense and care being taken. In this setting, a

108

reasonable juror would understandably be loath to be the cause of a mistrial by failing to reach a verdict. The jurors are then instructed that they must reach a unanimous (or ten person) vote in order to answer the special issues in the punishment phase. Yet, unlike any trials that a juror might be generally familiar with, under Texas law a verdict will be reached if the jury fails to answer the special issues during the punishment phase. The law's desire for unanimity no longer operates.

By intentionally failing to instruct the jury that a sentence of life without parole will result, even if the jury fails to reach an agreement on any of the special issues, the statute misleads jurors about the effects of their vote. A reasonable juror could, therefore, labor under the impression that a failure to reach an agreement with the other eleven jurors would result in a costly re-trial. Instead of operating as an intended incentive to reach a verdict, in a capital case the "10-12 Rule" creates an outside influence on a juror's deliberation and vote, as it did here.

Juror Mackey's ultimate capitulation to the death sentence given to Harris was not the result of careful deliberation that changed her answer to the special issues; rather, it was the result of her very reasonable misunderstanding that unanimity was required in capital sentencing. Because the Texas capital sentencing instructions resulted in an unconstitutional deliberative process in Harris's case, his death sentence should be vacated.

## B. The Supreme Court Has Invalidated Jury Instructions That Place an Added Burden on the Sentencer Before Finding Mitigating Circumstances

In *Mills*, the Supreme Court considered a capital sentencing scheme that required jurors to unanimously agree on mitigating factors. *Mills*, 486 U.S. 367. In the state of Maryland, the capital sentencing jury proceeded through three sections of a verdict form. In Section I, the jury was asked to evaluate whether any

of ten aggravating factors was present. *Id.* at 385-86. If the jury unanimously found at least one aggravating factor, it was instructed to move on to Section II, where it was instructed to mark "Yes" next to any mitigating factors it unanimously found. *Id.* at 386-88. The jury was only instructed to move on to Section III if one of more of the mitigating factors in Section II had been marked "Yes."[31] *Id.* at 388. If all the mitigating factors in Section II were marked "No," the defendant was sentenced to death. *Id.* at 389.

In assessing the constitutionality of this sentencing scheme, the *Mills* Court noted that "in a capital case 'the sentencer [may] not be precluded from considering, *as a mitigating factor*, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence of less than death.'" *Id.* at 374 (alteration and emphasis in original) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion))). The *Mills* Court held that the Maryland capital sentencing scheme was unconstitutional because a reasonable jury could have interpreted the jury instructions and the accompanying verdict form as requiring that the jury should mark "No" next to a mitigating factor unless the jurors were unanimous, even if all but one of the jurors thought that factor was present. *See id.* at 378-79, 384. Given this potential interpretation by a reasonable juror, there was an unacceptable risk that the jury could be prevented from reaching the balancing stage even if all twelve jurors believed that some mitigating circumstance was present but could not agree on a particular mitigating factor. *Id.* at 384 ("[T]he sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and

---

[31] In Section III, jurors were asked to balance the mitigating circumstances marked "Yes" in Section II against the aggravating circumstances marked "Yes" in Section I. *Id.* at 388-89.

consequently require the jury to impose the death penalty, is one we dare not risk.").

Similarly, in *McKoy v. North Carolina* the Supreme Court examined a North Carolina capital sentencing scheme that burdened the ability of a jury to reach a life sentence. 494 U.S. 433 (1990). In that case, the requirement that the jury find the presence of an individual mitigating factor unanimously was explicit in the statute. *Id.* at 435. Because the unanimity "requirement prevent[ed] the jury from considering, in deciding whether to impose the death penalty, any mitigating factor that the jury does not unanimously find," the North Carolina statute violated the Eighth and Fourteenth Amendments "by preventing the sentencer from considering all mitigating evidence." *Id.*

## C. Conclusion

Though the CCA has upheld prior constitutional challenges to the "10-12 Rule," these rulings were predicated on the notion that capital jurors would not be misled by the instructions required by the statute. *See Draughon*, 831 S.W.2d at 338. But the deliberations that occurred during the punishment phase of Harris's trial are a clear example of the potential hazard of the "10-12 Rule" that was dismissed by the CCA. Here, the jury was clearly unsure of the effect of a non-unanimous vote on the special issue questions, as evidenced by the jury's questions to the court seeking clarification. (Ex. 14 at ¶8 [Aff. of Juror Mackey]; *see also* 66 RR 98; 2 CR 692.) Further, at least one juror voiced the position that a non-unanimous vote would cause a mistrial. (Ex. 14 at ¶8 [Aff. of Mackey].) The jury's general confusion about the jury instruction coupled with the jury foreman's push for a unanimous vote resulted in Juror Mackey capitulating to the jury's ultimate decision, even though she believed mitigation evidence supported a life sentence. (*Id.* at ¶¶10, 11.) Thus, the "10-12 Rule" unconstitutionally violated Harris's due process rights to a fair, impartial trial, as well as his Eighth

111

against an arbitrarily imposed punishment. As such, Harris's death sentence should be vacated.[32]

# IV.

## PRAYER FOR RELIEF

WHEREFORE, Roderick Harris respectfully requests that this Court:

1. Order an evidentiary hearing for the purpose of examining the merits of his claims;

2. Vacate his death sentence and conviction of capital murder;

3. Grant any other relief that the law or justice may require.

Respectfully submitted,

DATED: June 11, 2014

By_____
Sam Farina-Henry
Post-Conviction Attorney

By_____
Ryan Carlyle Kent
Post-Conviction Attorney

---

[32] For purposes of preservation, Harris further asserts that Article 37.071 is facially unconstitutional due to the improper inhibitive effects the "10-12 Rule" has on jury deliberations and the statutorily-mandated false sentencing instructions regarding the number of votes that will result in a sentence of life imprisonment without parole. Because the Texas capital sentencing statute is facially unconstitutional, Harris's death sentence should be vacated.

112

STATE OF TEXAS                    §
COUNTY OF DALLAS                  §

VERIFICATION

      BEFORE ME, the undersigned authority, on this day personally appeared Sam Farina-Henry, who upon being duly sworn by me testified as follows:

1.     I am a member of the State Bar of Texas.

2.     I am the duly authorized attorney for Roderick Harris, having the authority to prepare and to verify Mr. Harris's Application for Post-Conviction Writ of Habeas Corpus.

3.     I have prepared and have read the foregoing Application for Post-Conviction Writ of Habeas Corpus, and I believe all allegations in it to be true.

                       Sam Farina-Henry

SUBSCRIBED AND SWORN TO BEFORE ME on this 11th day of June, 2014.

JEREMY SCHEPERS
Notary Public, State of Texas
My Commission Expires
MARCH 20, 2017

Notary without Bond

                       Notary Public, State of Texas

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Application for Writ of Habeas Corpus by hand to:

District Clerk, Writ Desk
Frank Crowley Courts Building
133 N. Riverfront Boulevard
Lock Box 12
Dallas, TX 75207
(Original and one copy, via mail)

Judge Michael R. Snipes
Criminal District Court No. 7
Frank Crowley Courts Building
133 N. Riverfront Boulevard
Lock Box 54
Dallas, TX 75207
(One courtesy copy, via mail)

Dallas County District Attorney
Frank Crowley Courts Building
133 N. Riverfront Boulevard
Lock Box 19
Dallas, TX 75207
(One copy, by hand; one copy, by e-mail)

Roderick Harris
Polunsky Unit #999573
3872 FM 350 South
Livingston, Texas 77351
(One copy, by hand)

This certification is executed on June 11, 2014, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Sam Fariña-Henry

114

# EXHIBIT B

## Order Designating Issues for an 11.071 Hearing

EX PARTE                          §          2015 JAN 20 PH 3:05 In the Criminal District

RODERICK HARRIS                   §                 Court No. 7 of

                                  §                 Dallas County, Texas

                                  §          DISTRICT CLERK

                                                          DALLAS CO. TEXAS

                                             _____DEPUTY

## STATE'S PROPOSED
## ORDER DESIGNATING ISSUES FOR AN 11.071 HEARING

A jury convicted Applicant Roderick Harris of capital murder for the murder of Alfredo Gallardo in the course of a home-invasion robbery. Pursuant to the jury's answers to the special issues, the Court sentenced Harris to death on May 21, 2012. Harris filed an Application for Writ of Habeas Corpus in this Court on June 11, 2014, and the State filed its answer on December 10, 2014.

Having reviewed Harris's application and the State's answer, and pursuant to Article 11.071, Section 9 of the Code of Criminal Procedure, this Court determines that controverted, unresolved factual issues exist regarding issues designated as Claims One through Five in Harris's application for writ of habeas corpus, as follows.

> (1) Whether Harris's trial counsel provided ineffective assistance for not sufficiently investigating and presenting punishment phase evidence that he allegedly suffered from fetal alcohol spectrum disorder and was exposed to toxic levels of lead as a child; and further, whether counsel should have presented additional expert testimony to explain the mitigating impact of his life history.

1

(2) Whether trial counsel was ineffective in the punishment phase for not offering into evidence gang expert testimony to rebut the State's evidence of Harris's involvement in a West Dallas street gang.

(3) Whether Harris's trial counsel was ineffective for not objecting to evidence in the punishment phase that Harris wore a restraint device while being transported in a courthouse elevator during jury selection.

(4) Whether Harris's trial counsel was ineffective and Harris was denied due process when trial counsel did not object during the guilt/innocence phase to the admission of autopsy photos and the medical examiner's testimony regarding the death of Carlos Gallardo (the brother of the complainant).

(5) Whether Harris's trial counsel was ineffective and Harris was denied due process when counsel did not raise guilt/innocence phase complaints about the admission of (a) crime scene photographs and testimony by police officers regarding their attempts to save Alfredo Gallardo's life at the scene, (b) police officers' testimony that Harris shot at the officers when he exited the Gallardo family's trailer, (c) evidence seized from Harris's vehicle, which authorities found parked in the driveway next door, and (d) a jail book-in sheet which identified Harris's vehicle.

Therefore, the Court designates the issues above numbered one through five as issues upon which it will receive evidence at a hearing to be scheduled at a date agreed to by the Court and the parties.

BY THE FOLLOWING SIGNATURE, THE TRIAL COURT HEREBY ADOPTS THE ABOVE PROPOSED ORDER.

Signed the ___6th___ day of ___Feb.___, 2015.

_____
Judge Elizabeth Frizell
Criminal District Court No. 7

2

## EXHIBIT C

**Trial Court's Amended Order on State's Motion for Disclosure of Roderick Harris's Trial Files Issued April 24, 2015**

# IN CRIMINAL DISTRICT COURT 7
## DALLAS COUNTY, TEXAS

EX PARTE )(

Roderick Harris )(

APPLICANT )(

Cause No.
F09-00409-Y(A)

## AMENDED ORDER ON STATE'S MOTION FOR DISCLOSURE
## OF RODERICK HARRIS'S TRIAL FILES

The Court **GRANTS** the State's Motion for Disclosure of Roderick Harris's Trial Files. The Defendant's Appellate Counsel shall disclose only the parts of the Defendant's files that are relevant to ineffective assistance of Counsel. The relevant portions of the Defendant's files are to be provided to the State via electronic copy by May 1, 2015, along with a privilege log describing and categorizing any non-responsive items.

_____

Elizabeth Frizell
Presiding Judge
Criminal District Court 7